JUDGE ABRAMS

26 CV 00558

SDNY PRO SE 2026 JAN 21 PM 6:06

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
**Lyudmila Syrochkina**
147 W 230 St #1F Bronx, NY 10463
929-501-2006Pro Se Plaintiff
v.
**NYU Langone Health (Dr. Kolbes, Compliance: Acosta),**
**Jacobi Hospital (RN Ofoma, PA Makina),**
**NYPD 50th Precinct (Officer Sharhan),**
**New York State Homes & Community Renewal (HCR – Peter Stecker, Jessica Moran),**
**David Tennenbaum**Defendants

# CIVIL RIGHTS COMPLAINT

42 U.S.C. §1983 – **Violation of 4th & 14th Amendments, ADA, FHA**
**Emergency Relief Requested: Temporary Restraining Order (TRO) – Imminent Homelessness and Threat of Civil Death**

# I. PRELIMINARY STATEMENT

1. Plaintiff is a 70-year-old woman with documented disabilities, including **Autism Spectrum Disorder (ASD)** and **Selective Mutism (SM)**. She has been a resident of a rent-stabilized apartment for 27 years, enrolled in the Senior Citizen Rent Increase Exemption (SCRIE) program.
2. Defendants coordinated a campaign to remove Plaintiff from her home and strip her legal and civil capacity, constituting **"civil death"**. This campaign included illegal housing actions, falsified medical records, police misconduct, and abuse of state agencies.
3. Plaintiff brings this action under **42 U.S.C. §1983**, the **Fourth Amendment** (unlawful seizure and false arrest), the **Fourteenth Amendment** (due process and equal protection violations), the **Americans with Disabilities Act (ADA)**, and the **Fair Housing Act (FHA)**.

# II. JURISDICTION AND VENUE

1. Jurisdiction is proper under 28 U.S.C. §1331 (federal question) and §1343 (civil rights).
2. Venue is proper in the Southern District of New York under 28 U.S.C. §1391 because the events occurred in the Bronx, New York, and Defendants are located or operate in this district.

# III. PARTIES

1. **Plaintiff:** Lyudmila Syrochkina, 70-year-old neurodivergent woman, resident at 147 W 230 St #1F, Bronx, NY.
2. **Defendant Tennenbaum:** Landlord, previously sanctioned for illegal rent overcharges with illegal riders (2020, 2023).
3. **NYU Langone Health:** Medical provider; Jonathan P Kobles, MD and Compliance officer A. **Acosta** altered/denied amend (without explaining reason for denial) EMRs, including falsified psychiatric diagnoses.
4. **Jacobi Hospital North central Bronx :** RN **Ofoma** administered medication without consent, created false EMR entries, and ignored medical clearance by LMSW **Essorg** and Dr. **Gonzales**. PA Makina replied to plaintiff words about enforced medication without consent and detaining after clearing and discharging and denying transfer to medical floor: "You already sued your landlord, so now will stay here, once you are here, you are staying here.' ( was said to plaintiff in Russian)
5. **NYPD 50th Precinct:** Officer **Sharhan** entered Plaintiff's home without warrant, used excessive force, handcuffed Plaintiff, and dehumanized (forbid using restroom and to wear shoes pushed barefoot out of home.
6. **HCR:** Peter **Stecker** illegally closed compliance case DKT# MN-610001-NC; Jessica **Moran** falsified compliance statements and blocked enforcement.

# IV. FACTUAL ALLEGATIONS

## A. HCR Closure and Trigger for Retaliation

1. On **July 17, 2025,** HCR attorney **Stecker** closed Plaintiff's compliance case despite **admitting landlord noncompliance**. This illegal closure removed Plaintiff's protection and triggered retaliatory actions.
2. Immediately thereafter, **Tennenbaum** initiated a coordinated campaign to impose "civil death," aiming to remove Plaintiff from her home and life entirely.

## B. Weaponization of Medical Records and EMRs

1. **Jacobi Hospital (RN Ofoma):**
   - Created an "evaluation" entry that did **not occur**.
   - Administered unknown medications repeatedly without consent during hypertensive crisis (BP 234 systolic was ignored and not registered ).
   - Ignored clearance from LMSW **Essorg** and Dr. **Gonzales**.

2. **NYU Langone Health (Dr. Kolbes, Acosta):**
    - EMR entries changed in content and page count without amendment marks.
    - Deleted accurate notes about Tennenbaum's harassment.
    - Added false psychiatric diagnoses ("psychosis," "delusions") to justify eviction and involuntary commitment.
3. EMR falsifications were coordinated with state and municipal agencies, creating a **legal record of "civil death"**intended to prevent Plaintiff from defending housing rights, working, or appearing in court.

## C. Police Misconduct

1. On **August 4, 2025,** Officer **Sharhan** entered Plaintiff's apartment **without a warrant,** citing a false Manhattan DA investigation.
2. Plaintiff was handcuffed barefoot, forced to the floor, and denied restroom access.
3. These actions were based on **spoofed calls** and falsified medical records, including the claim she "called too many times to DA Manhattan," which Plaintiff **did not make** (witness and alibi confirmation: Taya Shumerina, NJ, Aug 4, 2025).

## D. Housing Retaliation

1. Tennenbaum previously lost an eviction via **forged lease** (03/26/2022), and overcharge case (11/28/2023).
2. After HCR closure, Tennenbaum used multiple agencies to pressure Plaintiff, including:
    - Fake APS wellness checks
    - Interference with Home Care services
    - Two attempted lockouts
    - USPS mail interception and forged certified receipts
3. HCR staff (Moran, Stecker) **falsely claimed "full compliance"** while ignoring locksmith affidavits and submitted evidence of lock tampering.

## E. Independent Forensic Evaluation

1. **Dr. John Wilson, MD** performed forensic evaluation:
    - Confirmed Plaintiff has **ASD and SM,** medically stable
    - EMR entries do **not support involuntary commitment**
    - Confirmed the coordinated abuse of Article 9 and use of medical records to fabricate risk

## F. Civil Death – Loss of Legal, Housing, and Civil Rights

1. Defendants' coordinated actions constitute **civil death**, stripping Plaintiff of:
   - Legal capacity to defend tenancy
   - Right to work and maintain autonomy
   - Ability to access courts, housing, and medical care
2. Threats are ongoing, with **December 14, 2025 APS letter** threatening involuntary commitment.

## G. EMR Audit and Preservation Requests

Plaintiff requests immediate court order for:

1. **EMR audit logs** from NYU Langone and Jacobi for all entries 01/01/2025 – present.
2. Preservation of all emails and electronic records (ProtonMail/Tutanota) used in coordination.
3. Forensic review of deleted, altered, or backfilled EMR entries to document falsifications.
4. Blocking Defendants from further access to Plaintiff's electronic and physical records pending review.

## V. CLAIMS FOR RELIEF

1. **42 U.S.C. §1983 – Fourth Amendment:** Unlawful seizure, warrantless entry, and medical interference.
2. **42 U.S.C. §1983 – Fourteenth Amendment:** Due process violation, equal protection violation, deprivation of civil rights ("civil death").
3. **ADA / FHA Violations:** Failure to accommodate Plaintiff's ASD and SM in medical, housing, and law enforcement interactions.
4. **Injunctive Relief:** Immediate TRO to prevent eviction, medical abuse, and further civil death.

## VI. RELIEF REQUESTED

Plaintiff respectfully requests that the Court:

1. Issue an **Emergency Temporary Restraining Order** preventing eviction or involuntary hospitalization.

2. Order **HCR to reopen compliance case** and enforce rent registration and housing protections.
3. Direct **NYU Langone and Jacobi Hospital** to preserve, audit, and correct EMRs.
4. Block Defendants from interfering with Plaintiff's mail, email, or communications pending review.
5. Any additional relief the Court deems just and proper.

## VII. ATTACHMENTS

A. HCR 10/22/25 closure letter
B. HCR $2,000 stipulation
C. HIPAA Statement of Disagreement
D. Police photo
E. Locksmith affirmation
F. USPS mail interference confirmation
G. Witness alibi statement (Taya Shumerina)
H. Dr. Wilson MD forensic evaluation + Letter of Medical Necessity

**Executed:** January 21, 2026/s/ **Lyudmila Syrochkina**Plaintiff Pro Se



NEW YORK STATE OF OPPORTUNITY. | Homes and Community Renewal

KATHY HOCHUL
Governor

RUTHANNE VISNAUSKAS
Commissioner/CEO

July 17, 2025

147 W 230 LLC
20 South Broadway, Ste. 300
Yonkers, New York 10701

LYUDMILA SYROCHKINA
P.O. Box 8288
New York, New York 10116

**DKT# MN-610001-NC**

Dear Parties:

Please be advised that the above-referenced compliance proceeding has resulted in the issuance of a Commissioner's Order following a stipulation of settlement imposing a civil penalty for non-compliance with the underlying order. Accordingly, this matter is hereby closed.

The civil penalty has been paid. However, the amended registrations required by the underlying order and agreed-to as part of the stipulation have not been filed to date. A prior submission by the landlord was noncompliant with the directives in Order KO-610012-R. Landlord is advised that an ongoing failure to file these amendments could form the basis for a future noncompliance proceeding upon application by the tenant that would, if appropriate, lead to increased penalties due under the NYS Rent Stabilization Law & Code.

Very truly yours,

Peter M. Stecker, Esq.
Compliance Unit

State of New York
Division of Housing and Community Renewal
Office of Rent Administration
Web Site: www.hcr.ny.gov

Gertz Plaza
92-31 Union Hall Street
Jamaica, NY 11433
(833) 499-0343

Docket Number
KO 610012 R
Issue Date
11/29/2023

# ORDER GRANTING APPLICATION

**Mailing Address of Tenant:**

Lyudmila Syrochkina
Po Box 118
Bronx NY 10463

**Mailing Address of Owner:**

147 West 230 Llc
20 South Broadway
Suite 300
Yonkers NY 10701

**Subject Housing Accommodation:**

Apt. No: 1F
147 W 230th St
Bronx NY 10463

After consideration of all the evidence in the record, the Rent Administrator finds that:

On March 07, 2022, the tenant filed a rent overcharge complaint stating that the owner failed to register the apartment and charged illegal fees and/or surcharges.

The tenant filed a Rent Overcharge complaint under docket no. KO610012R and a Lease Violation complaint under docket no. K0610101RV which has been consolidated into this proceeding. The issues raised are being addressed herein.

The base date of an overcharge proceeding is the date six years prior to the filing date of the complaint. In the instant proceeding, the case was filed on March 07, 2022. The base date is March 07, 2016.

The legal regulated rent is being established at $1,640.69. The owner is directed that all subsequent legal regulated rent increases must be based on $1,640.69.

The preferential amount for this tenant is established at $1418.34. The owner is directed that all subsequent preferential rent increases for the tenant must be based on $1418.34.

The tenant is advised that the apartment has been registered from 2016, the first reviewable registration year to the present.

Regarding the tenant's complaint that the owner refuses to renew the lease and failed to furnish a signed copy of the

To: LYUDMILA SYROCHKINA
11 FORT GEORGE HILL
APT 2H
NEW YORK NY 10040

State of New York
Division of Housing and Community Renewal
Office of Rent Administration
Web Site: www.hcr.ny.gov

Gertz Plaza
92-31 Union Hall Street
Jamaica, NY 11433
(833) 499-0343

Docket Number
KO 610012 R
Issue Date
11/29/2023

# ORDER GRANTING APPLICATION

lease renewal.

The evidence in the record shows that the tenant signed a copy of the renewal lease on 10/22/19 for the period of 1/1/20-12/31/22.
The evidence in the record shows that the owner offered the tenant a late lease offer which was signed on 03/16/22. The rent increase is collectible after July.

The owner is directed to reflect the findings and determinations made in this Order on all future registration statements, citing this order as the basis for the change. The owner is also directed to amend, within 60 days of the issuance of this order, all registrations already on file for the subject apartment for years commencing after the base date for this proceeding to reflect the findings and determinations made in this order. However, in the event that the owner or tenant files a Petition for Administrative Review (PAR) against this order, no amended registrations should be filed until an Order is issued deciding the PAR.

Therefore, this proceeding is terminated.

Jerry M. Scher
Rent Administrator Issued: 11/29/2023

Attachment(s): Rent Calculation Chart

cc: LYUDMILA SYROCHKINA
DENALI MANAGEMENT
P K S REALTY L.P.
VALENTINA

State of New York
Division of Housing and Community Renewal
Office of Rent Administration
Gertz Plaza
92-31 Union Hall Street
Jamaica, NY 11433
Web Site: www.hcr.ny.gov

## Notice of Right to Administrative Review

This Notice explains your right to appeal, seeking review of orders issued by a Rent Administrator. If you believe that an order is based on an error of law and/or fact, as an aggrieved party you have the right to ask the Division of Housing and Community Renewal (DHCR) to review the order based on your claim of error. This request is called a Petition for Administrative Review, and is referred to as a PAR. If you wish to file a PAR, please read the information and instructions below and follow them carefully. Further details may be found in the instructions printed on the reverse side of the form used for filing a PAR.

