RECEIVED
SDNY PRO SE OFFICE
2026 FEB 18 PM 1:39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Lyudmila Syrochkina,
Plaintiff,

v.

NYU Langone Health (Dr. Kobles, Compliance Officer Acosta);
Jacobi Hospital (RN Ofoma, PA Galina Makina);
NYPD 50th Precinct (Officer Sharhan);
New York State Homes & Community Renewal – HCR (Peter Stecker, Jessica Moran);
David Tennenbaum,
Defendants.

Case No. 26-cv-00558

AMENDED COMPLAINT
(42 U.S.C. § 1983 – Fourth & Fourteenth Amendments)

Plaintiff, pro se, alleges:

---

## I. INTRODUCTION

1. Plaintiff is a 71-year-old woman with Autism Spectrum Disorder (ASD) and Selective Mutism (SM) who has lived for 27 years in a rent-stabilized apartment in the Bronx, New York, under the protections of the Housing Stability and Tenant Protection Act of 2019 (HSTPA 2019).

2. On November 17, 2021, Defendant landlord David Tennenbaum purchased Plaintiff's building and thereafter altered Plaintiff's 2022 renewal lease using white-out and inserted an inflated vacancy rent, which Plaintiff disputed through New York State Homes & Community Renewal (HCR).

3. On July 17, 2025, Defendant HCR attorney Peter Stecker closed Plaintiff's compliance case (DKT# MN-610001-NC) without a hearing and without notice to Plaintiff, despite acknowledging landlord non-compliance and despite the landlord's failure to comply with a Stipulation that had resulted in fines imposed by the Commissioner and Administrative Law Judge.

4. The July 17, 2025 closure reinstated inflated rent based on illegal riders, J-51-related "concessions," and a forged lease previously rejected by HCR in Order KO610012R, causing Plaintiff to lose her HSTPA 2019 protections and her lawful legal regulated rent (LLR) in the renewal lease.

5. Immediately after the July 17, 2025 closure and the fines against the landlord, multiple state and municipal actors—including NYPD, Jacobi Hospital, and NYU Langone—created and relied on false psychiatric documentation, backdated Adult Protective Services (APS) entries, and fabricated incapacity profiles to portray Plaintiff as psychotic, demented, homebound, and incapacitated, even though Plaintiff continued to work professionally as a choir director and organist in New York and Connecticut.

6. The fabricated incapacity profile was used, or threatened to be used, to justify warrantless entry into Plaintiff's home, involuntary medical detention and forced medication, and threats of Article 81 guardianship and future psychiatric intervention, which Plaintiff refers to as "civil death."

7. Plaintiff brings this action under 42 U.S.C. § 1983 for violations of her rights under the Fourth Amendment (unreasonable search and seizure) and the Fourteenth Amendment (due process and fabrication of records) by Defendants acting under color of state law.

8. This case is not a housing dispute; the housing issue was the trigger for retaliatory actions after Plaintiff refused to sign an inflated-rent lease and reported J-51 tax irregularities and deregulation issues to government authorities.

---

## II. JURISDICTION AND VENUE

9. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) because all events giving rise to these claims occurred in the Bronx, New York, which is within the Southern District of New York, and all Defendants reside in or conduct business within this District.

---

## III. PARTIES

11. Plaintiff Lyudmila Syrochkina is an individual residing in the Bronx, New York.

12. Defendant Jacobi Hospital is part of NYC Health + Hospitals, a public hospital system in New York City.

13. Defendant RN Ofoma is a registered nurse employed at Jacobi Hospital and, at all relevant times, acted under color of state law.

14. Defendant PA Galina Makina is a physician assistant employed at Jacobi Hospital and, at all relevant times, acted under color of state law.

15. Defendant NYU Langone Health is a hospital system that, at all relevant times described herein, acted jointly with state actors through APS, NYPD, and HCR in connection with Plaintiff, and its employees identified here acted under color of state law.

16. Defendant Compliance Officer Acosta is a compliance officer at NYU Langone Health who handled requests to correct Plaintiff's medical records and acted under color of state law.

17. Defendant Dr. Jonathan P. Kobles is a physician at NYU Langone Health who authored or was listed as author of electronic medical record (EMR) entries concerning Plaintiff and acted under color of state law.

18. Defendant NYPD Officer Sharhan is an officer of the NYPD 50th Precinct who, at all relevant times, acted under color of state law.

19. Defendant HCR employee Peter Stecker is an attorney or official at New York State Homes & Community Renewal who handled Plaintiff's rent-compliance case and, at all relevant times, acted under color of state law.

20. Defendant HCR employee Jessica Moran is an HCR official involved in enforcement (or non-enforcement) of Plaintiff's rent overcharge and compliance orders and, at all relevant times, acted under color of state law.

21. Defendant landlord David Tennenbaum is the owner of Plaintiff's building who, upon information and belief, acted jointly and in concert with state actors—including HCR, NYPD, APS, Jacobi Hospital, and NYU Langone—to retaliate against Plaintiff and remove her from her home by misuse of psychiatric and protective-services mechanisms.

---

## IV. FACTUAL ALLEGATIONS

### A. July 17, 2025 HCR Closure — Triggering Event

22. Plaintiff had a pending compliance case at HCR (DKT# MN-610001-NC) relating to inflated rent, forged or altered renewal leases, illegal riders, and J-51-related "concessions."

23. On November 29, 2023, HCR issued an order in Plaintiff's favor and imposed fines on the landlord for non-compliance and overcharge, but the landlord failed to fully comply.

24. On July 17, 2025, Defendant Stecker unilaterally closed Plaintiff's compliance case without giving Plaintiff notice, without providing Plaintiff any hearing, and without requiring the landlord to comply with the November 29, 2023 order and Stipulation.

25. The July 17, 2025 closure reinstated inflated rent based on an illegal rider and J-51-related "concessions," and relied on a forged lease that HCR had previously rejected in Order KO610012R.