**Who may File a PAR:**

An owner, tenant, or other party affected by an order, or an authorized representative of such person(s), may file a PAR. Two or more affected owners or tenants may join in filing a PAR. The DHCR encourages joint filings by affected parties filing on common grounds.

**How to File a PAR:**

1. Use the correct form. PARs must be filed in duplicate using DHCR form RAR-2, in accordance with the instructions on the form. PARs filed on other forms or by letter will not be accepted.

2. You must attach a complete copy of the order which you are appealing to the original of your PAR.

**Time Limit for Filing a PAR:**

The PAR must be hand-delivered or mailed to DHCR at Gertz Plaza, 92-31 Union Hall Street, Jamaica, New York 11433.

1. If the PAR is hand delivered, it must be received **no later than 35 days after the date the order was issued.** The date issued usually appears in the upper right-hand corner of the order.

2. If the PAR is mailed, it must be postmarked **no later than 35 days after the date the order was issued.** If you use a private postage meter and the envelope does not have an official U.S. Postal Service Postmark, the PAR must be received by the DHCR office **not later than 35 days after the order's issuance date,** or you will be required to submit other adequate proof (such as an official Postal Service receipt or certificate of mailing) that the PAR was mailed within the 35-day limit.

**PARs filed after the time limit will be considered untimely and will be dismissed.**

**How to Obtain the PAR Form:**

You may request the PAR form RAR-2 by coming to any DHCR Rent Office listed below or to the Office of Rent Administration's main office at Gertz Plaza, 92-31 Union Hall Street, Jamaica, New York 11433. You may also request that the form be mailed to you by calling (833) 499-0343. The form is also available on the website listed above. Please note that any delay resulting from mailed delivery of the form to you does not extend the time limit for filing the PAR.

**DHCR Rent Offices**

**Lower Manhattan**
25 Beaver St.
5th Floor
New York, NY 10004

**Upper Manhattan**
163 West 125th St.
5th Floor
New York, NY 10027

**Brooklyn**
55 Hanson Place
6th Floor
Brooklyn, NY 11217

**Bronx**
1 Fordham Plaza
4th Floor
Bronx, NY 10458

**Queens**
92-31 Union Hall St.
6th Floor
Jamaica, NY 11433

**Westchester County**
75 South Broadway
3rd Floor
White Plains, NY 10601

CALCULATION CHART

CHART DESCRIPTION : THIS CHART DETAILS ALL CHANGES THAT OCCURRED IN THE CALCULATION OF THE LEGAL REGULATED RENT AND THE COLLECTIBLE RENT FOR YOUR APARTMENT. THESE CHANGES MAY REFLECT INCREASES SUCH AS GUIDELINE, MAJOR CAPITAL IMPROVEMENTS, INDIVIDUAL APARTMENT IMPROVEMENTS, 421-A, AND OTHER SURCHARGES OR THEY MAY REFLECT DECREASES FOR SERVICE REDUCTION ORDERS OR REGISTRATION FREEZES. IN ADDITION, THE CHART WILL REFLECT THE CALCULATED OVERCHARGE AMOUNTS AND PENALTIES IF APPLICABLE.

DEFINITION OF TERMS :

| | |
|---|---|
| LRR | - THE LEGAL REGULATED RENT AS ADJUSTED IN ACCORDANCE WITH THE RENT STABILIZATION CODE. |
| CR | - THE COLLECTIBLE RENT, OR THE AMOUNT OF RENT AN OWNER IS ENTITLED TO COLLECT, MAY BE DIFFERENT FROM THE LRR BECAUSE OF TEMPORARY CHARGES, ADJUSTMENTS AND FREEZES. |
| BASE LRR | - THE LEGAL REGULATED RENT USED AT THE START OF THE CALCULATIONS. |
| BASE CR | - THE COLLECTIBLE RENT USED AT THE START OF CALCULATIONS. |
| GUIDELINE INCREASES | - THE RENT GUIDELINE BOARD'S ANNUAL RATE OF ADJUSTMENTS FOR EACH LEASE TERM IS CALCULATED ABOVE THE LEGAL REGULATED RENT, OR THE GROSS RENT FOR CALCULATION IF AN MCI WAS GRANTED, IN EFFECT ON THE DAY PRIOR TO THE EFFECTIVE DATE OF THE APPLICABLE RENT GUIDELINE BOARD ORDER. |
| MCI | - MAJOR CAPITAL IMPROVEMENT INCREASES AS GRANTED BY DHCR. |
| IAI | - INDIVIDUAL APARTMENT IMPROVEMENT INCREASES FOR INCREASED SPACE AND SERVICES, NEW EQUIPMENT, NEW FURNITURE OR FURNISHINGS. |
| 421A | - AN INCREASE AMOUNT WHICH IS 2.2% OF THE INITIAL RENTAL AMOUNT FOR THE APARTMENT. APPLICABLE ONLY TO OWNERS WHO HAVE BEEN GRANTED A PARTIAL TAX EXEMPTION PURSUANT TO SECTION 421-A OF THE REAL PROPERTY TAX LAW. |
| WAIVER RULE | - WHEN THE OWNER FAILS TO CHARGE A RENT INCREASE, TO WHICH THE OWNER IS ENTITLED, WITHIN A REASONABLE AMOUNT OF TIME, THE OWNER IS DEEMED TO HAVE PERMANENTLY WAIVED THE INCREASE AND MAY NOT LATER COLLECT THAT INCREASE FROM THE TENANT OR ANY SUBSEQUENT TENANT. |
| OVERCHARGE AMOUNT | - THE EXCESS RENT PAID ABOVE THE COLLECTIBLE RENT. (RENT PAID - COLLECTIBLE RENT = OVERCHARGE). OVERCHARGE AMOUNT IS ONLY CALCULATED FOR THE COMPLAINING TENANT AND DOES NOT INCLUDE ANY PENALTIES AMOUNT. |
| PENALTIES AMOUNT | - TREBLE DAMAGES AND/OR INTEREST ASSESSED ON OVERCHARGES WHICH OCCURRED ON OR AFTER 4/1/84. |

NYS DIVISION OF HOUSING AND COMMUNITY RENEWAL
OFFICE OF RENT ADMINISTRATION

CALCULATION CHART

COMPLAINING TENANT(S): LYUDMILA SYROCHKINA
DOCKET NO : K0610012R
SUBJECT PREMISES : 147 W 230TH ST
BRONX, 10463
APARTMENT NUMBER : 1F

| | | |
|---|---|---|
| OVERCHARGE AMOUNT | : | 0.00 |
| TREBLE DAMAGES AMOUNT | : | 0.00 |
| INTEREST AMOUNT | : | 0.00 |
| EXCESS SECURITY AMOUNT | : | 0.00 |
| SUBTOTAL | : | 0.00 |
| - REFUND | : | 2,086.17 |
| TOTAL AMOUNT DUE TENANT | : | 0.00 |

BASE LRR : 1,542.30
BASE CR : 1,229.94

| LEASE TERM FROM / TO | RENT PAID | RENT CHANGE DATE | LRR | CR | EXPLANATION | OVERCHARGE CALCULATIONS |
|---|---|---|---|---|---|---|
| TENANT NAME(S): LYUDMILA SYROCHKINA | | | | | | |
| 01/01/2018 - 12/31/2019 | 1,360.00 | 01/01/2018 | 1,561.58 | 1,360.00 | BASE DATE <1><2><3> GUIDELINE 49 - (R2) RENT $1542.30 + 2.00% INC | |
| 01/01/2020 - 12/31/2021 | 1,293.33 | 01/01/2020 | 1,600.62 | 1,393.75 | GUIDELINE 51 - (R2) RENT $1561.58 + 2.50% INC | |
| 01/01/2022 - 08/31/2023 | 1,293.33 | 01/01/2022 | 1,640.69 | 1,393.75 | GUIDELINE 53 - (R2) RENT $1600.62 + 2.50% INC<4> | |
| | 1,350.00 | 07/01/2022 | 1,640.69 | 1,428.34 | NEW RENT PAYMENT PERIOD STARTING 07/01/2022.<5><6> | |

NYS DIVISION OF HOUSING AND COMMUNITY RENEWAL
OFFICE OF RENT ADMINISTRATION

CALCULATION CHART FOOTNOTES

DOCKET NO : K0610012R

1) THE BASE DATE FOR AN OVERCHARGE PROCEEDING IS THE DATE SIX YEARS PRIOR TO THE FILING DATE OF THE COMPLAINT. IN THE INSTANT PROCEEDING, THE CASE WAS FILED ON 03/07/2022. THE BASE DATE IS 03/07/2016.

2) THE TENANT IN THIS PROCEEDING IS A RECIPIENT OF SCRIE OR DRIE. EVIDENCE INDICATES THAT THE TENANT'S PORTION OF THE RENT IS FROZEN AT $1,350 PLUS ANY APPLICABLE SURCHARGES.

3) TENANT WAS CHARGED AND PAID A PREFERENTIAL RENT.

4) THE TENANT REMAINED IN OCCUPANCY AS A MONTH TO MONTH TENANT FROM THE PERIOD 1/01/22 TO 08/31/23 WITHOUT A VALID LEASE OR INCREASE IN RENT DUE TO THE OWNER'S LATE LEASE OFFER. THE TENANT SIGNED THE LATE LEASE RENT INCREASE OFFER, THEREFORE THE RENT INCREASE IS NOT COLLECTIBLE UNTIL AFTER JULY 2022.

5) THE EVIDENCE IN THE RECORD SHOWS THAT THE TENANT HAD AN UNPAID RENT BALANCE OF $3,167.18 AS OF 08/01/22. THE OWNER CREDITED THE TENANT A TOTAL AMOUNT OF $2,086.17: $1,171.25, $381.12, $164.39, $369.41 IN AUGUST/2022 FOR NOT APPLYING THE PREFERENTIAL RENT CREDIT TO THE TENANT'S ACCOUNT FROM 12/2021 THROUGH 03/22 TOTALLING $914.92 AND 04/2022 THROUGH 08/2022 TOTALLING $1,171.25.

6) THE RENT IS COMPUTED THROUGH 08/31/2023, WHICH IS THE LAST DATE OF PAYMENT IN THE RECORD.

**** G E N E R A L N O T E S ****

* THE TENANT HAS BEEN PAYING AN AIR CONDITIONER SURCHARGE IN THE AMOUNT OF $10.00 SINCE THE BASE DATE IN ACCORDANCE TO THE OPERATIONAL BULLETIN - 2005-1 (SUPPLEMENT NO.1). SUCH SURCHARGE SHALL NOT BECOME PART OF THE LEGAL REGULATED RENT FOR THE PURPOSE OF COMPUTING ANY GUIDELINES OR OTHER INCREASES.

* WITH REGARDS TO THE TENANT'S COMPLAINT THAT SHE WAS CHARGED ILLEGAL FEES AND/OR SURCHARGES. THERE IS NO EVIDENCE THAT THE TENANT HAS PAID OR WAS CHARGED AN ILLEGAL FEE AND/OR SURCHARGE BY THE OWNER.

* THE EVIDENCE IN THE RECORD INDICATES THAT THE OWNER HAS PROPERLY REGISTERED THE BUILDING AND THE APARTMENT WITH DHCR FOR ALL YEARS THROUGH 2022.

* THE TENANT FILED A LEASE VIOLATION COMPLAINT UNDER DOCKET NO. K0610101RV. WHICH HAS BEEN CONSOLIDATED INTO THIS PROCEEDING. THE ISSUES RAISED ARE BEING ADDRESSED HEREIN.

NEW YORK STATE OF OPPORTUNITY. | Homes and Community Renewal

KATHY HOCHUL
Governor

RUTHANNE VISNAUSKAS
Commissioner/CEO

October 22, 2025

Lyudmila Syrochkina
147 W 230th St Apt 1F
Bronx, NY 10463

Re: Enforcement Case No.: NT-610001-HI
Owner: 147 W 230 LLC; David Tennenbaum
Premises: 147 W 230th St Apt 1F, Bronx, NY 10463

Dear Ms. Syrochkina,

I write to follow up on several matters discussed in your latest email correspondences, dated October 2nd, 2025, and October 15th, 2025.

First, I wanted to provide an update for the non-compliance matter that investigated compliance with the DHCR rent registration. As you know, under Docket Number KO-610012-R, the building owner was directed to amend the DHCR rent registrations for years 2016 through 2023 and to base the future rents on the lawful rent established by said order. The building owner did not comply with the directive within the sixty days of the issuance of the order. Through Docket Number MN-610001-NC, the Enforcement Compliance Unit entered into stipulation with the building owner, whereby the building owner agreed to amend the rent registrations. Recently, the building owner has amended the registrations for the aforementioned years to reflect the overcharge order. In the event that you do not already have it, attached you will find a copy of the amended registrations and a copy of the Stipulation and Commissioner Order for Docket Number MN-610001-NC. At this time, it is unwarranted to re-open the non-compliance matter as we have achieved full compliance with the underlying overcharge order.

Second, regarding your lease renewal complaint, please note that at this time, your lease renewal complaint is being processed under Docket Number LW-610068-RV and we have requested that it be expedited.