26. As a result of the closure, Plaintiff lost her HSTPA 2019 protections, including her allowable legal regulated rent (LLR) in the renewal lease, and was exposed to ongoing overcharges and risk of eviction.

27. Plaintiff received no letter or notice of the closure until October 22, 2025.

28. Plaintiff personally filed a Petition for Administrative Review (PAR) on August 20, 2025, which was date-stamped, but HCR failed and refused to process it.

29. In early July 2025, Plaintiff also reported J-51 tax issues and building deregulation (including 71 J-51 apartments and deregulation after January 1, 2022) to the Bureau of Investigation and the Comptroller. After these reports and after Plaintiff refused to sign a renewal lease effective January 1, 2026 containing inflated rent instead of the lawful LLR protected by HSTPA 2019, retaliation escalated.

**B. Warrantless Police Entry (August 4, 2025)**

30. On August 4, 2025, NYPD Officer Sharhan and other officers came to Plaintiff's apartment allegedly in response to an "elderly abuse investigation" based on a spoofed call.

31. Plaintiff did not consent to the officers' entry, and the officers did not have a warrant.

32. Officer Sharhan entered Plaintiff's home without a warrant and without exigent circumstances or probable cause.

33. Inside Plaintiff's home, Officer Sharhan handcuffed Plaintiff, refused Plaintiff's requests to use the restroom, and forced Plaintiff to leave her home barefoot.

34. Officer Sharhan transported Plaintiff, against her will, to Jacobi Hospital, in handcuffs and in a humiliating manner.

35. On that same day, August 4, 2025, Plaintiff traveled independently by train to New Jersey to spend the day with longtime friend and colleague Taya Shumerina and her daughter in Chester, New Jersey. Ms. Shumerina's written statement describes Plaintiff as oriented, cheerful, and fully engaged in normal

activities—visiting shops, a music school office, and restaurants—before returning to New York that evening, contradicting any claim that Plaintiff was acutely psychotic, confused, or unable to care for herself on that date.

36. Jacobi Hospital discharged Plaintiff shortly after arrival, noting no psychiatric basis for admission; Plaintiff's longstanding diagnosis remained Autism Spectrum Disorder, not psychosis or dementia.

37. The warrantless entry into Plaintiff's home and the seizure and transport of Plaintiff to the hospital were unreasonable and violated Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

**C. Jacobi Hospital — Fabricated Psychiatric Records and Forced Medication**

38. At Jacobi Hospital, Defendant RN Ofoma entered EMR notes labeling Plaintiff with "psychosis," "delusions," and "neurocognitive disorder," even though Ofoma did not personally assess Plaintiff and even though other medical providers documented that Plaintiff had no psychiatric history.

39. The EMR entries by Ofoma referenced "PSYKES," contradicting physician and licensed social worker notes that Plaintiff had no psychiatric history.

40. After Plaintiff was medically cleared, Defendant PA Makina detained Plaintiff and administered medication that Plaintiff did not consent to.

41. When Plaintiff requested a lawyer and stated she would sue for unlawful detention, Defendant Makina responded in Russian, "You already sued your landlord, and now you will stay here," revealing a retaliatory motive connected to Plaintiff's housing dispute and complaints.

42. Plaintiff experienced repeated spikes in blood pressure after the involuntary medication, but these spikes were not documented in her chart.

43. Jacobi Hospital's actions—detaining Plaintiff after medical clearance, forcibly medicating her without consent, and fabricating psychiatric diagnoses in her records—constituted unreasonable seizures and deprivations of liberty without due process, and the false entries contributed to a fabricated incapacity profile.

**D. NYU Langone — Backdated APS Referral and EMR Fabrication**

44. On or about August 8, 2025, Plaintiff was evaluated in the emergency department at NYU Langone Health after an outpatient cardiologist requested a mental-health check.

45. Physician assistant Michele Ikone documented that Plaintiff had no suicidal or homicidal ideation, was performing all activities of daily living, had no acute

medical complaints, and was medically and psychiatrically cleared for discharge, with "History of Asperger's syndrome" as the primary impression, and the ED disposition was discharge home in stable condition.

46. In contrast, attending physician Jonathan P. Kobles signed an attestation stating that Plaintiff had "chronic delusions" regarding her living situation and calling for psychiatric and social-work involvement for a "home safety assessment," despite the absence of any psychosis on exam and the discharge plan to send Plaintiff home.

47. Social worker Gabrielle Nash documented an Adult Protective Services (APS) referral and listed a web-referral number that appears in the EMR as dated January 21, 2025, even though Plaintiff had no APS involvement on that date; this APS referral was inserted into the August 8, 2025 visit, creating a backdated false history of APS involvement.

48. Care manager Laura Newbold completed a "Home Health Face-to-Face Encounter Certification" describing Plaintiff as homebound, debilitated, and needing skilled nursing and therapy at home, and listing Girling Home Care as an agency recipient, even though the ED notes state that Plaintiff performs all activities of daily living, is stable for discharge, and is not homebound.

49. The August 8, 2025 NYU Langone records thus present contradictory versions of Plaintiff's condition—one discharge impression of a stable patient with Asperger's syndrome and intact functioning, and another profile portraying Plaintiff as psychotic, debilitated, homebound, and subject to APS and home-health intervention.

50. Plaintiff requested that Compliance Officer Acosta correct and remove the backdated APS referral and false homebound/home-care entries from her NYU Langone records, but Acosta refused, leaving in place a fabricated incapacity profile that can be used to justify APS involvement, guardianship, and involuntary psychiatric intervention.

**E. HCR False Statements and Ongoing Retaliation**

51. In December 2025, Defendant HCR employee Jessica Moran informed Plaintiff that the landlord was in "full compliance" despite unresolved violations, continued inflated rent in the renewal lease, and prior Department of Finance and Ombudsman orders that were inconsistent with this statement.