Third, regarding the apartment door lock, during our preliminary investigation, the building owner alleges that he did not tamper or change your door lock. Please advise if there any

outstanding issues with your apartment door lock. Further, please advise if you have any concrete evidence that the building owner tampered with your lock. Without concrete evidence, there is insufficient evidence to proceed with the instant investigation. **Please mail or personally serve your supporting documents to me no later than November 7th, 2025.**

Lastly, the other issues raised in your October 2nd, 2025, and October 15th, 2025, e-mails appear more appropriate for consideration by the Attorney General's Office, Bronx District Attorney, NYS Division of Human Rights and/or NYS Office of Mental Health. If not done already, you are advised of your ability to contact these agencies directly for appropriate action.

I look forward to receiving your documentation supporting your harassment allegations.

Very truly yours,

Jessica Moran,
Enforcement Unit Staff

Certified Mail No.: 7001 0320 0004 5403 1833, 7001 0320 0004 5403 1826

To: Lyudmila Syrochkina
147 W 230th St Apt 1F
Bronx, NY 10463
(*via mail and e-mail to twerlyuba@gmail.com*)

Lyudmila Syrochkina
P.O. BOX 8288
New York NY 10116

NEW YORK STATE OF OPPORTUNITY. | Homes and Community Renewal

KATHY HOCHUL
Governor

RUTHANNE VISNAUSKAS
Commissioner/CEO

August 13, 2025

Lyudmila Syrochkina
147 W 230th St Apt 1F
Bronx, NY 10463

Re: Enforcement Case No.: NT-610001-HI
Owner: 147 W 230 LLC; David Tennenbaum
Premises: 147 W 230th St Apt 1F, Bronx, NY 10463

Dear Ms. Syrochkina,

I am glad we were able to speak on the phone on August 11th, 2025. Below, please find a summary memorializing our phone conversation. Please note, that I inadvertently sent a letter on August 12th, 2025, with erroneous dates. I've corrected this notice to include the correct dates:

> You stated that Building Owner David Tennenbaum has made death threats to you and physically assaulted you. I explained that these allegations formed the basis for opening the instant HI proceeding and the purpose of my call was to obtain more information about the alleged harassment. We agreed that you would personally serve independently verifiable documentation supporting your allegations of harassment to our Gertz Plaza address by this Friday August 15th, 2025. While I understand you would like to submit this documentation prior to Monday August 18th, 2025, if anything comes up, please mail or personally serve these documents to me no later than August 29th, 2025. As a reminder, note that §2525.5 of the Rent Stabilization Code, defines harassment as a course of conduct by any owner or any person acting on his or her behalf, directly, or indirectly (including, but not limited to, physical or verbal abuse, willful denial of services, refusal to renew leases, overcharging rent and/or multiple instances of frivolous litigation) which interferes with, or disturbs, or is intended to interfere with or disturb the privacy, comfort, peace, repose or quiet enjoyment of the tenant in his or her use or occupancy of the housing accommodations, or is intended to cause the tenant to vacate such housing accommodation or waive any right afforded under the Rent Regulatory Laws. There must be a willful interruption in services or a continuing course of conduct, as distinguished from an isolated incident. Please also see the attached Fact Sheet #17 regarding what constitutes harassment, here: https://hcr.ny.gov/fact-sheet-17 . I also suggested mailing you the DHCR Harassment

Complaint Form RA-60H, but you stated that the Building Owner is controlling your emails, phone calls and mail. The DHCR Form RA-60H is available online here: https://hcr.ny.gov/form-ra-60h or at any DHCR Public Information office. We will review any complaint you send.

You also stated that there no outstanding service (repair) issues in your apartment but that there are lease and overcharge issues. Your lease renewal issues are being investigated by open DHCR Docket No. KO-610068-RV. I advised that if you are seeking relief for any outstanding overcharge issues, you may file the HCR Form RA-89 (https://hcr.ny.gov/form-ra-89). It is noted that the prior overcharge order (Docket No. KO-610012-R) did not find that you were owed any overcharge award.

You explained that you disagree with the recent closure of DHCR Docket No. MN-610001-NC. As noted in the closure for that matter, you may file a new affirmation of noncompliance (Form RA-22.1 available here: https://hcr.ny.gov/form-ra-22.1) so that the Agency may investigate and, if appropriate, seek enhanced penalties allowed under the Rent Laws.

I also stated that I would be mailing a blank copy of the above-referenced forms to you, and I recommend you download them on your own.

I further understand that you have engaged the NYPD, the District Attorney's Office and other entities regarding the issues you are experiencing at your apartment. Please keep me posted as to any developments that occur with these various entities.

As discussed, I look forward to receiving the filled-out harassment complaint along with documentation supporting your harassment complaint.

Very truly yours,

Jessica Moran

Jessica Moran,
Enforcement Unit Staff

**Mail body:**

---

IWD: Fw: Additonal prove from USPS of tampered mail, for sent "Final Complaint to USPS Office of Inspector General (OIG)"

--

Secured with Tuta Mail:
https://tuta.com/free-email

Date: Sep 6, 2025, 13:17
From: orgconda@protonmail.com
To: almamil@tutamail.com
Subject: Fw: Additonal prove from USPS of tampered mail, for sent "Final Complaint to USPS Office of Inspector General (OIG)"

Sent with Proton Mail secure email.

------- Forwarded Message -------
From: Ori G <orgconda@protonmail.com>
Date: On Friday, June 6th, 2025 at 11:52 PM
Subject: Additonal prove from USPS of tampered mail, for sent "Final Complaint to USPS Office of Inspector General (OIG)"
To: hotline@uspsoig.gov <hotline@uspsoig.gov>

Hello,

I saw that two more emails confirming situation with tampered mail today earlier was disappeared (because i have a damaged vision); I am adding those materials now:

Copies of USPS prooving:
Lyudmila Syrochkina

Please observe emails from USPS :

From: **Sanchez, Chrystal M - New York 1 District, NY** <Chrystal.M.Sanchez@usps.gov>
Date: Fri, Feb 16, 2024 at 10:23AM
Subject: RE: [EXTERNAL] Email 5 attached Fwd: Fw: Updated situation with photo attach Re: First Contact
To: Organist Conductor <organist.conductor@gmail.com>

Good morning, Ms. Syrochkina,

I regret learning of the inconvenience you have experienced. All six of the emails you sent me last night have arrived. I've printed and reviewed the tracking histories for the certified letters and return receipts. Please review the details below, each of which will direct you to the tracking information on usps.com.

- 9589071052701042209694 – Certified Letter Mailed 9/30/2023. Processed on 10/01/2023 at the Morgan Processing Facility. No Delivery Scan. Service Request #59919235.
- 9590940275262098639414 – Return Receipt last movement 10/26/2023. Processed on 10/26/2023 at the Morgan Processing Facility. No Delivery Scan.
- 9590940275262098639360 – Return Receipt last movement 12/01/2023. Processed on 12/01/2023 at the Morgan Processing Facility. No Delivery Scan. SR #60100866 & #59920008.
- 9589071052701429208289 – Certified Letter Mailed 12/19/2023. Processed on 12/25/2023 at the Teterboro Processing Facility. No Delivery Scan.
- 9589071052701429201471 – Certified Letter Mailed 1/18/2024. Processed on 01/19/2024 at the Teterboro Processing Facility. No Delivery Scan. SR #60101145.

I was disappointed to learn your certified letter did not arrive at its destination. The postmaster of the Emerson Post Office, where PO Box 329 is situated, was consulted. Because of previous problems with accurate scanning, Postmaster Ms. Thomas stated that she herself scans every item of mail that is answerable for the entire PO Box sector.

Unfortunately, because so much time has passed since its mailing, and the search initiated by your inquiry has been unsuccessful in locating the missing item, we must reluctantly conclude that it is irretrievably lost.

It is important for me to explain that Certified Mail service does not provide for a detailed accounting of the movements of the mail as it travels through the system. Such positive tracking of individual pieces of mail is provided only for Registered Mail, Priority Mail, and Priority Mail Express and USPS Ground Advantage services.

Certified Mail provides a receipt to the mailer at the point of mailing and, upon receipt at the office of the addressee, we retain a delivery record. It is dispatched

and handled in transit as ordinary mail with no definitive tracking capability. Therefore, it is generally not possible to trace a single piece of certified mail when customers report it missing.

Certified Mail is eligible for a refund of the service fee, excluding the postage, if the mailing receipt and electronic verification have not been received after 30 days, but you know your mailpiece has been delivered. You can request a refund.

- Online at https://www.usps.com/help/refunds.htm
- At your local Post Office by:
    - Submitting the request at the local Post Office using *PS Form 3533, Application and Voucher for Refund of Postage and Fees*
    - Providing evidence of mailing and postage

Refunds are at the discretion of the local Post Office™. There is no refund for Certified Mail service if the item is undeliverable, but a delivery was attempted.

Please accept our sincere apology for any inconvenience this matter may have caused you.

Thank you in advance,

**Chrystal M. Sanchez**
Customer Relations Coordinator
New York 1 District
421 8th Avenue, New York, NY 10199

-------------

rom: **Sanchez, Chrystal M - New York 1 District, NY** <Chrystal.M.Sanchez@usps.gov>
Date: Sat, Feb 17, 2024 at 12:52 PM
Subject: RE: [EXTERNAL] mail theft continue
To: Organist Conductor <organist.conductor@gmail.com>

Good afternoon, Ms. Syrochkina,

I am aware that there are numerous perspectives to consider in your case. I can only properly address and investigate each postal concern.

I've addressed every Certified Letter Tracking Number you've given me. I've also given you an account of the conversation had with the Postmaster at Emerson, NJ. Remember, Certified Mail is dispatched and handled in transit as ordinary mail with no definitive tracking capability. Consequently, it is generally not possible to trace a single piece of certified mail when customers report it missing.

***Have you made a report to the Office of Inspector General about the Certified Letters addressed to PO Box in Emerson, NJ?***

Office of Inspector General (OIG) at: 1-866-644-5696 (available 24 hours a day).
http://www.uspsoig.gov/hotline

I also understand you've been getting mail automatically forwarded mail from your home to the James A Farley Post Office in Manhattan. Remember, when mail is being forwarded to you, you will have to wait until it is delivered. There is no estimated delivery time for forwarded mail.

***Have you changed all the mailing addresses of your important correspondence?***

You mentioned an important package coming from HCR.

***What is the tracking number?***

You mentioned getting Informed Delivery Images of your mail pieces.

***Is that mail pieces with your Home Address or PO Box Address?***

You've made serious theft accusations against Postal Employees.

***Have you made a report to the Office of Inspector General on these employees?***

Office of Inspector General (OIG) at: 1-866-644-5696 (available 24 hours a day).
http://www.uspsoig.gov/hotline

--------------

On Thu, Aug 17, 2023 at 7:51 AM, USPS Customer Support <uspscustomersupport@usps.gov> wrote:

Dear Lyudmila Syrochkina,

This is in response to your inquiry regarding your mail delivery service. I apologize for any inconvenience this may have caused you.

The local post office official went to your building to verify that there are no longer two mailboxes. We have also verified that there is a white sticker that read's "No Mail." If you would like to receive mail, please remove this sticker. If you no longer wish to receive mail, make sure to place in a change of address for the mail you wish forwarded. Otherwise, the mail going to your mailbox will be returned to sender, due to no other delivery option available.

If you have any additional questions, please give me a call at 202-313-2441 or reply to this email.

Thank you for allowing us the opportunity to respond. If you have any questions, please contact me at the telephone number below.

# Your USPS Service Request #53916937 Has Been Resolved! [ ref:_00Dj0GyYH._500BY19Hlq:ref ]

From: USPS Customer Support
uspscustomersupport@usps.gov
To: conductororganist@protonmail.com

Dear Lyudmila Syrochkina,

This is in response to your inquiry regarding your mail delivery service. I apologize for any inconvenience this may have caused you.

The local post office official went to your building to verify that there are no longer two mailboxes. We have also verified that there is a white sticker that read's "No Mail." If you would like to receive mail, please remove this sticker. If you no longer wish to receive mail, make sure to place in a change of address for the mail you wish forwarded. Otherwise, the mail going to your mailbox will be returned to sender, due to no other delivery option available.

If you have any additional questions, please give me a call at 202-313-2441 or reply to this email.

Thank you for allowing us the opportunity to respond. If you have any questions, please contact me at the telephone number below.

Sincerely,

Chrystal Sanchez

Customer Relations Coordinator

202-313-2441

***********

Your privacy is important to us. If you would like additional information on our privacy policy, please visit us online at: www.usps.com/privacypolicy.

ref:_00Dj0GyYH._500BY19Hlq:ref

NYU Langone Health

November 5, 2025

Lyudmila Syrochkina
147 W. 230th St. Apt 1F
Bronx, NY 10463

Dear Ms. Syrochkina,

We received your letter requesting amendments to your medical record on October 6, 2025. We have reviewed the letter and addressed the specific amendments outlined in accordance with NYU Langone Health's Right to Request an Amendment Policy (a copy of which is enclosed). These concerns were shared with the involved clinicians who agreed to make several corrections to your medical record. The following documentation has been updated in Epic:

Dr. Berger reviewed and amended the following entries:

- Language in Dr. Berger's clinical notes describing you as "delusive about your living situation" was removed and updated to reflect that your distress stemmed from landlord-related threats.
- Your medication history was corrected to include the medications you reported taking and to note that you declined Exforge and Crestor.
- Additional updates were made to Dr. Berger's August 19, 2025 note to include the verbal "heart blockade" assessment, replace the phrase "harassed at work" with clarification that your stress was related to your landlord, and revise the statement indicating you were "sent to the ED for suicide" to instead state that you were referred for concern.
- Your social and functional history was updated to accurately reflect your Master's degree and daily exercise routine.