52. Moran did not enforce the November 29, 2023 overcharge decision and did not correct the unlawful closure and rent reinstatement, thereby continuing the deprivation of Plaintiff's statutory rent protections.

53. HCR's actions deprived Plaintiff of notice, an opportunity to be heard, and the benefit of existing favorable orders, resulting in the loss of a protected property interest in her rent-stabilized tenancy and statutory protections.

### F. Fabricated Incapacity Profile ("Civil Death")

54. The combined actions of HCR, NYPD, Jacobi Hospital, and NYU Langone created a false incapacity profile for Plaintiff that included psychosis, dementia, APS involvement, homebound status, and the need for home-care services documented for multiple recipients, including a home-health agency.

55. This false incapacity profile was used to justify and threaten involuntary psychiatric commitment and Article 81 guardianship proceedings against Plaintiff.

56. Plaintiff received correspondence from APS referencing possible future psychiatric intervention based on the false incapacity profile.

57. On September 18, 2025, an independent forensic psychiatric evaluation was performed by John G. Wilson III, MD, a board-certified forensic psychiatrist licensed in New York, New Jersey, and Pennsylvania. Dr. Wilson diagnosed Plaintiff with autism spectrum disorder and specifically found no evidence of psychosis, dementia, or any condition warranting involuntary psychiatric treatment, and no current suicidal or homicidal ideation. Dr. Wilson opined that Plaintiff's concerns about being targeted by her landlord are not demonstrably false and that a diagnosis of "delusional disorder" should be made with caution, directly contradicting the fabricated diagnoses and incapacity profile created by Defendants.

58. These actions placed Plaintiff at continuing risk of loss of legal capacity, forced guardianship, and removal from her home—what Plaintiff describes as "civil death"—and constitute violations of Plaintiff's Fourteenth Amendment right to due process.

---

## V. CLAIMS FOR RELIEF

### COUNT I – FOURTH AMENDMENT

(Unreasonable Search and Seizure – 42 U.S.C. § 1983)
(Against Officer Sharhan, Jacobi Hospital, RN Ofoma, PA Makina, and NYU Langone actors involved in detention and forced medication)

59. Plaintiff realleges and incorporates by reference paragraphs 1–58 as though fully set forth herein.

60. Defendant Officer Sharhan, acting under color of state law, entered Plaintiff's home on August 4, 2025 without a warrant, without consent, and without exigent circumstances or probable cause.

61. Officer Sharhan seized Plaintiff by handcuffing her, refusing her basic needs (such as restroom access), forcing her to leave barefoot, and transporting her against her will to Jacobi Hospital.

62. At Jacobi Hospital, Defendants Ofoma and Makina, acting under color of state law, caused Plaintiff to be detained after medical clearance and administered medication without Plaintiff's consent.

63. These actions constituted unreasonable searches and seizures in violation of the Fourth Amendment.

64. As a direct and proximate result, Plaintiff suffered physical pain, emotional distress, humiliation, and fear of future involuntary detention and forced medication.

**COUNT II – FOURTEENTH AMENDMENT**

(Procedural Due Process – 42 U.S.C. § 1983)
(Against HCR Defendants Stecker and Moran)

65. Plaintiff realleges and incorporates by reference paragraphs 1–58 as though fully set forth herein.

66. Plaintiff has a protected property interest in her rent-stabilized tenancy and in the statutory protections and lawful regulated rent provided by HSTPA 2019 and applicable HCR orders.

67. Defendant Stecker closed Plaintiff's HCR compliance case on July 17, 2025 without notice to Plaintiff and without providing Plaintiff any opportunity to be heard, despite Plaintiff's ongoing dispute and the landlord's non-compliance.

68. Defendants Stecker and Moran failed to process Plaintiff's timely PAR filed on August 20, 2025 and failed to enforce the November 29, 2023 overcharge decision, thereby depriving Plaintiff of the benefit of that favorable order.

69. By closing the case and reinstating inflated rent based on illegal riders, J-51 "concessions," and a forged lease, HCR deprived Plaintiff of property without constitutionally adequate notice or hearing.

70. These actions violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.

71. As a direct and proximate result, Plaintiff has suffered financial harm through inflated rent, loss of statutory protections, risk of eviction, and emotional distress.

**COUNT III – FOURTEENTH AMENDMENT**

(Fabrication of Records / Substantive Due Process – 42 U.S.C. § 1983)
(Against Jacobi Hospital, RN Ofoma, PA Makina, NYU Langone, Dr. Kobles, Compliance Officer Acosta, and all state actors acting in concert)

72. Plaintiff realleges and incorporates by reference paragraphs 1–58 as though fully set forth herein.

73. Defendants Ofoma, Makina, Jacobi Hospital, NYU Langone, Dr. Kobles, and other NYU Langone staff deliberately created and maintained false medical records for Plaintiff, including fabricated diagnoses of psychosis, delusions, neurocognitive disorder, homebound debility, and APS involvement, despite contrary medical evidence.

74. Defendants also backdated APS referral information by inserting an APS web-referral number with a January 21, 2025 date into an August 8, 2025 visit, thereby constructing a false history of APS involvement.

75. Defendant Acosta refused to correct the false and contradictory entries even after Plaintiff requested corrections, knowingly allowing the fabricated record to stand.

76. The false psychiatric and APS records were used, or threatened to be used, to justify involuntary psychiatric detention, future psychiatric intervention, and Article 81 guardianship over Plaintiff.

77. The deliberate fabrication and use of false records to affect Plaintiff's bodily liberty, legal capacity, and housing constitute arbitrary and conscience-shocking conduct that violates substantive due process under the Fourteenth Amendment.

78. As a direct and proximate result, Plaintiff has suffered and continues to suffer emotional distress, fear of involuntary confinement and guardianship, damage to reputation and autonomy, and interference with her medical care and housing stability.