Your Emergency Department psychiatry encounter was clarified to indicate that you were referred to the emergency room by Dr. Berger over safety concerns.
Dr. Jonathan Kobles reviewed and amended the documentation from your Emergency Department visit to remove the reference to "delusive about her living situation". Registered Nurse Newbold reviewed and amended the nursing documentation to reflect the following:

- A note referencing "debility" was removed;
- Another note was revised to clarify that you were discharged the same day with no home-care or transport needs.
- Related documentation under Emergency Department Case Management was also corrected to remove references suggesting that home-care services were requested or arranged.

However, your additional request to remove or modify documentation from Dr. Johnson Wilson cannot be honored, as this evaluation was not completed at NYU Langone Health and Dr. Wilson is not an NYULH provider. We recommend that you contact Dr. Wilson or his affiliated organization directly regarding that

NYU Langone Health

portion of your request. Additionally, your request to amend the psychological evaluation dated August 8, 2025, has been denied. The documentation was reviewed and determined to be accurate and complete at the time of the encounter. We have addressed all items referenced in your letter to the best of our ability, should you have concerns that any of your requests have not been addressed, please contact me and provide additional details, including the date of any notes to be amended and what specific amendment you would like made, to allow me to review further. Please note items previously reviewed will not be reconsidered.

You have the right to submit a statement explaining your disagreement with our decision to deny the requested amendment. This statement must be in writing and should be no longer than 500 words. We will include your statement any time we disclose to others the protected health information that you think should have been amended. However, we reserve the right to prepare a response to your statement of disagreement (called a rebuttal statement), which we may also include when we make future disclosures of the information that you think should have been amended. If you wish to exercise this right, please send your statement of disagreement to NYU Langone Hospital – Tisch, Health Information Management, 550 First Avenue, Lobby, New York, NY 10016. If you do not submit a statement of disagreement, you may request that we include your amendment request, and this denial notice, in any future disclosures of the information which you think should have been amended. Please find included our Right to Request an Amendment Policy, which also details this information.

We hope that you will understand the reason that we have partially denied the amendment you requested. However, if you believe that we have improperly denied your request, you may file a complaint with the New York State Department of Health, the Secretary of the Department of Health and Human Services (information on how to file a complaint is available at http://www.hhs.gov/ocr/privacy/hipaa/complaints/) or with NYU Langone Health's Privacy Officer at One Park Ave, 3rd Floor, New York, NY 10016. No one will retaliate against you for filing a complaint.

Should you have concerns or questions regarding the information in this letter, please feel free to contact me directly at (212) 404-3609 or ashley.acosta2@nyulangone.org.

Sincerely,

Ashley Acosta

Ashley Acosta
Senior Analyst, Compliance and Privacy

NYU Langone Health

# AFTER VISIT SUMMARY

**Milla Syrochkina** DoB: 2/9/1955 8/8/2025 Tisch Hospital - Perelman Emergency Department 212-263-5550
Emergency Department Follow-Up & Care Transition Center 212-263-6695

## Instructions

Your personalized instructions can be found at the end of this document.

Read the attached information
Autism, Understanding (English)

## What's Next

AUG 19 2025 Follow Up Appointment with Jeffrey Berger, MD
Tuesday August 19 4:00 PM
Arrive 15 minutes prior to appointment.
The Green Pathway is temporarily closed. Follow signage to the Schwartz East Elevators to the 5th floor. The elevators are located just past Breads Bakery.

NYU Langone Cardiology Associates
530 First Avenue
HCC 5th Floor
New York NY
10016-6402
212-263-4300

## Patient Demographics

| Address | Phone | E-mail Address |
|---|---|---|
| 147 W. 230th St. Apt 1F BRONX NY 10463-0743 | 929-501-2006 (Home) | orgconda@protonmail.com |

## Emergency Department Treatment Team

1. Jonathan P Kobles, MD
2. Andrew H O'Hagan, MD
3. Michele A Ikone, PA

## Follow Up Communication

You will be contacted by the Emergency Department (ED) Follow-up and Care Transitions Center. We want to help you with anything you may need. We will gladly help you review your discharge instructions, assist with doctor appointments or get medications you need. If you have any questions or concerns about your ED visit, please call the ED Follow-up

## Today's Visit

Diagnosis
History of Asperger's syndrome

Blood Pressure
139/78

Temperature (Oral)
98.4 °F

Pulse
76

Respiration
18

Oxygen Saturation
98%

## MyChart at NYU Langone

- Sign up for NYU Langone Health MyChart to stay connected to your care anytime and anywhere.
- You can schedule appointments, view test results, request prescription refills, send secure messages to your providers, and more.
- To enroll, download the NYU Langone Health app and select "Activate MyChart Account" on the login screen. Or you can visit https://mychart.nyulmc.org and select "Sign Up Now."
- For technical support, please call 1-866-262-6458.

# AFTER VISIT SUMMARY

NYC HEALTH+ HOSPITALS | Jacobi | North Central Bronx

**Lyudmila Syrochkina** MRN: 7386687

8/4/2025 NCB ED Psych 718-519-3030

## Instructions

You are being discharged home

Please follow up with your current provider.

If you are in crisis, please call 911 or go to your nearest ER.

## What's Next

You currently have no upcoming appointments scheduled.

## General Emergency Department Discharge Instructions

We appreciate that you chose us as your healthcare provider.

This form provides you with information about the care you received in our Emergency Department and instructions about caring for yourself after you leave the Emergency Department. If you have further questions concerning this visit please call us at the included phone number above on this form. Please keep this form and bring it with you should you need additional treatment. If your symptoms become worse or you are not improving as expected and you are unable to reach your usual health care provider, or get to your follow-up appointment, you should return to the Emergency Department immediately. We are available 24 hours a day.

*It is important that you keep appointments that may have been scheduled. If you are unable to make an appointment, please call the corresponding clinic to reschedule your appointment.*

## Instructions

**No changes were made to your medications.**

## Home Medication Information

The list of your home medications is based on the information provided by you (or your representative) during your Emergency Department visit, and/or the information contained in your medical record. In addition,

## Today's Visit

You were seen by Dr. Luis Gonzales

**Reason for Visit**
Psychiatric Evaluation

**Diagnosis**
Autism spectrum disorder

**Done Today**
DISCHARGE PATIENT

**Medications Given**
amLODIPine (NORVASC) Last given 8/4/2025 8:00 PM
metoprolol tartrate (LOPRESSOR) Last given 8/4/2025 9:59 PM

Blood Pressure 212/111
Temperature (Oral) 98.1 °F
Pulse 89
Respiration 19
Oxygen Saturation 97%

## Home Medication Information (continued)

some of your home medications **may have been changed** by the Emergency Department provider who evaluated you. These changes **may** include:

- New medications
- Changes to the amount or how often you take a medication
- Discontinuation of a medication

Please review the information below carefully. **Continue all your current medications as you are presently taking, with the exception of the following changes below. If you have questions about any of the medications or the changes, please contact your Primary Care Physician, the Provider who prescribed the medication, or your Pharmacist.**

## Changes to Your Medication List

You have not been prescribed any medications.

NYC HEALTH+ HOSPITALS | MyCHART

Stay engaged with your health with **MyChart**, a free, convenient, secure online tool. With MyChart you can...Message your doctor's office... Request refills... See test results... See your visit summaries and upcoming appointments... Pay your bill... Request financial assistance... And much more!

To sign up for MyChart, go to **mychart.nychhc.org** or scan the QR code below using your smartphone's camera, click **"Sign Up Now"**, and enter your personal **activation code**: **3JC4T-D9NJA**
**Expires: 11/2/2025 8:57 PM** Expires:

You can also call to get help signing up or using MyChart anytime: 844-920-1227

**Remember, for emergencies, always call 911- do not use MyChart.**

## Additional Information

If you, your child, or someone you know are struggling and need to speak to someone immediately, call 1-888-NYC-WELL. They can provide phone support, resources, and treatment options or request a Mobile Crisis Team. The Mobile Crisis Team serves any person in NYC who is experiencing or at risk of a psychological crisis. The Mobile Crisis Team provides urgent assessment, crisis intervention, supportive counseling, information and referrals, linkage with appropriate community based mental health services for ongoing treatment, and follow up. You can also reach out anytime (24/7) to a crisis helpline:

- The National Suicide Prevention Lifeline: Call or Text **"988"**

# Acknowledgement of Discharge Instructions

- I understand the treatment received during this visit was provided on an **emergency basis only** and is not meant to be a replacement for ongoing medical care. I also understand the information provided in these discharge instructions, **including follow up information**, should be followed in order to ensure proper ongoing treatment of my complaint/diagosis.

- A member of the Emergency Department staff has reviewed the discharge instructions provided to me and has answered any questions I may have had regarding these instructions.

Patient/Representative ______________________________

Witness ______________________________

**Lyudmila Syrochkina**
**CSN: 191205706**
**DOB:** 2/9/1955 female
**MRN: 7386687**
**Adm Date:** 8/4/2025

**2. Call to schedule an appointment.** 1-877-VAX-4NYC (1-877-829-4692)

**3. Visit one of the walk-up vaccine sites.** All NYC Health + Hospitals vaccine sites welcome walk-ins. Go to https://tinyurl.com/NYCWalkinCovidVaccine or use the QR code below on your phone:

**Important things to know before you visit us for your vaccine:**

**Bring proof of ID.** Please bring proof of your identification and date of birth. For a full list of documents that you can bring, please visit nyc.gov/covidvaccine.

**Talk to your doctor first about the vaccine if you are:**

- Pregnant or breastfeeding
- Taking strong immune system-related medicines (e.g. steroids or chemotherapy)
- Have a history of serious allergic reactions

**Reschedule if you are sick**. You will be unable to get the vaccine if you:

- Have COVID-19, or
- Are waiting for a COVID-19 test result

Please reschedule if you are not feeling well on the day of your appointment.

**Bring your health insurance card**. COVID-19 vaccines are free with no out of pocket costs to all New Yorkers regardless of insurance status. But if you have health insurance, we will bill your insurance.

**Stay protected** – Wear a face covering to your appointment. Follow social distance guidelines.

**Let's get vaccinated and fight against the pandemic together!**

Thank you for being a patient at NCB ED PSYCH today. If your prescription was sent to the internal hospital pharmacy, please keep this paper for your records and provide to the pharmacist when you arrive. Thank you again!

**Patient EMPI: 104483097 - For Internal Pharmacy Use Only**

104483097

10104483097

## Additional Information (continued)

- NYC Well counseling line at 1-888-NYC-WELL or text "WELL" to 65173

For additional resources in your area contact: Hitesite.org, or go to your local Mental Health Association of New York City Family Resource Center (www.MHAofNYC.org).

# Your Treatment Plan

The treatment you have received during your visit was provided on an **emergency basis only** and is not meant to be a replacement for ongoing medical care. The information provided in these discharge instructions, **including follow up information**, should be followed in order to ensure proper treatment of your condition.

## Don't wait any longer! Protect yourself and others against COVID-19!

NYC Health + Hospitals is committed to help New Yorkers fight the COVID-19 pandemic. One of the most powerful tools to end the COVID-19 pandemic are vaccines. By getting vaccinated, you are protecting yourself, your family, your coworkers, and your community. Being vaccinated will prevent you from:

- Getting COVID-19
- Becoming seriously ill or dying due to COVID-19
- Spreading COVID-19 to others

Once vaccinated, you will add to the number of people in the community who are protected. This will help us to reach herd immunity - when a large part of the community becomes immune (protected from) COVID-19. This makes it harder for the disease to spread.

**COVID-19 vaccines are safe, free and effective!**

NYC Health + Hospitals has been using Pfizer, Moderna and J&J vaccines. All three vaccines have been given Emergency Use Authorization (EUA) by the Food and Drug Administration (FDA) in United States. These vaccines have been carefully studied both before and after the FDA's EUA. The vaccines have shown virtually no significant or long-term problems.

In a study of more than 17 million people who received Pfizer or Moderna vaccines:

- Serious allergic reactions happened at a rate of only 2-4 per 1 million doses. This is safer than almost all medicines!

**There are many ways to get your COVID-19 vaccine!**

Anyone age 12 and older that lives in the United States can get the COVID-19 vaccine in New York City. To get your vaccine, you can:

1. **Schedule an appointment online.** Go to https://tinyurl.com/NYCHHCovidVaccine or use the QR code below on your phone:

# Your USPS Service Request #53916937 Has Been Resolved! [ ref:_00Dj0GyYH._500BY19Hlq:ref ]

From: USPS Customer Support
uspscustomersupport@usps.gov
To: conductororganist@protonmail.com

Dear Lyudmila Syrochkina,

This is in response to your inquiry regarding your mail delivery service. I apologize for any inconvenience this may have caused you.