**COUNT IV – § 1983 AGAINST ALL DEFENDANTS ACTING UNDER COLOR OF STATE LAW**

(Concerted Retaliatory Deprivation of Civil Rights)

79. Plaintiff realleges and incorporates by reference paragraphs 1–58 as though fully set forth herein.

80. At all relevant times, Defendants who are state or municipal employees (HCR, NYPD, Jacobi, and APS-related actors) acted under color of state law, and private actors (NYU Langone, its staff, and landlord Tennenbaum) acted jointly and in concert with those state actors.

81. Defendants collectively retaliated against Plaintiff for asserting her rights in her housing dispute, for refusing to sign an inflated-rent lease, and for reporting J-51 tax fraud and deregulation issues, by misusing police, hospital, and APS processes to portray Plaintiff as incapacitated and to threaten removal of her liberty and housing.

82. Through this coordinated conduct, Defendants deprived Plaintiff of her rights under the Fourth and Fourteenth Amendments and caused the harms described above.

---

## VI. DAMAGES

83. As a result of the acts and omissions alleged, Plaintiff has suffered:

a. Financial damages due to inflated rent and loss of rent-stabilization protections.
b. Physical pain and medical effects arising from forced medication and detention.
c. Emotional distress, anxiety, fear, and humiliation.
d. Damage to reputation and creation of a false incapacity profile affecting her medical care and legal status.
e. Risk of eviction, guardianship, and future involuntary psychiatric commitment.

---

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendants' actions described herein violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

B. Award Plaintiff compensatory damages in an amount to be determined at trial;

C. Award punitive damages against the individual Defendants where allowed by law;

D. Order expungement and correction of all fabricated psychiatric, APS, and incapacity-related records created about Plaintiff by Defendants;

E. Order appropriate injunctive relief to prevent Defendants from using fabricated records to detain Plaintiff, seek guardianship, or interfere with her housing;

F. Award costs and any other relief the Court deems just and proper.

---

## VIII. EXHIBITS

**Exhibit A – HCR July 17, 2025 closure letter issued by Defendant Peter Stecker, reinstating inflated rent and closing Plaintiff's compliance case without notice or hearing.**

**Exhibit B – NYU Langone Health discharge paper (hard copy) dated August 8, 2025, showing Plaintiff medically and psychiatrically cleared for discharge.**

**Exhibit C – Screenshot(s) of spoofed telephone calls used as pretext for the August 4, 2025 "elder abuse" welfare check and warrantless entry into Plaintiff's apartment.**

**Exhibit D – Jacobi Hospital 8/4/2025 discharge summary and MyChart printouts, showing brief ED visit, no psychiatric admission, and subsequent EMR entries adding "psychosis," "neurocognitive disorder," and PSYKES references.**

**Exhibit E – NYU Langone Health 8/8/2025 MyChart/emergency department records, including notes by Michele Ikone, PA; Jonathan P. Kobles, MD; social worker Gabrielle Nash (APS referral); and care manager Laura Newbold (Home Health Face-to-Face Certification describing Plaintiff as homebound and debilitated).**

**Exhibit F – Witness statement of Taya Shumerina describing Plaintiff's activities and normal functioning in Chester, New Jersey, on August 4, 2025.**

**Exhibit G – Forensic psychiatric evaluation of Plaintiff by John G. Wilson, MD, dated September 26, 2025, diagnosing autism spectrum disorder and finding no psychosis, dementia, or basis for involuntary psychiatric treatment.**

Dated: ______17 February__________________, 2026
New York, New York

Lyudmila Syrochkina
Plaintiff, Pro Se

929-501-2006

Lyudmila Syrochkina

Verified by pdfFiller
02/17/2026

NEW YORK STATE OF OPPORTUNITY. | Homes and Community Renewal

KATHY HOCHUL
Governor

RUTHANNE VISNAUSKAS
Commissioner/CEO

July 17, 2025

147 W 230 LLC
20 South Broadway, Ste. 300
Yonkers, New York 10701

LYUDMILA SYROCHKINA
P.O. Box 8288
New York, New York 10116

**DKT# MN-610001-NC**

Dear Parties:

Please be advised that the above-referenced compliance proceeding has resulted in the issuance of a Commissioner's Order following a stipulation of settlement imposing a civil penalty for non-compliance with the underlying order. Accordingly, this matter is hereby closed.

The civil penalty has been paid. However, the amended registrations required by the underlying order and agreed-to as part of the stipulation have not been filed to date. A prior submission by the landlord was noncompliant with the directives in Order KO-610012-R. Landlord is advised that an ongoing failure to file these amendments could form the basis for a future noncompliance proceeding upon application by the tenant that would, if appropriate, lead to increased penalties due under the NYS Rent Stabilization Law & Code.

Very truly yours,

Peter M. Stecker, Esq.
Compliance Unit

# AFTER VISIT SUMMARY

NYC HEALTH+ HOSPITALS | Jacobi | North Central Bronx

Lyudmila Syrochkina MRN: 7386687

8/4/2025 NCB ED Psych 718-519-3030

## Instructions

You are being discharged home

Please follow up with your current provider.

If you are in crisis, please call 911 or go to your nearest ER.

## What's Next

You currently have no upcoming appointments scheduled.

## General Emergency Department Discharge Instructions

We appreciate that you chose us as your healthcare provider.

This form provides you with information about the care you received in our Emergency Department and instructions about caring for yourself after you leave the Emergency Department. If you have further questions concerning this visit please call us at the included phone number above on this form. Please keep this form and bring it with you should you need additional treatment. If your symptoms become worse or you are not improving as expected and you are unable to reach your usual health care provider, or get to your follow-up appointment, you should return to the Emergency Department immediately. We are available 24 hours a day.