The local post office official went to your building to verify that there are no longer two mailboxes. We have also verified that there is a white sticker that read's "No Mail." If you would like to receive mail, please remove this sticker. If you no longer wish to receive mail, make sure to place in a change of address for the mail you wish forwarded. Otherwise, the mail going to your mailbox will be returned to sender, due to no other delivery option available.

If you have any additional questions, please give me a call at 202-313-2441 or reply to this email.

Thank you for allowing us the opportunity to respond. If you have any questions, please contact me at the telephone number below.

Sincerely,

Chrystal Sanchez

Customer Relations Coordinator

202-313-2441

***********

Your privacy is important to us. If you would like additional information on our privacy policy, please visit us online at: www.usps.com/privacypolicy.

ref:_00Dj0GyYH._500BY19HIq:ref

# Information for the United States Inspection Service (USPIS)

From: Chrystal Sanchez
chrystal.m.sanchez@usps.gov
To: conductororganist@protonmail.com

Dear Lyudmila Syrochkina,

Thank you for letting me know about your report of someone that tampered with your mail.

As previously discussed, because of the nature of your inquiry, I am referring your correspondence to The Postal Inspection Service, which is the law enforcement arm of the United States Postal Service. Complaints alleging mail tampering or theft by nonemployees come under the exclusive jurisdiction of The Postal Inspection Service.

To learn more about The Postal Inspection Service visit: https://www.uspis.gov/.

A Postal Inspection Service representative will contact you if additional information is needed.

Sincerely,

Chrystal Sanchez
Customer Relations Coordinator
202-313-2441

# Your USPS Service Request #54157090 Has Been Resolved! [ ref:_00Dj0GyYH._500BY1AvPC:ref ]

From: USPS Customer Support
uspscustomersupport@usps.gov
To: conductororganist@protonmail.com

Dear Lyudmila Syrochkina,

This is in response to an issue concerning the manager at KINGSBRIDE POST OFFICE. I apologize that this was not a positive experience, and share your concern and disappointment regarding the treatment reported in your complaint.

We expect our employees to perform their duties in a manner which is both courteous and professional. Above all else, providing excellent customer service is our goal and we regret you did not receive it in this instance. Please be assured that appropriate action has been taken to address the issue and prevent a recurrence. In addition, a mail verification watch will be placed for the next 2 weeks for your address.

I tried contacting you via phone but to no avail. However, if you feel your mail is being tampered with, I recommend for you to contact Postal Inspection at website www.postalinspectors.uspis.gov.

Please accept our sincere apology. Every effort will be made to provide you with quality service in the future.

Thank you for allowing me to serve you! You may receive an invitation for a survey

from postalexperience@inmoment.com regarding our recent interaction.

The survey would be about my performance as the Customer Service Representative that assisted with your Service Request.

Please note your overall satisfaction is regarding my interaction with you.

Your feedback is appreciated. We use your feedback to continuously improve our service and your satisfaction level.

Sincerely,

Andrea Evans

Complaints & Inquiry Clk

NEW YORK 1 CAO
(718) 348-3900

**********

Your privacy is important to us. If you would like additional information on our privacy policy, please visit us online at: www.usps.com/privacypolicy.

ref:_00Dj0GyYH._500BY1AvPC:ref

# USPS Case Confirmation For Service Request 54225103

From: USPS Customer Support
uspscustomersupport@usps.gov
To: conductororganist@protonmail.com

Dear Lyudmila Syrochkina,

This is in response to your recent inquiry concerning suspected mail theft.

This Service Request 54225103 has been forwarded and is currently being reviewed by the United States Postal Inspection Service (USPIS).

The Postal Inspection Service is the law enforcement of the United States Postal Service. Complaints alleging mail tampering or theft come under the exclusive jurisdiction of the Postal Inspection Service. This inquiry does not require you to contact either the Inspection Service or the Postal Service. A Postal Inspection Service representative will contact you if this inquiry requires further investigation.

Please note, information provided in a mail theft complaint and reviewed by the Inspection Service does not always result in a criminal investigation.

We appreciate you reporting this issue.

Regards,

United States Postal Service

PS: Please do not reply to this message as this email address is not monitored for responses. Your privacy is important to us. If you would like additional information on our privacy policy, please visit us online at: www.usps.com/privacypolicy.

NYU Langone Health

January 6, 2026

Lyudmila Syrochkina
147 W. 230th St. Apt 1F
Bronx, NY 10463

Dear Ms. Syrochkina,

We received your email communications dated between December 18, 2025 and December 27, 2025, requesting amendments to your medical record related to the Emergency Department psychiatry encounter dated August 8, 2025. Your request was reviewed in accordance with NYU Langone Health's Right to Request an Amendment Policy, a copy of which is enclosed, and the concerns were shared with the involved clinicians.

The following update has been made in Epic:
The ERS note dated August 8, 2025, authored by Dr. Jonathan Kobles, has been removed from your medical record.

Your request to amend the psychological evaluation dated August 8, 2025 and May 27, 2025, authored by Dr. Andrew O'Hagan, is denied, as the documentation was determined to be accurate and complete at the time of the encounter. Items previously reviewed will not be reconsidered.

The following requested amendments were denied:

- Removal of the referral source listed in the HPI.
- Removal of documentation regarding observation at Jacobi Hospital.
- Designation of Asperger's or ASD as the primary psychiatric diagnosis and removal of rule out delusional disorder.
- Removal of descriptors including paranoid or bizarre thinking and disorganization.
- Removal of chronic suicidal ideation.

You have the right to submit a statement explaining your disagreement with our decision to deny the requested amendment. This statement must be in writing and should be no longer than 500 words. We will include your statement any time we disclose to others the protected health information that you think should have been amended. However, we reserve the right to prepare a response to your statement of disagreement (called a rebuttal statement), which we may also include when we make future disclosures of the information that you think should have been amended. If you wish to exercise this right, please send your statement of disagreement to NYU Langone Hospital – Tisch, Health Information Management, 550 First Avenue, Lobby, New York, NY 10016. If you do not submit a statement of disagreement, you may request that we include your amendment request, and this denial notice, in any future disclosures of the information which you think should have been amended. Please find included our Right to Request an Amendment Policy, which also details this information.

NYU Langone Health

We hope that you will understand the reason that we have partially denied the amendment you requested. However, if you believe that we have improperly denied your request, you may file a complaint with the New York State Department of Health, the Secretary of the Department of Health and Human Services (information on how to file a complaint is available at http://www.hhs.gov/ocr/privacy/hipaa/complaints/) or with NYU Langone Health's Privacy Officer at One Park Ave, 3rd Floor, New York, NY 10016. No one will retaliate against you for filing a complaint.

Should you have concerns or questions regarding the information in this letter, please feel free to contact me directly at (212) 404-3609 or ashley.acosta2@nyulangone.org.

Sincerely,

Ashley Acosta
Senior Analyst, Compliance and Privacy

W-101
Rev. 01/31/2021 (page 2 of 3)

ADULT PROTECTIVE SERVICES HAS COMPLETED ITS ASSESSMENT OF THIS APPLICATION FOR SERVICES AND HAS DETERMINED THAT YOU ARE:

**Ineligible:**
Ineligible for protective services as defined in section 473 of the Social Services Law of the State of New York. The decision that you are ineligible to receive protective services is based upon the following determination:

We are unable to locate you

You have a right to accept or reject protective services. However, when APS determines you are eligible for protective services, it has the responsibility to make an evaluation, pursuant to 18 NYCRR 457.6, to evaluate your risk of harm and determine your mental capacity to reject protective services. Your refusal of protective services will not prevent Adult Protective Services from making such an evaluation and, if necessary, pursuing the delivery of involuntary protective services.

Pursuant to 18 NYCRR 404.1 (b) (2) and 404.1 (f) (2), you have a continuing obligation to report any change in your status to your APS Office.

**RIGHT TO A CONFERENCE:**
You may have a conference to review these actions. If you want a conference, you should ask for one as soon as possible. At the conference, if we discover that we made the wrong decision or if, because of information you provide, we void our decision, we will take corrective action and give you a new notice. You may ask for a conference by calling the Borough Office Director (see page #1 of this notice). If you ask for a conference, you are still entitled to a Fair Hearing. Please read the Fair Hearing Information on page 3 of this notice.

**LEGAL ASSISTANCE.**
If you need free legal assistance, you may be able to obtain such assistance by contacting your local Legal Aid Society or other legal advocate group. You may locate the nearest Legal Aid Society or advocate group by checking the Yellow Pages under "Lawyer" or by calling the Borough Director (see page 1 of this notice).

**ACCESS TO RECORDS/INFORMATION:**
You have the right to review your case record. Upon your request, you have the right to free copies of documents which we will present into evidence at the fair hearing. Also, upon request, you have the right to free copies of other documents from you case record for your fair hearing. To request such documents, or to find out how you may review your case record, call the Borough Director (see page 1 of this notice.)

If you want additional information regarding your case, how to request a fair hearing, or how to obtain additional copies of documents, call the Borough Director or write us at the borough office address listed on the first page of this notice.

| | |
|---|---|
| Assigned Caseworker | NICKEISHA WILLIAMS |
| Assigned Supervisor | DEANNA DOUGLAS |

NYU Langone Health

November 5, 2025

Lyudmila Syrochkina
147 W. 230th St. Apt 1F
Bronx, NY 10463

Dear Ms. Syrochkina,

We received your letter requesting amendments to your medical record on October 6, 2025. We have reviewed the letter and addressed the specific amendments outlined in accordance with NYU Langone Health's Right to Request an Amendment Policy (a copy of which is enclosed). These concerns were shared with the involved clinicians who agreed to make several corrections to your medical record. The following documentation has been updated in Epic:

Dr. Berger reviewed and amended the following entries:

- Language in Dr. Berger's clinical notes describing you as "delusive about your living situation" was removed and updated to reflect that your distress stemmed from landlord-related threats.
- Your medication history was corrected to include the medications you reported taking and to note that you declined Exforge and Crestor.
- Additional updates were made to Dr. Berger's August 19, 2025 note to include the verbal "heart blockade" assessment, replace the phrase "harassed at work" with clarification that your stress was related to your landlord, and revise the statement indicating you were "sent to the ED for suicide" to instead state that you were referred for concern.
- Your social and functional history was updated to accurately reflect your Master's degree and daily exercise routine.

Your Emergency Department psychiatry encounter was clarified to indicate that you were referred to the emergency room by Dr. Berger over safety concerns.
Dr. Jonathan Kobles reviewed and amended the documentation from your Emergency Department visit to remove the reference to "delusive about her living situation". Registered Nurse Newbold reviewed and amended the nursing documentation to reflect the following:

- A note referencing "debility" was removed;
- Another note was revised to clarify that you were discharged the same day with no home-care or transport needs.
- Related documentation under Emergency Department Case Management was also corrected to remove references suggesting that home-care services were requested or arranged.

However, your additional request to remove or modify documentation from Dr. Johnson Wilson cannot be honored, as this evaluation was not completed at NYU Langone Health and Dr. Wilson is not an NYULH provider. We recommend that you contact Dr. Wilson or his affiliated organization directly regarding that

NYU Langone Health

portion of your request. Additionally, your request to amend the psychological evaluation dated August 8, 2025, has been denied. The documentation was reviewed and determined to be accurate and complete at the time of the encounter. We have addressed all items referenced in your letter to the best of our ability, should you have concerns that any of your requests have not been addressed, please contact me and provide additional details, including the date of any notes to be amended and what specific amendment you would like made, to allow me to review further. Please note items previously reviewed will not be reconsidered.

You have the right to submit a statement explaining your disagreement with our decision to deny the requested amendment. This statement must be in writing and should be no longer than 500 words. We will include your statement any time we disclose to others the protected health information that you think should have been amended. However, we reserve the right to prepare a response to your statement of disagreement (called a rebuttal statement), which we may also include when we make future disclosures of the information that you think should have been amended. If you wish to exercise this right, please send your statement of disagreement to NYU Langone Hospital – Tisch, Health Information Management, 550 First Avenue, Lobby, New York, NY 10016. If you do not submit a statement of disagreement, you may request that we include your amendment request, and this denial notice, in any future disclosures of the information which you think should have been amended. Please find included our Right to Request an Amendment Policy, which also details this information.

We hope that you will understand the reason that we have partially denied the amendment you requested. However, if you believe that we have improperly denied your request, you may file a complaint with the New York State Department of Health, the Secretary of the Department of Health and Human Services (information on how to file a complaint is available at http://www.hhs.gov/ocr/privacy/hipaa/complaints/) or with NYU Langone Health's Privacy Officer at One Park Ave, 3rd Floor, New York, NY 10016. No one will retaliate against you for filing a complaint.

Should you have concerns or questions regarding the information in this letter, please feel free to contact me directly at (212) 404-3609 or ashley.acosta2@nyulangone.org.