*It is important that you keep appointments that may have been scheduled. If you are unable to make an appointment, please call the corresponding clinic to reschedule your appointment.*

## Instructions

**No changes were made to your medications.**

## Home Medication Information

The list of your home medications is based on the information provided by you (or your representative) during your Emergency Department visit, and/or the information contained in your medical record. In addition,

## Today's Visit

You were seen by Dr. Luis Gonzales

**Reason for Visit**
Psychiatric Evaluation

**Diagnosis**
Autism spectrum disorder

**Done Today**
DISCHARGE PATIENT

**Medications Given**
amLODIPine (NORVASC) Last given 8/4/2025 8:00 PM

metoprolol tartrate (LOPRESSOR) Last given 8/4/2025 9:59 PM

Blood Pressure
212/111

Temperature (Oral)
98.1 °F

Pulse
89

Respiration
19

Oxygen Saturation
97%

# AFTER VISIT SUMMARY

NYU Langone Health

**Milla Syrochkina** DoB: 2/9/1955 8/8/2025 Tisch Hospital - Perelman Emergency Department 212-263-5550
Emergency Department Follow-Up & Care Transition Center 212-263-6695

## Instructions

Your personalized instructions can be found at the end of this document.

Read the attached information
Autism, Understanding (English)

## What's Next

AUG 19 2025 Follow Up Appointment with Jeffrey Berger, MD
Tuesday August 19 4:00 PM
Arrive 15 minutes prior to appointment.

The Green Pathway is temporarily closed. Follow signage to the Schwartz East Elevators to the 5th floor. The elevators are located just past Breads Bakery.

NYU Langone Cardiology Associates
530 First Avenue
HCC 5th Floor
New York NY
10016-6402
212-263-4300

## Today's Visit

Diagnosis
History of Asperger's syndrome

Blood Pressure
139/78

Temperature (Oral)
98.4 °F

Pulse
76

Respiration
18

Oxygen Saturation
98%

## Patient Demographics

| Address | Phone | E-mail Address |
|---|---|---|
| 147 W. 230th St. Apt 1F<br>BRONX NY<br>10463-0743 | 929-501-2006 (Home) | orgconda@protonmail.com |

## Emergency Department Treatment Team

1. Jonathan P Kobles, MD
2. Andrew H O'Hagan, MD
3. Michele A Ikone, PA

## Follow Up Communication

You will be contacted by the Emergency Department (ED) Follow-up and Care Transitions Center. We want to help you with anything you may need. We will gladly help you review your discharge instructions, assist with doctor appointments or get medications you need. If you have any questions or concerns about your ED visit, please call the ED Follow-up

## MyChart at NYU Langone

- Sign up for NYU Langone Health MyChart to stay connected to your care anytime and anywhere.
- You can schedule appointments, view test results, request prescription refills, send secure messages to your providers, and more.
- To enroll, download the NYU Langone Health app and select "Activate MyChart Account" on the login screen. Or you can visit https://mychart.nyulmc.org and select "Sign Up Now."
- For technical support, please call 1-866-262-6458.

Attestation signed by Jonathan P Kobles, MD at 8/8/2025 8:34 PM
I performed a history and physical examination of Lyudmila Syrochkina and discussed her management with the NP/PA/resident on the treatment team.

In addition to the history, physical, assessment and plan of care outlined in the NP/PA/resident's documentation, when I obtained the patient's history of present illness, the patient noted that: Patient referred in from outpatient cardiology after expressing delusions regarding her living situation. In the ED, no SI. No acute medical complaints. Upon my examination, I found that the patient was well appearing in no acute distress.
My assessment and plan of care for this patient is:
Patient who chronic delusions, does not want any medical treatments. No SI. Will discuss with psych and social work for home safety assessment.
Please also see NP/PA/resident's note.

CRITICAL CARE: No billable critical care

NYU Langone - ED Provider Note

Triage and Provider History
Registration Arrival Complaint:
med eval
Triage Chief Complaint:
Medical Evaluation (Reports landlord has been hacking all electronics in her apartment. States has been trying to file elderly abuse case with DA. Denies SI/HI. States was assaulted by a policeman on 8/4. Patient has difficulties staying on topic and requires constant redirection during triage. ) and Psychiatric Evaluation
Nursing HPI:

History of Present Illness:
Lyudmila Syrochkina is a 70 y.o. female:
70 y/o F w/ PMHx of Aspergers, sent in from clinic reporting to clinic SI, currently no SI/HI reported to ED staff. Patient denies plan to harm herself, others. Patient states she has had multiple psychosocial stressors this past week. Patient reports being falsely arrested over the weekend. Patient believes that her landlord is listening into her apartment. Patient admits to being non adherent to her medications for her chronic medical conditions. Patient's speech is pressured, she is anxious. No evidence of impaired ADLs. Patient was sent in by clinic for

evaluation of potential underlying psychiatric undiagnosed condition. Patient denies fever, positional/exertional SOB, chest pain, abdominal pain, nausea/vomiting/diarrhea, leg swelling, numbness/tingling in extremities, burning w/ urination, urinary frequency. No other complaints at this time.

I have reviewed, verified, and updated the following clinical documentation in the chart as appropriate: Available allergies, PMH, PSH, SH, FH, and prior to arrival medications. Findings related to the current presentation are included in the HPI.

I have also reviewed the following clinical documentation: ED Nursing notes and vital signs corresponding to time patient was under my care.

Review of Systems

Physical Exam
Initial Vitals: | BP: 158/100 | Heart Rate: 79 | Resp: 18 | Temp: 36.4 °C (97.5 °F) | SpO2: 99 %, O2 Device: None (Room air) | | |

Physical Exam
Cardiovascular:
Rate and Rhythm: Normal rate and regular rhythm.
Pulmonary:
Effort: Pulmonary effort is normal. No respiratory distress.
Breath sounds: Normal breath sounds. No wheezing or rales.
Musculoskeletal:
Right lower leg: No edema.
Left lower leg: No edema.
Skin:
General: Skin is warm and dry.
Neurological:
Mental Status: She is alert.
Psychiatric:
Comments: Rapid pressured speech

Assessment & Plan

70 y/o F w/ PMHx of Asperger's presents to to the ED for wellness check. Patient is performing all ADLs. No SI/HI. Psych consult placed. Plan for discharge.
The patient's current pain assessment and goals for pain management are: No pain is reported to me at this time.