Sincerely,

Ashley Acosta

Ashley Acosta
Senior Analyst, Compliance and Privacy

Gmail

L <organist.conductor@gmail.com>

**Statement**

1 message

T Shum <tayashum@gmail.com> Tue, Dec 16, 2025 at 10:23 PM
To: Organist Conductor <organist.conductor@gmail.com>

Statement / Account of Events

I have been a friend of Lyudmila Syrochkina for over two decades, and we are also colleagues as musicians. Lyudmila had not seen me or my daughter for several years, and we planned a reunion on August 4, 2025.
She was scheduled to meet us at Chatham on Monday, August 4, 2025. Lyudmila did not have her phone at the time and called from an unfamiliar commuter phone. We
arranged to pick her up from Chatham around 9:00 AM and drove to Chester, NJ.
She had left home at 4:30 AM and was hungry.
We spent a wonderful day together in Chester, visiting Starbucks, the music school office, local boutiques, and a farm restaurant. We bought Lyudmila peaches for her home and several gifts from boutiques, all of which she loved. Later, we drove her back to the train station in Chatham so she could return to New York Penn Station. She was in a very happy mood, as she had not seen us for years.
However, she did not call later in the day, and we became concerned. Between 6:00 and 7:00 PM, I received a call from a social worker at Jacobi ED, who asked about Lyudmila's visit to NJ. Later, Lyudmila did not call us, and we left a message. We then called the same number used by the social worker. He informed us that Lyudmila had been briefly admitted and discharged, but was being monitored to stabilize her high blood pressure (HTN).
Lyudmila eventually left a message after midnight and called the next morning,

# ADA SELECTIVE MUTISM - Pro Se Filing Assistance 1/7/26 9AM

From justinvictor456@proton.me
To accommodation@nysd.uscourts.gov

Jan 6

To: accommodation@nysd.uscourts.gov

To: accommodation@nysd.uscourts.gov

To: accommodation@nysd.uscourts.gov
CC: justinvictor456@proton.me
Subject: ADA SELECTIVE MUTISM - Pro Se Filing Assistance 1/7/26 9AM Rm 200

Lyudmila Syrochkina
147 W 230 St #1F, Bronx NY 10463
929-501-2006

Disability: AUTISM SPECTRUM DISORDER + SELECTIVE MUTISM
Attachments:
1. Dr. John G. Wilson III MD FORENSIC EVALUATION 9/26/25 (triple board-certified)
2. Dr. Wilson LMN 1/5/26 requesting counsel accommodation

Need: Pro se clerk assistance filing civil rights complaint Rm 200
Date: January 7, 2026 9AM 500 Pearl St
Case: 70yo Music Director/Organist imminent homelessness vs Tennenbaum rent fraud

Attachments: Dr. Wilson documents

**251.58 KB** 2 files attached

LMN Dr. Wilson.pdf 97.12 KB
Forensic Eva...on.pdf 154.47 KB

IMG_0586.PNG

1 of 1



IMG_0583.PNG

1 of 1

1:08 PM 66%

Today
1:07 PM

Edit

password and greeting

Set Up

+0000000000
unknown
July 30, 2025 at 2:11PM

0:17 -0:19

Transcription

"Good afternoon I'm calling from them and had the circus attorneys office the elder BC unit we're returning your missed call. You can give us a call back at 212-335-9007 again 212-335-9007 or you can email us at eau@danny.nyc.gov that he is an egg a as an apple with an umbrella umbrella..."

Was this transcription useful or not useful?

116%

Tello LTE 6:14 PM 50%

Today
12:36 PM

Edit

APS Never- Block >




That's me, I am the case manager from self-help. Your referral came in for eviction, so I will be asking you questions about this.

Hank you I got it, thank you for your call and picture.

Subject

IMG_0586.PNG

1 of 1



IMG_0583.PNG 1 of 1



# PAXTON Exhibit F: Paxton AI HIPAA-Compliant Forensic Analysis of EMR Discrepancies (Tisch Hospital 8/8/25; Jacobi 8/4/25)

**Paxton**
Based on my review of the provided documents concerning Lyudmila Syrochkina, I have identified several apparent discrepancies and inconsistencies. These are detailed below for your review.

**Discrepancies Regarding the Tisch Hospital Visit (August 8, 2025)**
The medical records from Ms. Syrochkina's visit to the Tisch Hospital Emergency Department on August 8, 2025, contain numerous conflicting details across different notes and versions of the patient's chart.

**Reason for Visit**
There are conflicting accounts regarding the reason for Ms. Syrochkina's presentation to the emergency department.
• Several notes state she was referred by a clinic. An ED Provider Note indicates she was "sent in from clinic reporting to clinic SI" (suicidal ideation) and for evaluation of a "potential underlying psychiatric undiagnosed condition" [1]. Dr. Jonathan P. Kobles' attestation states the patient was "referred in from outpatient cardiology after expressing delusions regarding her living situation" [1.1],[4],[6]. A social worker note similarly reports she was "sent in by OP cardiologist" [1.2],[4.1].
• In contrast, handwritten annotations on a copy of the medical record state, "I came volunteerely" and "I came on my own" [1.3].

**Patient's Diagnosis**
The records provide inconsistent primary diagnoses for the visit.
• **Asperger's Syndrome:** Dr. Andrew H. O'Hagan's "ED Discharge Note" lists the "primary encounter diagnosis" as "History of Asperger's syndrome" [1.4],[4.2],[6.1]. The After Visit Summary provided to the patient also lists this as the diagnosis [1.5]. The Emergency Psychiatry Consult note diagnoses "Aspergers ASD R/o delusional disorder" [1.6].
• **Delusional Disorder:** Dr. Kobles' attestation states his assessment is "Patient who chronic delusions" [1.7],[4.3],[6.2]. An independent psychiatric evaluation by Dr. John G. Wilson III on September 18, 2025, noted that Ms. Syrochkina disputed this diagnosis and that, given the plausibility of her concerns about her landlord, a diagnosis of delusional disorder should be made with caution [3].

**Patient's Functional Status**
The assessment of Ms. Syrochkina's ability to function independently is contradictory.

• A note from PA Michele A. Ikone states the patient "is performing all ADLs" (Activities of Daily Living) [1.8],[4.4],[6.3]. The final disposition notes from her discharge list her condition as "Good" and mobility as "Ambulatory" [1.9].
• Conversely, a "Home Health Certification" note, attested by Dr. Kobles, supports a finding that the patient is "homebound" and requires skilled nursing [1.10],[4.5],[6.4]. This note also includes a diagnosis of "debility related to hospitalization," [1.11],[4.6],[6.5] though records indicate she was only seen in the emergency department and not admitted [1.12].

**Physical Examination**

There is a dispute over whether a physical examination was performed.
• Dr. Kobles' attestation begins, "I performed a history and physical examination of Lyudmila Syrochkina" [1.13],[4.7],[6.6]. PA Ikone's note includes findings for a physical exam across multiple systems [1.14],[4.8],[6.7].
• The patient's annotated copy of the record includes the handwritten comment "never done" next to the Physical Exam section [1.15].

**Discharge Plans and Follow-Up**

The records contain multiple, inconsistent discharge plans.
• **Plan 1: Simple Discharge to Home.** The hard copy After Visit Summary given to the patient indicates a discharge to home with a follow-up appointment scheduled with Dr. Jeffrey Berger, her cardiologist [1.16].
• **Plan 2: Inpatient Psychiatric Transfer.** An "ERS Initial Screening Note" by Dr. Kobles indicates the patient "is stable for transport to Psychiatric Care" for further evaluation [1.17],[4.9]. This transfer did not occur, as she was discharged home [1.18].
• **Plan 3: Home Health Services.** A progress note by RN Laura Newbold states the "ED CM asked to make home care services referral for nursing for med pouring and also Social work at home" [1.19],[4.10],[6.8]. A "Home Health Certification" was completed to facilitate this, identifying Girling Home Care as the agency [1.20],[4.11],[6.9]. The follow-up for this plan was to be with a "PCP" [1.21],[4.12],[6.10]. However, the patient's annotated record states, "I dont have one" [1.22].

**Vital Signs**

Different blood pressure readings are recorded for the visit.
• The initial vitals taken at 12:54 recorded a blood pressure of 158/100 [1.23],[4.13],[6.11].
• The final vitals documented at 17:48, and included on the After Visit Summary, recorded a blood pressure of 139/78 [1.24].

**Record-Keeping and Documentation**Several issues with documentation standards are present.
• The "Home Health Certification" note includes templated "Physician Documentation" language stating a licensed physician had a face-to-face encounter, but the physician is not named in that section [1.25],[4.14],[6.12]. The patient's annotation questions this, asking, "Who is it? No name?" [1.26].
• The records show two separate "Post Acute Care Call" notes created at 5:59 PM on August 8, 2025, one by RN Verlande Guirand-Precil for a "First Call" and one by RN Nathazsa Ivy Enriquez for a "Second Call" [1.27],[4.15],[6.13]. Both note the patient was not reached and a message was left [1.28],[4.16],[6.14]. However, the first note states "Follow up complete? No," while the second states "Follow up complete? Yes" [1.29],[4.17],[6.15]. The electronic signatures for these notes were made on different subsequent days [1.30].

• The Social Work Assessment screening criteria include "Suspicion of abuse, neglect, exploitation" [1.31],[4.18],[6.16]. The document "Factual Contradictions and Clinical Inconsistencies" notes this information is absent from other records [5].

**Discrepancies Regarding the Jacobi Medical Center Visit (August 4, 2025)**

The records from the visit to NCB ED Psych four days prior also contain conflicting information.

**Reason for Encounter and Patient's Mental State**

• An ED note by RN Stella Ijeoma Ofoma states that according to the NYPD report, the patient was "making numerous phone calls to Manhattan DA office" and "verbalized SI with no plan" [2]. It also describes her as "disorganized, paranoid, irritable, hyper verbal" upon arrival [2.1].

• However, the PES Physician Note by LMSW Daniel Essrog states the patient "denies S/H/I" and that "delusions [were] not elicited" [2.2]. This note records that a collateral contact, Taya Shumerina, "confirmed Pt's baseline behavior is as Pt is exhibiting currently" [2.3].

• A statement from Taya Shumerina confirms she spent the day with Ms. Syrochkina and described her as being in a "very happy mood" prior to the ED visit [7]. She confirms receiving a call from a social worker at Jacobi ED that evening [7.1].

**Cited References**

[1] TISCH HOSPITAL.pdf
[2] Gestalt Hestal 2.pdf
[3] Evalu.pdf
[4] 882025 .pdf

[5] Factual Contradictions and Clinical Inconsistencies.pdf
[6] Attestation signed by Jonathan P Kobles.pdf
[7] Statement Taya.pdf

**Paxton**

Thank you for providing the progress note from Swathi Bolneni, PA, at NYU Langone Cardiology Associates. This document adds critical context to the events of August 8, 2025. It clarifies the circumstances leading to Ms. Syrochkina's visit to the Tisch Hospital Emergency Department and highlights further contradictions in the record.

This new information directly impacts the understanding of the "Reason for Visit" and "Means of Arrival" and sharpens the discrepancies previously identified. Below is an updated analysis.

Updated Analysis of Discrepancies for the Tisch Hospital Visit (August 8, 2025)

The progress note from the referring cardiology clinic provides a timeline and rationale for the ED visit that is inconsistent with the records created at Tisch Hospital.

Reason for Visit and Means of Arrival

The new note from PA Swathi Bolneni clarifies the patient's intent and the clinic's recommendation, which then conflicts with how the visit was documented upon her arrival at the ED.

- The Referring Clinic's Account: According to the progress note from NYU Langone Cardiology Associates, Ms. Syrochkina called the clinic on the morning of August 8, 2025. During this call, she requested assistance from social work to file a police report against her landlord and asked to be examined by a psychiatrist, stating she was "concerned that her mental state is being misconstrued by other parties." The cardiology team recommended she go to the ED for a timely evaluation. The note explicitly states, "She denies thoughts of hurting herself or others." It also documents that she "firmly and repeatedly declined transport to ED via EMS, but agrees to come to the ED on her own."
- Contradictory Accounts in the Tisch ED Records: The documentation from the Tisch ED presents a conflicting narrative about why she was there and how she arrived.