Michele A Ikone, PA
08/08/25 1525

Michele A Ikone, PA
08/08/25 2030

# ED Notes - Clinical Notes

## Jason M Garcia at 8/8/2025 12:57 PM

Bed: 06
Expected date: 8/8/25
Expected time: 12:42 PM
Means of arrival: Other
Comments:
12:42 PM
Team: 4 Name: syrochkina, lyudima
DOB: 2/9/55
CC: sent by md berger for assault and mental health check denies SI/HI
Patient Acuity: Urgent
Jason M Garcia

# Consults - Clinical Notes

## Gabrielle Nash, LMSW at 8/8/2025 5:57 PM

Consult Orders
1. IP CONSULT TO SOCIAL WORK [1047358603] ordered by Jonathan P Kobles, MD at 08/08/25 1523

08/08/25 1700

Screening Criteria

| | |
|---|---|
| Screening Criteria | Discharge planning assistance;Suspicion of abuse, neglect, exploitation |
| Consult to SW Complete? | Yes |

SW consult acknowledged in Epic. Chart reviewed and appreciated. Patient is a 70 y.o. female presenting for psychiatric eval (sent in by OP cardiologist for concerns of an acute exacerbation of an underlying psychiatric disorder) with a past medical history of Abnormal Pap smear of cervix (11/12/2024), Angina pectoris (2020), Asperger disorder, Hearing loss (May 2024), Heart murmur (12/3/24), Migraines (02/08/2024), Pregnancy induced hypertension (1985), Sleep apnea (2020), and Vertigo (02/2024).

SW met with the pt at the bedside and identified self and role of social work on the medical team with regards to psychosocial assessment, discharge planning/coordination, and supportive consult service. Patient agreeable to speaking with SW. Pt reports her landlord is harassing her and has hacked her cell phone and NYU MyChart. Pt reports she has filed multiple reports regarding harrassment with police and has not received any assistance. Pt reports police presented at her home on Monday and proceeded to arrest her and bring her to Jacobi Hospital. Pt reports she was assaulted by one of the police officers and she has filed a complaint with the DAs office. Despite concerns regarding her landlord, pt reports she feels comfortable returning home. Pt denied having any family or friends she could stay with and declined shelter referral. SW informed pt this SW will make a referral to APS for additional support in the community, pt appreciative of referral. SW also included community legal and mental health resources in pts AVS. Pt medically and psychiatrically was cleared for dc.

SW submitted referral to APS- web referral number 2025012105

Gabrielle Nash, LMSW

# Progress Notes - Clinical Notes

## Laura Newbold at 8/8/2025 4:31 PM

| | |
|---|---|
| | 08/08/25 1631 |
| ED Care management Progress Note Elements | |
| Anticipated Discharge Disposition | HOMHLTH |

ED CM asked to make home care services referral for nursing for med pouring and also Social work at home for entitlements.

| | |
|---|---|
| Services Anticipated at Discharge - Primary | Certified Home Health Agency (CHHA) |
| CHHA | Girling Home Care 718-748-7447<br>Agency staff will contact patient to schedule the visit. |

# ERS Update Note - Clinical Notes

## Jonathan P Kobles, MD at 8/8/2025 4:35 PM

ERS Initial Screening Note

Psychiatric Care: I have performed an initial screening evaluation and the patient is stable for transport to Psychiatric Care (Kimmel ED West or Brooklyn Psychiatric ED or NYULHS Psychiatric ED or External Psychiatric Facility) for further evaluation.
The below vitals have been reviewed.

Reassessment Vital Signs:

| | 08/08/25 1254 |
|---|---|
| BP: | 158/100 |
| Pulse: | 79 |
| Resp: | 18 |
| Temp: | 36.4 °C (97.5 °F) |
| SpO2: | 99% |

Pain Score: (not recorded)

# Home Health Certification (Face to Face) - Clinical Notes

## Laura Newbold at 8/8/2025 3:37 PM

Attestation signed by Jonathan P Kobles, MD at 8/8/2025 6:47 PM
Agree with assessment.

Home Health Face-to-Face Encounter Certification

Physician for Follow Up:

Name of Physician for Home Care Follow Up: PCP

Case Information:

- Case Number: 16987010
- Home Care Agency:

Clinical Findings:
The following clinical findings support that the patient is homebound due to the need for special transportation and that the patient needs intermittent skilled nursing and/or therapy New diagnosis .

Skilled Nursing Needs (perform, assess and/or instruct):
RN as needed for change in clinical status, Disease process, Self care management, Response to treatment, and Symptom management

PT, OT, Speech Therapy/Language Pathology (perform, assess and/or instruct):
PT and/or OT for weakness or deconditioning

Medical Condition(s):
Medical condition which is related to the primary reason the patient needs home care (Diagnosis: anxiety,debility and Debility related to hospitalization

Physician Documentation:
I, a licensed physician, had a face to face encounter with the above-named patient on 8/8/2025 for the above medical condition(s) which is related to the primary reason the patient needs home care.

I certify that the patient is under my care and I have initiated the establishment of the home health plan of care and that this patient will be followed by a physician who will periodically review the plan of care.

Additional Comments or Instructions:

# ERS Disposition Note - Clinical Notes

## Andrew H O'Hagan, MD at 8/8/2025 5:41 PM

ED Discharge Note

Clinical impression: History of Asperger's syndrome (primary encounter diagnosis)

Discharge reassessment: pt was medically and psychiatrically cleared

Condition at discharge: stable

Consults:
Recommendations based on discussion with consultant/s: mental health and case management referrals
Social determinants impacting medical decision-making: n/a

The written discharge plan has been verbally discussed with the patient, the parents, or other medical decision-makers in a manner that ensures that they understand the information provided to make appropriate decisions. This discussion included all critical value results of laboratory or other diagnostic tests ordered during the patient's stay and identified any other tests with results pending. The patient, parent, or medical decision-maker has voiced understanding of the discharge instructions and plan.