• An ED Provider Note claims she was "sent in from clinic reporting to clinic SI" (suicidal ideation) [4],[6],[1]. This is in direct opposition to the referring provider's note, which documents a denial of suicidal thoughts.
• Dr. Jonathan P. Kobles' attestation states the patient was "referred in from outpatient cardiology after expressing delusions regarding her living situation" [4.1],[6.1],[1.1]. This description frames the referral differently from the patient's proactive request for an evaluation to correct potential misinterpretations.
• A Social Worker note also states she was "sent in by OP cardiologist" for an "acute exacerbation of an underlying psychiatric disorder" [4.2],[1.2].
• Corroboration of Patient's Account: The note from PA Bolneni validates Ms. Syrochkina's own handwritten annotations on a copy of the medical record, where she wrote "I came volunteerely" and "I came on my own" [1.3]. Further, the official admission information lists the "Means of Arrival" as "Public Transport," which aligns with the patient coming on her own as documented by PA Bolneni [1.4].
This new information shows that while Ms. Syrochkina was referred by her cardiologist's office, she initiated the contact, denied suicidal ideation, and traveled to the hospital voluntarily. The Tisch ED records, however, document the reason for the visit as a referral for suicidal ideation and delusions.
3 cited references
**Follow up questions**
• Would you like me to produce a redlined chronology comparing each document's timeline and statements about reason for visit, means of arrival, and suicidal ideation?
• Do you want a concise memorandum identifying which discrepancies are most likely material to litigation or administrative proceedings and the recommended evidentiary steps to corroborate or refute them?
• Should I draft targeted requests for production and deposition questions for the treating clinicians and social workers to resolve the conflicting accounts?
**You**
1. I am working permanently at Branford CT as Music Director Organist commuting 3 hours public transportations. The fabricated : Dr Kolbes never ever approached me. His notes " transfer" never happened nor was planned: why dont you see : Dischargege 5:51 pm. I LEFT. Kolbes notes : 8:34 PM- after i left?? But he never met me at all. // There was no referral from

cardiologist, Swathi Bolneni suggestedand i volunteered to check after Police Assault 08/04. I was illegally arrested and brought in handcuffs etc after returned home from Chester NJ. MH attorney in JAcobi never found any order HM article 9. Then: why dont you see what I see: RN OFoma quoting PSYCKES : Dr Gpnzales and LMSW Essorg cant see PSYCKES anything as neurocognitive psychosis and depressiuon delusion s and make favorable cleraing discharge in 20 minutes. LAngone FOR days later checking PSTCKES : N/A- please analyse all discrepencies NOW

**Paxton**

Thank you for highlighting these specific areas of concern. Based on the documentation you provided and your latest query, I have performed a more detailed analysis focusing on the temporal and inter-document discrepancies you identified.

1. Discrepancies Regarding Dr. Jonathan P. Kobles' Notes and Involvement (Tisch Hospital, August 8, 2025)

Your observations about the timing and content of Dr. Kobles' notes reveal significant inconsistencies when compared to the documented timeline of your discharge.

• Timing of Notes vs. Patient Discharge: The medical record confirms that you were discharged from the Tisch Hospital ED at 5:59 PM (17:59) on August 8, 2025 [1]. The After Visit Summary provided to you was printed at 5:51 PM [1.1]. However, Dr. Kobles' electronic signature attesting to the "ED Provider Note" written by PA Michele A. Ikone was recorded at 8:34 PM (20:34) on the same day [1.2],[4],[6]—more than two and a half hours after you had officially been discharged. This timeline supports your assertion that the attestation, which states he "performed a history and physical examination" [1.3],[4.1],[6.1], was finalized after you had already left the facility.

• Planned vs. Actual Disposition: The records show a conflict regarding a potential psychiatric transfer.

• At 4:35 PM, Dr. Kobles signed an "ERS Initial Screening Note" stating you were "stable for transport to Psychiatric Care [...] for further evaluation" [1.4],[4.2],[6.2].

• The ED Care Timeline shows that orders related to patient movement and admission were placed and then quickly discontinued between 2:44 PM and 2:46 PM [1.5].

• Ultimately, the final disposition was a "Discharge" to "Home Or Self-care," not a transfer [1.6]. This corroborates your statement

that the transfer documented in Dr. Kobles' initial screening note never occurred.

• Contradiction on Patient Encounter: Your claim that you never met Dr. Kobles is directly at odds with his official attestation, where he states, "I performed a history and physical examination of Lyudmila Syrochkina" [1.7],[4.3],[6.3]. This is further supported by your handwritten annotation on the record stating "never approached me at all" next to his attestation [1.8]. This presents a direct and irreconcilable conflict between the physician's record and your account, which is also reflected in your annotation on the physical exam section as "never done" [1.9].

2. Discrepancies Regarding the Referral and Reason for Visit

Your clarification that PA Swathi Bolneni "suggested" the visit and you "volunteered" to go sharpens a previously identified discrepancy. The account from the referring provider (as described in the progress note you provided) indicates a collaborative decision for you to seek a voluntary psychiatric evaluation to address concerns about your mental state being misconstrued. This contrasts starkly with the Tisch ED records, which frame the visit differently:

• One note states you were "sent in from clinic reporting to clinic SI" (suicidal ideation) [1.10],[4.4],[6.4].

• Dr. Kobles' attestation claims you were "referred in from outpatient cardiology after expressing delusions regarding her living situation" [1.11],[4.5],[6.5].

• A social worker note states you were "sent in by OP cardiologist for concerns of an acute exacerbation of an underlying psychiatric disorder" [1.12],[4.6],[6.6].

The narrative in the Tisch ED records omits the context of your voluntary participation and proactive request for an evaluation, instead documenting the visit as a response to reported suicidal ideation and delusions, which the referring provider's note indicates you denied.

3. Discrepancies Regarding PSYCKES and the Jacobi Medical Center Visit (August 4, 2025)

Your analysis of the Jacobi records and the subsequent check at Langone reveals a critical inconsistency in the reporting from the Statewide Health Information Network for New York (PSYCKES).

• Conflicting Reports within Jacobi:

• In an ED note from 7:23 PM, RN Stella Ijeoma Ofoma documented information purportedly from PSYCKES, stating you have a "hx of depression, Autism spectrum disorder, Neurocognitive disorders" [2]. She also noted your arrival presentation as "disorganized, paranoid, irritable, hyper verbal" based on the police report and her observation [2.1].

• However, the "PES Physician Note" by LMSW Daniel Essrog, created later that evening and attested by Dr. Luis Gonzales, states "delusions not elicited" and "there is no evidence of delusions or paranoia" [2.2]. His formulation describes you as psychiatrically stable and at your baseline [2.3]. While his note indicates "Psyckes" was reviewed, it does not mention the "Neurocognitive disorders" or other acute diagnoses cited by RN Ofoma [2.4]. This suggests the assessing clinicians did not find or agree with the information the RN recorded from PSYCKES.

• Contradiction Between Hospitals: The discrepancy is amplified by the records from your visit to Tisch Hospital four days later. The "Emergency Psychiatry Initial Consult" note from August 8, 2025, explicitly states, "PSYCKES Reviewed: not applicable" [1.13]. This raises a significant question: If PSYCKES contained a history of neurocognitive disorders and other conditions on August 4th, it is unclear why the system would be documented as "not applicable" just four days later at a different facility. This contradiction casts doubt on the accuracy and consistency of the information being recorded across institutions.

These points highlight fundamental inconsistencies in the medical documentation concerning the timeline of events, the reason for your visits, your clinical presentation, and the data recorded in the state's psychiatric database.

**Paxton**

You are correct to identify the description of your speech in RN Stella Ijeoma Ofoma's note from the Jacobi Medical Center visit on August 4, 2025, as a significant point of contradiction. Your account of the interaction, combined with your documented medical history, is in direct conflict with the nurse's assessment.

Here is an analysis of the contradictions you have highlighted:

**1. Contradiction with Diagnosed Medical Condition**

The description in the nursing note is inconsistent with your diagnosed psychiatric condition.

• **RN Ofoma's Description:** In a note from the Jacobi ED visit, RN Ofoma described you as "hyper verbal" and stated that when asked about your reason for being at the hospital, you "ramble[d] on and on" [2].

• **Contradictory Diagnosis:** This description of excessive, rambling speech appears to be clinically inconsistent with your diagnosis of Autism Spectrum Disorder (ASD). An independent psychiatric evaluation by Dr. John G. Wilson III confirms the ASD diagnosis and notes a history of selective mutism [3]. In a letter dated January 5, 2026, Dr. Wilson further specifies that due to your ASD diagnosis, you experience "profound challenges with social and oral communication, including episodes of selective mutism" [8]. Selective mutism is an anxiety-driven inability to speak in specific social situations, which is the opposite of being "hyper verbal."

**2. Contradiction with Other Clinicians' Notes from the Same Visit**

RN Ofoma's assessment is also contradicted by the "PES Physician Note" written by LMSW Daniel Essrog during the same visit on August 4, 2025.

• While RN Ofoma described you as rambling and disorganized, LMSW Essrog documented your thought process as "linear, goal-directed, concrete, and perseveration" [2.1]. A thought process that is linear and goal-directed is, by definition, not rambling.

• LMSW Essrog described your speech as having a "rapid rate (at baseline)" but with "normal volume" [2.2]. While your speech may have been fast, his assessment indicates it was structured and coherent, which conflicts with the disorganization implied by "rambles on and on." He also specifically noted that delusions were "not elicited" and there was "no evidence of delusions or paranoia" [2.3], which further counters RN Ofoma's assessment of a disorganized and paranoid presentation.

**3. Conflict Between Your Account and the Official Record**

Your personal recollection of the event—that RN Ofoma did not perform an assessment, never spoke with you directly, and that a single question was asked through a translator—is in direct and irreconcilable opposition to her written note. The note presents a detailed behavioral assessment, including observations about your speech and mental state, which would require a substantive interaction [2.4]. This discrepancy places the veracity of the documented assessment in question.

**Cited References**

[2] Gestalt Hestal 2.pdf

[3] Evalu.pdf

[8] Dr Wilson January 5.pdf**Related References**

[1] TISCH HOSPITAL.pdf

[4] 882025 .pdf

[5] Factual Contradictions and Clinical Inconsistencies.pdf

[6] Attestation signed by Jonathan P Kobles.pdf

[7] Statement Taya.pdf

**Paxton**

Of course. I will provide an analysis of the legal questions you have raised based on the provided documents and relevant legal authorities. Your questions center on three main topics: (1) the right to access and amend medical records, including audit logs; (2) the potential for medical malpractice claims based on the care provided; and (3) the possibility of billing fraud.

**1. Access to Audit Logs and Amending Medical Records**

Your questions regarding the denial of audit logs, the changing page count of your records, and

the refusal to amend your records touch upon specific patient rights under New York law and general principles of discovery in litigation.

**Denial of Audit Log Access and Discrepancies in Records**

You asked if a change in the page count of your medical records is a "red flag" and if NYU Langone's denial of access to the audit log is illegal.

• **Discrepancies as a "Red Flag":** The production of multiple, conflicting versions of a medical record, including variations in page count, is a significant red flag in litigation. In cases alleging medical malpractice, courts recognize that such inconsistencies justify a deeper inquiry into the integrity of the record. For example, in *Donato v. Nutovits*, the court considered the fact that the hospital had produced four different versions of the decedent's medical chart, with varying page counts, as a key reason to grant the plaintiff's motion to compel the electronic record's audit trail [2]. Your observation of a change from 168 to 166 pages is precisely the type of discrepancy that strengthens the legal argument for demanding the complete audit log.

• **Right to Access Audit Logs:** While a hospital's refusal to provide an audit log outside of a legal proceeding is a matter of institutional policy, once a lawsuit is filed, such records are generally discoverable. Under New York's Civil Practice Law and Rules (CPLR) § 3101(a), there is a mandate for "full disclosure of all matter material and necessary in the prosecution or defense of an action" [8].o New York courts have interpreted "material and necessary" liberally, allowing discovery of information that is relevant and useful for trial preparation [8.1].

o Hospitals in New York are required by regulation to maintain an audit trail for their electronic health records [1], [34]. Specifically, 10 NYCRR § 405.10(c)(4)(v) requires hospitals to implement "an audit capability to track access by users" [34.1].

o In *Vargas v. Lee*, a case cited by multiple New York courts, the appellate court held that an audit trail was "relevant to the allegations of negligence" because it could provide information about the post-operative care provided and was needed to "ascertain whether the patient records that were eventually provided to them were complete and unaltered" [8.2].

o More directly, in *Heinrich v. State*, the court ordered the disclosure of audit trails, finding them "material and relevant to the prosecution of this action" where there were discrepancies between deposition testimony and the medical records [8.3]. The court explicitly noted that the audit log could reveal "which provider had what information about the patient, when they had it, and what modifications... were made" [8.4].

Therefore, in the context of litigation where you allege records have been altered, a hospital's denial of a request for the audit log is on weak legal ground. Courts frequently find that audit logs are "material and necessary" and will compel their production [8.5], [1.1].

**Right to Amend Medical Records**

You asked if it is illegal for Jacobi to deny an amendment and about the significance of Langone's compliance officer refusing to explain the refusal.

• Under New York Public Health Law § 18(8), a patient has the right to "challenge the accuracy of information maintained in the patient information" and require that a "brief written statement prepared by him or her concerning the challenged information be inserted into the patient information" [39]. This statement becomes a permanent part of

the record and must be released whenever the disputed information is released [39.1].

• This law does not force a provider to change their original note, but it does give you the right to have your disagreement formally and permanently documented within the record itself [39.2]. A hospital's outright refusal to permit the addition of such a statement would violate this statute.

• State regulations reinforce this right. For example, 10 NYCRR § 405.10(a)(7) requires hospitals to allow patients to add written statements challenging the accuracy of their records [34.2]. Other regulations concerning state agencies mandate that upon refusing a correction, the agency must inform the person in writing of the reasons for the refusal and of their right to submit a statement of disagreement [31], [23]. A hospital's failure to provide a reason for its refusal to amend, or to inform you of your right to add a statement, could be a violation of its own policies and the principles underlying state law.

**2. Analysis of Potential Malpractice and Fraud**You have raised questions about whether the actions and documentation at Jacobi and Langone
could constitute medical malpractice or billing fraud. The discrepancies you've identified provide substantial evidence that could be used to support such claims.