# Post Acute Care Call - Clinical Notes

## Nathazsa Ivy Enriquez at 8/8/2025 5:59 PM

Post Acute Care Call Documentation:

Patient called by: Registered Nurse
Call Attempt: Outbound Call Second Call (Number ending in -2006)
Was patient reached: No
Patient response to follow-up call: Left message
Follow up complete? Yes

## Verlande Guirand-Precil at 8/8/2025 5:59 PM

Post Acute Care Call Documentation:
Patient called by: Registered Nurse
Call Attempt: Outbound Call First Call
Was patient reached: No
Patient response to follow-up call: Left message
Follow up complete? No

< Voicemail

To retrieve a voicemail first set a password and greeting.

Set Up

**+0000000000**
unknown
July 30, 2025 at 2:11PM

0:17 -0:19

**Transcription**

"Good afternoon I'm calling from them and had the circus attorneys office the elder BC unit we're returning your missed call. You can give us a call back at 212-335-9007 again 212-335-9007 or you can email us at eau@danny.nyc.gov that he is an egg a as an apple with an umbrella umbrella...."

Statement / Account of Events 08/04/2025

I have been a friend of Lyudmila Syrochkina for over two decades, and we are also colleagues as musicians. Lyudmila had not seen me or my daughter for several years, and we planned a reunion on August 4, 2025.
She was scheduled to meet us at Chatham on Monday, August 4, 2025. Lyudmila did not have her phone at the time and called from an unfamiliar commuter phone. We arranged to pick her up from Chatham around 9:00 AM and drove to Chester, NJ. She had left home at 4:30 AM and was hungry.
We spent a wonderful day together in Chester, visiting Starbucks, the music school office, local boutiques, and a farm restaurant. We bought Lyudmila peaches for her home and several gifts from boutiques, all of which she loved. Later, we drove her back to the train station in Chatham so she could return to New York Penn Station. She was in a very happy mood, as she had not seen us for years.
However, she did not call later in the day, and we became concerned. Between 6:00 and 7:00 PM, I received a call from a social worker at Jacobi ED, who asked about Lyudmila's visit to NJ. Later, Lyudmila did not call us, and we left a message. We then called the same number used by the social worker. He informed us that Lyudmila had been briefly admitted and discharged, but was being monitored to stabilize her high blood pressure (HTN).
Lyudmila eventually left a message after midnight and called the next morning,

Taya Shumerina
Pianist, Organist, Piano teacher
NJ
609-369-7108
tayashum@gmail.com>

John G. Wilson III, MD
Child, Adolescent, Adult & Forensic Psychiatrist
www.DrWilsonMD.com

**Examinee:** Lyudmila Syrockina
**Date of Birth:** February 9, 1955
**Date of Examination:** September 18, 2025
**Date of Report:** September 26, 2025
**Examiner:** John Wilson, MD

**SUMMARY OF REASON FOR REFERRAL:**

A psychiatric evaluation was conducted at the request of Ms. Lyudmila Syrockina ('Ms. Syrochkina') due to her concerns regarding an ongoing dispute with her landlord and the potential use of New York's mental health law as a means to facilitate her involuntary psychiatric hospitalization and eviction.

**INFORMED CONSENT:**

Before beginning the interview, Ms. Syrochkina was informed that her statements were not confidential and would be used to prepare a report. The nature and purpose of the examination was reviewed with Ms. Syrochkina, including the limits of confidentiality, the limited doctor/patient relationship with Ms. Syrochkina (which does not include treatment at this time), and that the undersigned was not compelling Ms. Syrochkina to participate in this evaluation. Ms. Syrochkina then the signed consent forms to proceed with the evaluation after demonstrating understanding of these disclosures. All information was provided by Ms. Syrochkina, except where otherwise indicated. Points of conflict or corroboration with other sources were noted.

**BASIS OF EVALUATION:**

1. Interview with Ms. Lyudmila Syrochkina on 09/18/25.
2. Letter by Elliot Weinburg, MD, dated 08/17/11.
3. Letter by Daniel Aaron, PhD, dated 06/10/11.
4. Ms. Lyudmila Syrochkina's curriculum vitae, undated.

**RELEVANT SOCIAL HISTORY:**

Ms. Syrockina reported that she was born in Rostov, Russia, and raised by both parents. Her mother worked as a teacher, and her father was a dentist. She has one older brother.

Ms. Syrockina completed high school and pursued higher education in music. She stated, "I was a musician and was good." In 1981, she graduated from the Glinka Conservatory in Nizhniy Novgorod, Russia, specializing in concert performance.

She emigrated to the United States with her daughter in 1994. Since then, she has held various positions as a pianist, organist, conductor, and vocal coach. Her curriculum vitae documents employment across Connecticut, Virginia, and New York.

Ms. Syrockina has lived in a rent-stabilized apartment in the Bronx, New York, for the past twenty-seven years. She reported that the building was purchased approximately four years ago by a landlord whom she described as a "famous notorious evictor." She alleges persistent harassment intended to compel her to vacate the premises, which she states is consistent with the landlord's documented legal history.

She currently lives alone and has been estranged from her daughter since 2019. She reported that both her parents and brother are deceased.

**RELEVANT HISTORY OF SUBSTANCE USE AND TREATMENT:**

Ms. Syrockina denied any history of substance use, including alcohol or illicit drugs.

**RELEVANT MEDICAL HISTORY:**

Ms. Syrockina reported a medical history of angina pectoris, hypertension, and hyperlipidemia. She stated she experienced severe adverse reactions to amlodipine and metoprolol.

**RELEVANT LEGAL HISTORY:**

Ms. Syrockina described an extended legal conflict with her landlord regarding housing and eviction. She also reported a prior employment-related incident following an episode of selective mutism in 2011, which she states has since resolved. She denied any history of arrest or violence.