**Medical Malpractice**

Medical malpractice is a form of negligence requiring a provider's action or inaction to fall below the accepted standard of care, causing injury or harm.

• **Jacobi Visit (August 4, 2025):** The records contain a stark contradiction. RN Ofoma's note describes you as "disorganized, paranoid, irritable, hyper verbal," claims you verbalized suicidal ideation, and cites PSYCKES for a history of "Neurocognitive disorders" [42]. In direct opposition, the PES Physician Note by LMSW Essrog from the same visit states "delusions not elicited," there was "no evidence of delusions or paranoia," and you were psychiatrically stable at your baseline [42.1].

o This conflict is legally significant. If the severe symptoms described by RN Ofoma were accurate, discharging you after a few hours with no follow-up plan could represent a breach of the standard of care. Conversely, if LMSW Essrog's assessment was correct and RN Ofoma's note was fabricated or grossly exaggerated, it calls into question the integrity of the entire record and could be used as evidence of a "consciousness of guilt" regarding the encounter.

• **Tisch Hospital (Langone) Visit (August 8, 2025):** The contradictions here are numerous and severe. Dr. O'Hagan's final discharge note gives a primary diagnosis of "History of Asperger's syndrome" and plans a routine cardiology follow-up [41], [44]. This is inconsistent with other parts of the same record where you are described as having "chronic delusions" and paranoia, and are certified as "homebound" with "debility related to hospitalization" [41.1], [44.1], [45], [46].

o Discharging a patient alleged to be delusional, paranoid, and homebound with debility, without an appropriate, concrete psychiatric and social work follow-up plan in place, could be a significant deviation from the standard of care. The documented discharge plan appears completely disconnected from the severe conditions documented elsewhere in the record.

**Billing Fraud**

Billing fraud involves knowingly submitting false claims for payment, often by documenting conditions that are more severe than the patient's actual state (upcoding) or billing for services not rendered.

• The conflicting records could be interpreted as evidence of fraudulent billing practices. At Jacobi, if RN Ofoma's documentation of severe psychiatric symptoms was knowingly false, it could be seen as an attempt to justify a higher-level billing code for the encounter, even though the ultimate clinical decision was for a quick discharge [42.2].

• At Langone, the evidence is more pronounced. The diagnosis of "debility related to hospitalization" is factually impossible, as you were never hospitalized [41.2], [44.2], [45.1]. Creating a "Home Health Certification" based on this false premise and a finding

that you were "homebound"—while another note by PA Ikone says you were "performing all ADLs" [41.3], [44.3]—strongly suggests the creation of a fraudulent paper trail to bill for home health services that were not medically necessary or justified.
In summary, the extensive, well-documented contradictions across different records for the same encounters provide a strong basis to question the care provided and the integrity of the billing practices at both institutions.

**Cited References**

[1] Gilbert v. Highland Hosp., 52 Misc. 3d 555 (N.Y. Sup. Ct. 2016)
[2] Donato v. Nutovits , Index No. 70468/2012 (N.Y. Sup. Ct. 2016)
[8] Heinrich v. State, 73 Misc. 3d 650 (N.Y. Ct. Cl. 2021)
[23] Section 82.4: Correction or amendment of medical records.
[31] Section 616.26: Correction or amendment of records.
[34] Section 405.10: Medical records.
[39] Section 18: Access to patient information
[41] TISCH HOSPITAL.pdf
[42] Gestalt Hestal 2.pdf
[44] 882025 .pdf
[45] Factual Contradictions and Clinical Inconsistencies.pdf
[46] Attestation signed by Jonathan P Kobles.pdf

**Related References**

[3] Wheeler v. United States, Case No. 17-2249-JTM (D. Kan. 2018)
[4] Thomas v. S. Health Partners, Civil Action 2:21-cv-012 (WOB-CJS) (E.D. Ky. 2023)
[5] Hernandez v. Temple Univ. Hosp., CIVIL ACTION NO. 17-4381 (E.D. Pa. 2019)
[6] Psychiatric Healthcare v. Soc. Serv, 100 S.W.3d 891 (Mo. Ct. App. 2003)

[7] Cynthia B v. N Rochelle Hosp, 86 A.D.2d 256 (N.Y. App. Div. 1982)
[9] Smith v. State of New York, 181 A.D.2d 227 (N.Y. App. Div. 1992)
[10] McKinney v. Delaware County Memorial Hospital, CIVIL ACTION NO. 08-1054 (E.D. Pa. 2009)
[11] Jo Ellen Smith Psychiatric Hospital v. Harrell, 546 So. 2d 886 (La. Ct. App. 1989)
[12] Hall v. Flannery, Case No. 3:13-cv-914-SMY-DGW (S.D. Ill. 2015)
[13] Kepler v. NaphCare Incorporated, No. 4:24-cv-00220 (D. Ariz. May 20, 2025)
[14] Bates v. Duby, CIVIL ACTION DOCKET NO. CV-89-088 (Me. Super. 2003)
[15] CSEA v. NYS DEPT. OF MENTAL RETARDATION, 0112012/2007 (N.Y. Misc. 2007)
[16] McGrath v. State of New York, 200 Misc. 165 (N.Y. Misc. 1950)
[17] Picco v. Glenn, Civil Action No. 12-cv-02858-RM-MJW (D. Colo. 2015)
[18] Heinrich v. Serens, No. 2020-34574 (N.Y. Sup. Ct. 2020)
[19] Meherg v. Rush University Medical Center, 2025 IL App (1st) 231102-U (Ill. App. Ct. 2025)
[20] Meherg v. Rush University Medical Center, 2025 IL App (1st) 231102-U (Ill. App. Ct. 2025)
[21] Section 751.9: Patients' rights.
[22] Section 363-E: Medicaid plan, applications for waivers and plan amendments; public disclosure
[24] rule-0073523-002-rules-for-hospitals-and-related-institutions
[25] Section 405.7: Patients' rights.
[26] Section 580.9: Records and statistics.
[27] Section 9.11: Patients' records
[28] Section 700.2: Definitions.
[29] Section 16.107: Amendment, suspension or revocation of licenses.

[30] Section 405.9: Admission/discharge.
[32] Section 85.29: Maintenance of medical records.
[33] Section 520.7: Statement of disagreement.
[35] Section 50-2.5: Fees for copying records.
[36] Section 582.9: Records and statistics.
[37] Section 441.200: Medical record.
[38] Section 18: Access to patient information
[40] Section 4413: Savings clause
[43] Evalu.pdf
[47] Statement Taya.pdf
[48] Dr Wilson January 5.pdf

**Paxton**

Thank you for providing the document analyzing the linguistic characteristics of the medical notes. In my professional opinion, the issues highlighted in your analysis are significant and substantively strengthen the case that the medical records in question lack credibility. These are not minor stylistic points; they represent deviations from professional documentation standards that can be critically important in a legal context.

Below is my analysis of the points raised in the document you provided.

**Unprofessional Language and Grammatical Errors**

The document you uploaded correctly identifies several instances of language that fall below the accepted standard for professional medical documentation [9]. Such errors can be used to question the care, precision, and attentiveness of the clinicians who wrote the notes.

- **Grammatical Awkwardness:** The phrase in Dr. Kobles' attestation, "Patient who chronic delusions," is grammatically incomplete [6],[4],[1]. While a simple typo can be an isolated error, such a sentence fragment in a formal physician's assessment is highly unusual and suggests a lack of diligence.
- **Non-Standard Terminology:** The progress note by RN Laura Newbold states that the "ED CM asked to make home care services referral for nursing for med pouring" [1.1]. As your analysis notes, "med pouring" is unprofessional jargon [9.1]. Standard clinical

language would typically use more precise terms like "medication administration assistance" or "medication management." The use of informal language can imply a casual, and potentially careless, approach to patient care and documentation.

**Boilerplate Text and Impersonal Documentation**

Your analysis also correctly flags the use of generic, pre-formatted language, which raises significant questions about the authenticity and specificity of certain entries [9.2].

- The "Home Health Certification" note is a prominent example of this issue [6.1],[4.1],[1.2]. The section for "Physician Documentation" contains the impersonal, template-like phrase, "I, a licensed physician, had a face to face encounter with the above-named patient" [1.3],[6.2],[4.2].
- This generic statement is not attributed to a specific, named physician within that section of the note [1.4],[6.3],[4.3]. This is a serious breach of documentation standards, as it fails to clearly identify the certifying physician for the face-to-face encounter. This lack of specificity is precisely what you highlighted in your own handwritten annotation on the record: "Who is it? No name?" [1.5]. The use of such boilerplate text, detached from a specific author, significantly weakens the note's evidentiary value.

**Legal Significance of Linguistic Discrepancies**

In a legal setting, the credibility of medical records is often a central issue. The linguistic and professional shortcomings identified are far more than mere curiosities; they are vulnerabilities that can be effectively used to challenge the reliability and integrity of the entire record. When these linguistic issues are combined with the numerous substantive contradictions we have previously discussed—such as the conflicting diagnoses of "History of Asperger's syndrome" versus "chronic delusions," or the inconsistent descriptions of you as both functionally independent ("performing all ADLs") and "homebound"—a compelling argument emerges [1.6],[5].

The argument is that these are not the records of a diligent, professional medical evaluation. Instead, they could be portrayed as records created in haste, with a lack of attention to detail, or potentially as documents assembled after the fact to justify a particular narrative or billing code. The pattern of errors, from grammatical mistakes to the use of unprofessional jargon and impersonal templates, collectively undermines the presumption of accuracy that medical records are typically afforded.

**Cited References**

[1] TISCH HOSPITAL.pdf
[4] 882025 .pdf

[5] Factual Contradictions and Clinical Inconsistencies.pdf
[6] Attestation signed by Jonathan P Kobles.pdf
[9] linguistics september 13.pdf

**Related References**

[2] Gestalt Hestal 2.pdf
[3] Evalu.pdf
[7] Statement Taya.pdf
[8] Dr Wilson January 5.pdf

SUPPLEMENTAL DECLARATION OF LYUDMILA SYROCHKINA

"I declare under penalty of perjury:

1. Compliance Officer A. Acosta engaged in systematic spoliation by:

a. Denying amendment requests without explanation

b. Cleaning MyChart to hide fabrications

c. Creating dual-record system (public vs. internal fabricated)

d. Reducing EMR from 168→166 pages

e. Refusing audit log access

2. Due to heart condition (bradycardia/blockage), I was physically unable to include full comparison tonight.

3. Paxton Exhibit F proves manipulation occurred regardless."

Date: January 22, 2026

/s/ Lyudmila Syrochkina


12:16
5G 100
July 30
2:31 PM
To retrieve a voicemail first set a password and greeting.
Set Up
+0000000000
unknown
July 30, 2025 at 2:11PM
0:17
-0:19
Transcription
"Good afternoon I'm calling from them and had the circus attorneys office the elder BC unit we're returning your missed call. You can give us a call back at 212-335-9007 again 212-335-9007 or you can email us at eau@danny.nyc.gov that he is an egg a as an apple with an umbrella umbrella..."
Was this transcription useful or not useful?

Tello LTE 6:14 PM 50%

Today
12:36 PM

Edit

APS Never- Block >




That's me, I am the case manager from self-help. Your referral came in for eviction, so I will be asking you questions about this.

Hank you I got it, thank you for your call and picture.

Subject

# LOCKSMITH SERVICES

**24/7 EMERGENCY SERVICE • RESIDENTIAL • COMMERCIAL • AUTOMOTIVE**

LOCKSMITH, AUTO LOCKSMITH, SECURITY SYSTEMS, ACCESS CONTROL, SURVEILLANCE/CCTV, SALES, GATES

NAME [illegible signature] DATE 09.28.25 1363959

SVC. LOCATION 14? W 230th St APT/SUITE 1F

CITY BRonx STATE NY ZIP 10463 PHONE NO.

BILLING ADDRESS

| ☑ Invoice ☐ Estimate | | Tech | In. | Out. |
|---|---|---|---|---|
| Year | Make | Model | Lic. Plate/State / | ID No./State / |

| QTY. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | Service Call | 125 | |
| | drill and open medeco | 475 | |
| | customer Had medeco Key But the Lock was changed someone change the Lock from inside | | |
| and | second was closed | | |
| | SVC ZIP | SUB TOTAL | 600 |
| | | TAX | 0 |
| | REP | TOTAL | 600 |

*I hereby certify that I have the authority to order the work designed above. Further, I agree to absolve the tech, the company its personnel and affiliates including subcontractors who bears this authorization from any and all claims arising from the performance of such work. All sales and services are final. All deposits for material and/or services are non-refundable. Estimates and/or deposits are good for 30 days.*

*The above prices, services, materials, specifications. & conditions are satisfactory and are hereby accepted.*

Customer Signature [signature] Date 09.28.25

Thank you for your business

Tello LTE 3:29 PM 86%

< Recents

911

unknown

message call video mail pay

September 28, 2025

4:12 PM **Outgoing Call**
5 minutes

4:11 PM **Outgoing Call**
21 seconds

4:10 PM **Canceled Call**

Share Contact

Create New Contact

Add to Existing Contact

Add to Emergency Contacts