**RELEVANT HISTORY OF PSYCHIATRIC ILLNESS AND TREATMENT:**

Ms. Syrockina reported no formal psychiatric treatment but described lifelong psychiatric symptoms. She identified herself as having been a severely anxious child with substantial social deficits. She reported a history of selective mutism in childhood, requiring academic accommodations to communicate in writing for multiple years. She noted persistent difficulties with social interaction, literal interpretation of language, and poor eye contact. She stated, "I eat the same food. I wear the same clothing. If I like wearing something, I buy two because I'll wear it every day."

She emphasized a deep fixation on music and poetry and described this focus as integral to her professional success. She identified herself as a "savant" in this domain. Additionally, she reported hypersensitivity to low-frequency sound, which she finds particularly distressing (e.g., loud vehicles, subwoofers, and amplified speakers).

She denied symptoms of psychosis, mania, or obsessive-compulsive disorder. She endorsed chronic low mood, stating, "I've been depressed my whole life," but denied anhedonia, appetite disturbance, or low energy. She described a single suicide attempt in her 20s by cutting, following a relationship breakup, with no subsequent attempts or recent suicidal ideation.

John G. Wilson III, MD
Child, Adolescent, Adult & Forensic Psychiatrist
www.DrWilsonMD.com

She noted multiple emergency psychiatric evaluations since July 2025. On each occasion, she was assessed and discharged without hospitalization. One referral was initiated by her cardiologist after she stated, "I can't go on living like this," in reference to her landlord conflict. Another was triggered by a welfare check requested by the landlord. She reported that one physician documented a diagnosis of "delusional disorder," which she disputes, citing the evaluator's limited information. She stated that at no time prior to, or during these evaluations did she experience or report any suicidal or homicidal ideation.

Her primary concern is that her landlord may seek to exploit the New York's mental hygiene law to facilitate her eviction via involuntary hospitalization.

**MENTAL STATUS EXAMINATION AND BEHAVIORAL OBSERVATIONS:**

Ms. Syrockina appeared her stated age. She is a Caucasian female who speaks with a Russian accent. She had short brown hair, and adequate hygiene. She wore a red blouse layered over a white shirt and a pearl necklace. She appeared anxious, with labile affect. She made very limited eye contact. No abnormal movements or tics were observed. Speech was rapid with circumstantial thought processes. She struggled to answer questions directly and appeared driven to present her narrative.

She denied suicidal or homicidal ideation and auditory hallucinations. She was alert and oriented to person, place, and time. Memory was intact; she recalled 3/3 items immediately and again after five minutes. Informal cognitive testing was intact, including spelling "world" backward and performing serial sevens. Abstract reasoning was tested through identifying similarities. She identified "bird and plane" as similar by "flying," but struggled with "watch and ruler" due to language confusion.

**REVIEW OF AVAILABLE COLLATERAL RECORDS**

Ms. Syrockina provided two brieft letters documenting psychiatric history since 2011. A letter from Dr. Elliot Wineburg, reported her diagnosis as Asperger's syndrome. The letter noted poor eye contact, limited social interaction, and significant social deficits. A separate handwritten note by Daniel Aaron, PhD (dated 06/10/11), referenced "high-functioning Asperger's syndrome" without supporting documentation.

**DIAGNOSIS:**

*autism spectrum disorder*

John G. Wilson III, MD
Child, Adolescent, Adult & Forensic Psychiatrist
www.DrWilsonMD.com

**FORMULATION:**

All formulations and opinions are presented with a reasonable degree of medical probability. All opinions are subject to revision if new material becomes available.

Ms. Syrochkina's presentation and history of psychiatric symptoms continues to be consistent with the diagnosis of ***autism spectrum disorder (ASD)***, as defined by the Diagnostic and Statistical Manual, Fifth Edition Text Revision (DSM-5-TR, APA 2022).

Ms. Syrockina meets criteria for ASD based on deficits in social communication, as evidenced by poor eye contact, selective mutism, difficulty understanding social nuance, and literal interpretation of language. She also demonstrates restricted and repetitive patterns of behavior, including insistence on sameness, resistance to change, and narrowly focused interests in music and poetry. Her hypersensitivity to low-frequency sound further supports the diagnosis. These symptoms have led to significant social and occupational impairment.

Her primary concern involves perceived risk of involuntary hospitalization under New York's mental hygiene laws, allegedly as a strategy by her landlord to facilitate eviction. Based on the available information, she does not present current risk factors warranting involuntary psychiatric treatment. There is no evidence of recent suicidal or homicidal ideation, or behavior placing her or others at imminent risk. Her concern appears rooted in misinterpretation of legal language and is consistent with the cognitive profile associated with autism spectrum disorder.

Ms. Syrochkina reported that a recent medical evaluation included a diagnosis of "delusional disorder." Ms. Syrochkina's belief that she is being targeted by her landlord, while possibly shaped by misinterpretation or heightened emotional response, is not demonstrably false. There is no clear evidence to indicate that her concerns are incorrect or rooted in a fixed, false belief. A delusion is defined as a belief held with strong conviction despite clear evidence to the contrary. Given the plausibility of her concerns, such a diagnosis should be made with caution. This conclusion is limited by the absence of direct collateral documentation from recent medical evaluations.

I declare that I am competent in assessing the areas identified in this evaluation.

John Wilson

John G. Wilson III, MD
NJ Medical License # 25MA10496700
NY Medical License # 303845
PA Medical License # MD475628
Board Certified in Psychiatry, American Board of Psychiatry and Neurology
Board Certified in Child and Adolescent Psychiatry, American Board of Psychiatry and Neurology
Board Certified in Forensic Psychiatry, American Board of Psychiatry and Neurology

255 South 17th St., Unit 2701, Philadelphia, PA 19103
Tel: (267) 573-0575 Fax: (714) 333-2441