**SECOND AMENDED COMPLAINT**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**LYUDMILA SYROCHKINA,**
Plaintiff,

v.

**1) NYU LANGONE HEALTH; 2) JACOBI MEDICAL CENTER NCBH (NYC HEALTH + HOSPITALS); 3) RN OFOMA; 4) PA GALINA MAKINA; 5) PETER STECKER, in his individual and official capacities; 6) JESSICA MORAN, in her individual and official capacities; 7) OFFICER SHARHAN, in his individual and official capacities; 8) ACOSTA, in their individual capacity; 9) DR. KOBLES, in their individual capacity; and 10) DAVID TENNENBAUM, individually,**
Defendants.

**Case No. 1:26-cv-00558 (RA) (GWG)**

**SECOND AMENDED COMPLAINT**

**(Civil Rights, Disability Rights, and Fair Housing — Jury Trial Demanded)**

## I. INTRODUCTION

Plaintiff Lyudmila Syrochkina is a 71-year-old autistic, selectively mute, rent-stabilized tenant of twenty-seven years' standing and a SCRIE recipient since 2017. She brings this Second Amended Complaint to stop an ongoing federal civil-rights deprivation that threatens her bodily liberty, truthful medical treatment, civil and human rights to information, disability-protected access to fair process, and continued ability to remain in her home.

Plaintiff alleges that, beginning after the November 17, 2021 ownership change of her building, Defendant David Tennenbaum subjected her tenancy to an altered and white-out-changed lease path, an inflated rent path inconsistent with HSTPA, false arrears, illegal lease riders, false rent concessions in a J-51 tax building, refusal of a lawful renewal lease since 2021, mail and wire interference, two consecutive lockouts, and a continuing pattern of disability-based housing harassment. Plaintiff alleges that these acts interfered with her HSTPA-protected rent path, endangered her SCRIE protection and housing stability, and

violated the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

Plaintiff further alleges that, on July 17, 2025, individual HCR actor Peter Stecker silently closed her noncompliance matter without notice or hearing, withheld the closure order until October 22, 2025, failed to meaningfully process her PAR filing of 08/20/2025 (a copy was stamped at Hertz Plaza and videotaped on 08/20/25), failed to meaningfully process the refiled PAR 44 days after 08/20/25, rerouted her matter away from the original altered-lease record, and caused or permitted a March 13, 2026 order to displace the HSTPA-protected preferential-rent path of $1,418.34 recognized in HCR Order KO610012R dated 11/29/2023. Plaintiff further alleges that these acts occurred while she was denied effective written and electronic communication consistent with her disability, thereby depriving her of notice, review, and fair process, in violation of the Fourteenth Amendment, the First Amendment, and ADA Title II.

Plaintiff further alleges that Defendant Jessica Moran participated in the continuation of that deprivation by failing to provide meaningful communication, failing to ensure proper tracking and processing of Plaintiff's filings, and participating in rerouting the matter onto a later and distorted administrative path instead of correcting the original altered-lease record. Plaintiff alleges that, together, Stecker and Moran caused Plaintiff to lose the benefit of a favorable HCR enforcement path, increased the risk to her SCRIE and rent freeze, and denied disability-consistent access to process.

Plaintiff further alleges that, on August 4, 2025, Defendant Officer Sharhan unlawfully seized her in her home based on spoofed incoming calls and false statements falsely attributed to her, forced her to the floor inside her apartment, handcuffed her, denied her restroom access and footwear, removed her barefoot, and caused her to be transported to Jacobi Hospital. Plaintiff alleges that this seizure violated the Fourth and Fourteenth Amendments and ADA Title II.

Plaintiff further alleges that, at Jacobi Hospital NCBH ED, Defendants Ofoma and Makina detained her after she had effectively and quickly been cleared and discharged by co-signed physician Louis Gonzalez and LMSW Essorg; administered medication, without her informed consent, that had never been prescribed by her cardiology team at Langone under Dr. Berger; caused dangerous blood-pressure spikes, including readings reaching approximately 234 systolic; created false incapacity documentation and a false monitoring narrative in her record; and tied her continued confinement to her landlord litigation of 08/28/2023 as a retaliatory act. Plaintiff alleges that these acts violated the Fourteenth Amendment, the First Amendment, ADA Title II, Section 504, and the law of battery.

2

Plaintiff further alleges that LMSW Essorg personally handed her a hard-copy AVS listing an ASD diagnosis, 212/111 blood pressure, and enforced Amlodipine and Metoprolol.

Plaintiff further alleges that, on August 8, 2025, after a phone conversation at 12:48 with her cardiology care team, including PA Swathi Bolneni, she went voluntarily to NYU Langone's emergency department for the sole purpose of creating a truthful record showing that she was not suicidal. Plaintiff alleges that she was assessed face-to-face only by Dr. O'Hagan for 22 minutes between 16:18 and 16:39 and was discharged after a brief evaluation with an Asperger's ASD diagnosis, without any prescribed medications, without any follow-up appointments for mental-health treatment, and with only a next visit to cardiologist Dr. Berger on 08/19/25. Plaintiff further alleges that NYU Langone, Acosta, and Kobles thereafter adopted, maintained, and continued to rely on a false disability-related EMR portraying Plaintiff as "delusional and paranoid about her living conditions and landlord" and as "debilitated, homebound, exploitable, and APS-eligible," in violation of Section 504 and ADA Title III.

Plaintiff requested the closing of Medicaid on July 10, 2025, and Medicaid was closed on August 6. Plaintiff was fully billed for premium Medicare Part B beginning in August.

Plaintiff further alleges that, on April 29, 2026, the Billing Office at Langone, through Shakira Robinson, notified Plaintiff: "I've requested your statement for services rendered on 8/8/2025 at The Home Depot Emergency Department at NYU Langone Health - Cobble Hill be emailed to your address we have on file. Please allow 7-10 business days for...". Plaintiff alleges that she had never heard of "Home Depot ED" and was never there.

Plaintiff further alleges that the itemized bill for 08/08/2025 shows an amount charged to Medicare of $5,106.17, which is inconsistent with a 22-minute brief evaluation by Dr. O'Hagan at ED Tisch Perelman, 530 1st Ave., without a hospital gown, with conversation only, with no encounter with Dr. Kobles ever happening, and with a short triage in which Plaintiff was practically not talking except for a few details of police assault. Plaintiff further alleges that the six productions of the EMR, while drastically different, still mention fake Kimmel team 4, and there is no mention of Cobble Hill Brooklyn Home Depot. Plaintiff further alleges that the Medicare claim bills Orthopedic ED Langone at 301 E 17 st, while Plaintiff was at 570 1st Ave. Plaintiff informed agencies about billing fraud and attempts to defraud Medicare and/or Medicaid.

Plaintiff further alleges that she was never in Kimmel, Home Depot, or Orthopedic ED Langone and that, according to defense counsel, with Summo, Levine, and Klobus declared in DCT 65, they corrected the "glitch" of inpatient. Plaintiff alleges that this confirmed the outpatient-only visit, which is also confirmed by Plaintiff's signature;

however, the fraudulent billing for being simultaneously in four different NYC locations—ED Perelman, Kimmel Pavilion, Cobble Hill Home Depot ED, and Orthopedic ED at 318 E.— apparently still exists. Plaintiff further alleges that the headings "Tisch ED Perelman" appear on the AVS hard copy, the EMR produced 09/17/25, the EMR of 11/17/25, and still appear in the computer at the second floor of 570 1st Ave.

Plaintiff further alleges that the Jacobi and NYU Langone records, generated separately, show striking parallel fabrication patterns, transforming simple benign hard-copy AVS encounters into expanded false incapacity narratives foreseeably usable in Article 81-type, APS-style, guardianship, and other liberty-restricting contexts. Plaintiff further alleges that her forensic psychiatrist on 09/18/25 qualified those records as exploitation of mental-health material for the goal of removing her from her home for eviction.

Plaintiff further alleges that she was back to W-2 payroll employment at the end of September 2025, while working on 1099 during the summer and commuting by public transportation to Long Island, New Haven, and Philadelphia. Plaintiff further alleges that, at the same time, Dr. Kobles signed "face to face" documentation without assessment and without diagnosing any physical illness at all, and that Laura Newbold assessed "debility due to hospitalization," although Plaintiff alleges she was never hospitalized in her entire life. Plaintiff further alleges that fraudulent home care and physical therapy, in the absence of any diagnosed physical illnesses on 08/08/25 and despite Plaintiff never having met Dr. Kobles, with Girling and other unknown home care agencies, were also attempted or happened as defrauding Medicare, and Plaintiff had no Medicaid after August 6. Plaintiff further alleges that the fake assessment by Gabrielle Nash with referral number APS decoding as date 01/21/25 is also billing fraud, which Langone refused to investigate.

Plaintiff clarifies that she does not assert claims under 42 U.S.C. § 1983 against NYU Langone Health, Acosta, or Dr. Kobles, and therefore the argument that NYU Langone is a private actor does not defeat the claims actually pled. Plaintiff's claims against NYU Langone Health, Acosta, and Dr. Kobles arise under Title III of the Americans with Disabilities Act, which applies to NYU Langone as a private place of public accommodation, and under Section 504 of the Rehabilitation Act of 1973, which applies to NYU Langone as a recipient of federal financial assistance. Plaintiff seeks only declaratory and injunctive relief from these Defendants and seeks no monetary damages from them.

Plaintiff further clarifies that this action is not an Article 78 proceeding and is not a challenge to HCR Order KO610012R dated November 29, 2023. Plaintiff did not file an Article 78 petition or a PAR challenging that order because the order was favorable and recognized $1,418.34 as Plaintiff's HSTPA-protected operative preferential rent for the life of her continuing tenancy. Plaintiff's federal claims are not a request that this Court review

or overturn that favorable order. Plaintiff's federal claims arise from the later conduct of individual HCR actors Peter Stecker and Jessica Moran, including silent closure of the noncompliance matter on July 17, 2025, withholding of the closure order until October 22, 2025, non-processing and effective voiding of Plaintiff's PAR filings, denial of effective written and electronic communication despite Plaintiff's known disability, rerouting away from the original altered-lease record, and the later displacement of the favorable HSTPA-protected rent path of $1,418.34 by the inflated $1,652.79 path reflected in the March 13, 2026 order. These claims arise under the Fourteenth Amendment, the First Amendment, and Title II of the Americans with Disabilities Act, and are not subject to or barred by Article 78.

Plaintiff seeks declaratory and prospective injunctive relief sufficient to stop the ongoing deprivation and seeks monetary damages only from Defendant David Tennenbaum. Plaintiff does not seek monetary damages from NYU Langone Health, Acosta, Dr. Kobles, Officer Sharhan, Jacobi Medical Center, RN Ofoma, PA Galina Makina, Peter Stecker, or Jessica Moran.

# II. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Act.

This Court has supplemental jurisdiction over Plaintiff's state and city claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Plaintiff resides in this District.

# III. PARTIES

Plaintiff Lyudmila Syrochkina is a 71-year-old disabled individual with Autism Spectrum Disorder and Selective Mutism, a long-term rent-stabilized tenant, and a SCRIE recipient since 2017, residing at 147 West 230th Street, Apartment 1F, Bronx, New York 10463.

Defendant David Tennenbaum is, on information and belief, the principal, owner, manager, and controlling landlord actor associated with Plaintiff's building since 11/17/2021. Plaintiff alleges that he personally signed Plaintiff's lease-related papers and stipulation-of-settlement materials and personally authorized, ratified, directed, or knowingly used the landlord conduct alleged

herein with respect to Plaintiff's tenancy, lease handling, rent demands, communications, and housing conditions.

Plaintiff alleges that Tennenbaum acted as the controlling human landlord actor with respect to the building and the lease, rent, renewal, arrears, communications, and other tenancy-related conduct alleged in this Complaint, including through the ownership entity associated with the building. Plaintiff names Tennenbaum as the landlord defendant in this action because he personally signed lease-related papers and stipulation materials and personally directed, authorized, or ratified the conduct alleged herein.

Defendant Peter Stecker is, on information and belief, an individual employee or official of the New York State Division of Housing and Community Renewal who was personally involved in the conduct alleged herein. He is sued in his individual and official capacities.

Defendant Jessica Moran is, on information and belief, an individual employee or official of the New York State Division of Housing and Community Renewal who was personally involved in the conduct alleged herein. She is sued in her individual and official capacities.

Defendant Officer Sharhan is, on information and belief, a New York City Police Department Precinct 50 officer who personally participated in the August 4, 2025 seizure of Plaintiff. Plaintiff seeks declaratory and prospective relief only as to this Defendant and does not seek monetary damages from him.

Defendant Jacobi Medical Center is, on information and belief, a public hospital operated by NYC Health + Hospitals. Plaintiff does not seek monetary damages from this Defendant.

Defendant Registered Nurse Ofoma is, on information and belief, an RN who personally participated in Plaintiff's detention, medication, and charting at Jacobi. Plaintiff does not seek monetary damages from this Defendant.

Defendant PA Galina Makina is, on information and belief, a physician assistant who personally participated in Plaintiff's detention, medication, charting, and the Russian-language statement linking Plaintiff's continued confinement to retaliation for her landlord litigation. Plaintiff does not seek monetary damages from this Defendant.

Defendant NYU Langone Health is, on information and belief, a private hospital and a place of public accommodation under ADA Title III, and a recipient of federal financial assistance under Section 504. It is sued only for declaratory and injunctive relief; no monetary damages are sought from it.

Defendant Acosta is, on information and belief, the NYU Langone Compliance Officer who personally received notice of the disputed false EMR content and personally controlled, directed, or participated in NYU Langone's response. No monetary damages are sought from Acosta.

Defendant Dr. Kobles is, on information and belief, a physician whose name appears in the disputed NYU Langone EMR, even though Plaintiff alleges that Dr. Kobles never met or personally evaluated her face-to-face. No monetary damages are sought from Dr. Kobles.

Plaintiff expressly does not sue HCR as an agency in this action; Plaintiff sues only the individual HCR actors Stecker and Moran.

## IV. PREHISTORY OF THE TENANCY AND THE HSTPA-PROTECTED PREFERENTIAL-RENT FRAMEWORK

Plaintiff has lived in Apartment 1F at 147 West 230th Street, Bronx, New York, since approximately October 26, 1998, in a rent-stabilized building constructed in 1928 and subject during the relevant period to J-51 tax-benefit treatment since 1984.

Plaintiff is elderly and disabled, with Autism Spectrum Disorder and Selective Mutism, and has been a SCRIE recipient since 2017.

For approximately twenty-three years, from 1998 to 2021, Plaintiff's tenancy was stable, peaceful, and uneventful, and Plaintiff signed renewal leases in the ordinary course without reason to suspect fraud or later deprivation of rights.

By 2020/2021, Plaintiff's lease under the prior owner reflected a lawful post-HSTPA structure with a rent of $1,383.75 and no false riders or concession scheme, and Plaintiff's SCRIE-frozen tenant-side base rent after HSTPA 2019 was $1,350.00, with a payable amount of approximately $1,293.33 as of December 1, 2021.

On or about November 17, 2021, ownership of the building changed, and Defendant David Tennenbaum became the principal or controlling landlord actor associated with Plaintiff's building.

After the ownership change, Defendants abruptly disturbed Plaintiff's previously stable rent and lease structure, including by billing Plaintiff at an inflated amount of approximately $1,552.76 even though Plaintiff was still under the prior lawful rent of $1,293.33 and the SCRIE structure. Plaintiff further alleges that Defendant Tennenbaum used SCRIE $100.42, calculated for rent 2020/2021 in the amount of $1,383.75, to be listed for the illegal charge of $1,552.76.

Plaintiff repeatedly requested a lawful renewal lease in writing and by telephone beginning in 08/2021, while the old owner's management remained in place, but they refused to reply; and from 12/2021 Plaintiff requested it from the new owner, Denali/Yonkers, both before and after the ownership change, and Defendants ignored those requests.

On or about March 4, 2022, Plaintiff filed RA90 lease violations; and on March 16, 2022, Defendants sent Plaintiff a purported renewal lease using an outdated pre-HSTPA form and backdated to January 1, 2022.

7

Plaintiff sought guidance from 311 and Department of Finance and SCRIE channels, and, based on that guidance, signed a renewal reflecting the lawful tenant-side amount of $1,418.34 corresponding to the 2022/2023 increase framework.

In April 2021, Plaintiff filed her first complaint with the AG office and received a letter with information about HSTPA 2019, assuring that HSTPA 2019 cannot be revoked for the life of the tenancy.

Defendant Tennenbaum returned that signed renewal only on April 21, 2022, with a white-out alteration: the white-out removed $1,418.34 and inserted the inflated figure of $1,652.79, while recasting the inflated figure as "base regulated rent."

Plaintiff alleges that this white-out-altered lease was a forged document and the beginning of the false lease path later used against her, and that the alteration was not cosmetic but changed the legal role of the rent figure on paper in violation of HSTPA.

Plaintiff repeatedly reported the altered lease and inflated rent path to HCR, 311, Ombudsman DOF, and SCRIE-related channels, and to the AG office; and on or about March 4, 2022, through RA89, and later in August 2022 through RA90, she began pursuing lease-violation relief through HCR.

In August 2023, Stecker closed a harassment case opened in July 2023 after Plaintiff saw her apartment listed, beginning on 02/09/2023, across the market as available for rent and sale, with market price attributed to Bruma Realty. Stecker did not wait for overcharge case RA89/90 and Order KO610012R to be issued, and did not react to the attached white-out forged lease copy.

On November 29, 2023, HCR issued Order KO610012R, which, under HSTPA, established two distinct figures with different functions: a vacancy legal regulated rent of $1,640.69, usable only upon permanent vacatur of the apartment, and Plaintiff's post-HSTPA operative base rent of $1,418.34, governing her continuing tenancy as the HSTPA-protected preferential rent.

Order KO610012R expressly directed that all subsequent preferential-rent increases for Plaintiff must be based on $1,418.34, and the accompanying calculation chart confirmed Plaintiff's SCRIE-frozen tenant share of $1,350.00 plus any applicable surcharges, and that Plaintiff remained in occupancy from 01/01/2022 through 08/31/2023 without a valid lease or rent increase due to the owner's late lease offer.

Under HSTPA, because Plaintiff was paying a preferential rent on or after June 14, 2019, that preferential rent continues for the life of her tenancy, with subsequent lawful increases applied to the preferential figure rather than to the higher vacancy legal regulated rent.

Plaintiff did not file a PAR after KO610012R because she accepted it as favorable on the core HSTPA issue and because the order recognized her HSTPA-protected preferential-rent path of $1,418.34 as the only operative base rent for her continuing tenancy.

Plaintiff alleges that, despite KO610012R, Defendant Tennenbaum did not comply in practice with the HSTPA-protected preferential-rent structure and instead continued to press the inflated disputed rent path against Plaintiff's tenancy.

Plaintiff therefore pursued noncompliance relief under RA22 HCR docket MN610001NC, which culminated in a December 11, 2024 stipulation of settlement and a January 27, 2025 Commissioner's order imposing a civil penalty on the landlord for noncompliance.

### V. JULY 17, 2025 SILENT CLOSURE, STECKER/MORAN REROUTING, MARCH 13, 2026 INFLATED ORDER, AND IMMINENT SCRIE/FREEZE CRISIS

By spring 2025, after four years of fighting the forged white-out lease path, Plaintiff reasonably believed that HCR noncompliance docket MN610001NC would finally enforce Order KO610012R and require a lawful renewal lease based on the HSTPA-protected preferential-rent figure of $1,418.34, so that her 2026/2027 renewal could proceed in the ordinary lawful manner and her SCRIE and frozen-rent protections could continue without interruption.

Because Plaintiff was under immediate housing pressure and had still not received a lawful corrected renewal, she signed the 2024/2025 lease "UNDER PROTEST," on emergency advice from attorney Christine Damiano of the City Bar Attorneys Program, solely to avoid loss of housing and without waiving her challenge to the inflated illegal rent. On or about May 14, 2025, Plaintiff again sent that under-protest lease directly to Defendant Stecker so that he could see that the lease preserved SCRIE and the freeze for only one year and did not resolve the underlying forged-lease and HSTPA dispute.

Stecker therefore knew, before July 17, 2025, that Plaintiff's tenancy remained trapped in an unresolved altered-lease dispute; that the prior lease had been signed only under protest as an emergency survival measure; that Plaintiff's SCRIE and rent freeze depended on timely enforcement of MN610001NC; and that failure to enforce KO610012R would place Plaintiff at risk of losing rent protections she had held since 2017.

Nevertheless, on July 17, 2025, Defendant Stecker closed MN610001NC without advance notice, without a hearing, without meaningful explanation, and without timely service of the order, thereby cutting off the only active enforcement track that could have produced a lawful corrected renewal lease before Plaintiff's SCRIE and frozen-rent protections were placed in danger.

Plaintiff did not receive the July 17, 2025 closure order at or near the time it was issued and did not obtain it until October 22, 2025. For months, Plaintiff was left unable to understand why the enforcement matter had disappeared, what rights remained open to her, or how she could preserve her housing benefits. Agents at Gertz Plaza HCR assured Plaintiff that

9

closure was still delayed. Beaver Street HCR assured her in 09/2025 that there was no closure in their electronic records. Moran stated several times by phone only that Plaintiff now needed to file a new RA22 noncompliance matter, which Moran would approve as starting from 2023, despite the approaching emergency involving the freeze and SCRIE. The last time Plaintiff demanded that Stecker reopen noncompliance matter MN610001NC in November 2025, Stecker replied that the case could not be reopened because it was now archived.

During that same period, Plaintiff's mail, phone, router, internet, and emergency communication ability in and around her apartment were unstable or blocked, further impairing her ability to receive HCR notices, respond to agency action, and protect her tenancy, while the landlord continued to benefit from the delay and communication inequality.

On August 20, 2025, Plaintiff filed a PAR challenging the silent closure. She videotaped the in-person delivery of the PAR at the 6th-floor Gertz Plaza HCR office. Plaintiff alleges that this PAR was effectively voided, was not meaningfully docketed, and was never given a usable PAR number or status. After approximately 44 days from filing the PAR, Plaintiff received the PAR back without a rejection note and without a docket number assigned to the PAR from 07/20/25, and she then refiled it in person and again received no meaningful processing.

After the 07/17/25 closure, approximately since August, Defendant Moran began contacting Plaintiff by phone and directing her to file a new RA-22 matter starting again from 2023, and Stecker advanced the same rerouting approach, even though restarting from 2023 meant new years of delay rather than enforcement of the already-won HSTPA issue recognized in KO610012R.

Plaintiff alleges that the Stecker-Moran rerouting was not a neutral administrative correction, but a displacement of the original 2022 altered-lease record and of the favorable HSTPA structure already recognized in KO610012R. Plaintiff further alleges that this rerouting stripped her of the only realistic path to a timely 2026/2027 lawful renewal lease on the $1,418.34 base needed to preserve SCRIE and frozen-rent protection, which she had received since 2017.

Plaintiff repeatedly wrote to Stecker and Moran after the July 17, 2025 closure, explaining that any new multi-year RA-22 track would destroy her ability to preserve SCRIE and the rent freeze, because the landlord was already using the forged white-out lease, inflated riders, and inflated rent path to block ordinary renewal processing.

In November 2025, Stecker answered in substance that HCR would expedite lease-violation matter LW610068RV, which Plaintiff had filed on 11/29/2023, and that a full solution resolving her housing crisis and emergency would be coming soon. Plaintiff relied on that representation as a promise that HCR would finally restore the lawful HSTPA rent path rather than extinguish it.

Instead, the remaining time to protect Plaintiff's SCRIE and frozen-rent rights was further consumed, and on March 13, 2026, HCR issued Order LW610068RV treating the inflated figure of $1,652.79 as if it were the operative renewal rent, thereby reversing the practical effect of KO610012R, legalizing the white-out forged lease path, and revoking the HSTPA-protected preferential-rent structure that should have governed Plaintiff's continuing tenancy.

Plaintiff alleges that Order LW610068RV was not properly delivered to her by HCR and that, even as of April 26, 2026, she still had no meaningful administrative path to know the status or number of her PAR filed on 04/03/26, which was personally delivered at the 6th floor of HCR at Gertz Plaza to Ms. Sullivan, nor of her PAR filed on 08/20/25, while the landlord was already positioned to use the inflated rent path against her housing and benefits, billing her since April 2026 for $2,700 instead of the frozen $1,350. Plaintiff's income is $2,182 monthly. Plaintiff continues to believe there is TAC abatement fraud, which she reported on 06/03/25 to Comptroller Lander and to the Bureau of Investigation via FedEx.

Plaintiff further alleges that Stecker and Moran knew exactly what was at stake: Plaintiff was a 71-year-old disabled, selectively mute, SCRIE-protected tenant of twenty-seven years; the previous lease had been signed under protest only to avoid immediate housing loss; and ordinary timely enforcement of KO610012R was the only path that could preserve her freeze and SCRIE rights.

Plaintiff alleges that Stecker and Moran acted in concert with, or at minimum knowingly advanced, the same result sought by Tennenbaum: replacing Plaintiff's HSTPA-protected $1,418.34 rent path with the inflated white-out lease path, blocking a lawful renewal, depriving Plaintiff of SCRIE and frozen-rent protection, and placing her at imminent risk of false arrears, eviction pressure, and homelessness.

Plaintiff was further told at the SCRIE office at 66 John Street that, because Defendant Tennenbaum had delayed execution of the lease until May 22, 2024, Plaintiff was now deemed to be in a "consecutive period" status for no-renewal-lease processing and would therefore lose SCRIE and the rent freeze after July 1, 2026. Defendant Tennenbaum received Tax Abatement for the 2024/2025 lease signed by Plaintiff "UNDER PROTEST."

11

Plaintiff alleges that this was not a neutral administrative problem and not tenant inaction, but the foreseeable result of the landlord's intentional delay in providing a usable lawful lease, combined with Stecker's July 17, 2025 closure of MN610001NC and the later HCR rerouting that prevented timely correction of the forged and inflated lease path before the next SCRIE cycle. As a result, the same unlawful lease manipulation that HCR had been asked to correct became the direct mechanism by which Plaintiff's SCRIE and frozen-rent protections were placed into expiration.

Plaintiff did not lose SCRIE because she ignored renewal requirements. The SCRIE office sent a renewal in November 2025, but it was not delivered because her mail had been tampered with since 2022, and Plaintiff has since used the SCRIE renewal form for "renewal without lease." Plaintiff was pushed into the claimed "consecutive period" bar because Tennenbaum intentionally delayed execution of the lease until May 22, 2024, while Stecker's July 17, 2025 closure then blocked the only HCR enforcement path that could have corrected the lease before the next SCRIE cycle. Under the SCRIE no-renewal-lease materials, the program recognizes that tenants may need to renew without a usable lease, but also limits repeated use of that path; that is exactly why the landlord's delay and HCR's obstruction became catastrophic here.

The threatened July 1, 2026 loss of SCRIE and the rent freeze was thus manufactured through delay, nondelivery, and blocked review, not through any failure by Plaintiff to act. By coercing Plaintiff into another four to five years of Non Compliance RA22 with the clock reset for the 2023 forged lease, Stecker and Moran, in concert with Tennenbaum, intentionally set the imminent loss of HSTPA, SCRIE, and freeze protection for an ADA-disabled elderly tenant.

Unlike ordinary SCRIE tenants and other senior tenants in her building who were able to continue their benefits through usable renewal leases, Plaintiff was trapped in a unique forged-lease and inflated-rent pathway that HCR knew about, failed to correct, and ultimately converted into the direct mechanism for loss of her SCRIE and frozen-rent protections.

Plaintiff alleges that the July 17, 2025 silent closure, the voiding or non-processing of her PARs, the Stecker-Moran rerouting, the November 2025 promise of a coming solution, the March 13, 2026 inflated order, the continuing nondelivery of HCR papers, the granting of electronic delivery to Tennenbaum while denying electronic delivery of HCR mail to disabled and elderly Plaintiff, and the later shift, by Motion to Dismiss in her SDNY case, into "Article 78 issues" language, together deprived her of due process, destroyed the last remaining path to preserve her SCRIE and frozen-rent protections, and created the imminent emergency now before this Court: July 1, 2026 loss of rent freeze, loss of SCRIE,

inflated rent demands, false arrears, and homelessness after twenty-seven years of protected tenancy, leaving Plaintiff to face the imminent, concrete deprivation that this Court is asked to prevent.

## VI. AUGUST 4, 2025 — UNREASONABLE SEIZURE BY OFFICER SHARHAN, JACOBI FORCED MEDICATION, AND MAKINA RETALIATION STATEMENT

On July 28, 2025, after a technician at the Genius Bar in the Apple Store on 5th Avenue confirmed that Plaintiff's iPhone showed multiple signs of malware and needed the attention of a forensic cyber professional, Plaintiff was advised to buy a new iPhone. Plaintiff bought an iPhone 16e that same afternoon, on 07/28/25, and bought a new Mint Mobile number in the evening on 07/29/25 at Quick Fix Phone in Brooklyn near Ocean Avenue. Less than 24 hours after activating the new number, Plaintiff received a spoofed call impersonating the "DA Manhattan Office," with voice-to-text gibberish, and the iPhone marked the number "+0000000000" as "Scam Likely," even though Plaintiff had not yet tested the phone by calling friends. On August 1, there were additional "Scam Likely" calls. Plaintiff also sent a text to her friend Taya confirming that she would travel by NJ Transit early in the morning on 08/04/25 to meet at Chatham Train Station, but still without her phone. On August 4, 2025, Plaintiff spent the day in Chester, New Jersey, with her longtime friend Taya Shumerina and Ms. Shumerina's daughter Abigail Julia, having left her apartment in the Bronx without her phone at 4:30 a.m.

Plaintiff returned to her apartment by NJ Transit at approximately 5:50 p.m. and, upon arrival, discovered multiple incoming calls—seven total—displayed on her phone as "+0000000000," presented as if they were from the Manhattan District Attorney's Office.

At approximately 5:52 p.m., a knock came at Plaintiff's door at the same time another incoming call came in, and both the caller and the persons at the door represented in substance that they were "from the Manhattan District Attorney's Office."

Defendant Officer Sharhan of Bronx Precinct 50 and a second female officer were at the door. Sharhan immediately asked whether Plaintiff's landlord was abusing her, and as Plaintiff began to explain her ongoing HSTPA revocation, wire, mail, and communication problems, Sharhan interrupted her, forced her to the floor, and handcuffed her.

Plaintiff begged to use the restroom, told Sharhan that she was elderly, hypertensive, and needed medication, and asked to keep the restroom door open and to put on her shoes. Sharhan refused all of those requests. He still did not show a warrant or explain the reason for the handcuffing or the visit.

Plaintiff was removed from her apartment barefoot, paraded through the building and outside while handcuffed and barefoot, placed in a police vehicle without a meaningful

explanation, and transported against her will to NCBH Jacobi Hospital, where she was taken to the psychiatric emergency area still barefoot.

Plaintiff alleges that LMSW Daniel Essorg spent considerable time trying to find a warrant for arrest, and informed her that the stated basis for the seizure was a false claim that she had called the Manhattan District Attorney's Office and threatened suicide. Plaintiff alleges that she made no such calls, and that her phone showed only seven incoming spoofed calls and no outgoing calls at all.

On August 6, 2025, Plaintiff went to the 50th Precinct to obtain a complaint or shield number concerning Sharhan. Sharhan came out and told her, in substance, that he would kick her out of the precinct, and never gave her a meaningful explanation for the August 4, 2025 seizure.

At Jacobi, Plaintiff refused to sign consent forms and asked LMSW Essorg to examine her phone, and the phone confirmed only incoming spoofed calls and no outgoing suicidal call or outgoing calls at all. Plaintiff's friend Taya Shumerina was contacted by Daniel Essorg as a source of collateral information and confirmed that Plaintiff had spent the day in New Jersey without her phone, had been functioning normally, and had been very happy with friends in a restaurant in Chester, New Jersey.

After that confirmation, Plaintiff was told in substance that she had been cleared for discharge after a very short evaluation. Plaintiff nevertheless alleges that Defendants Ofoma and Makina continued to control the encounter and kept Plaintiff in the hospital, telling her that she would be held for blood-pressure stabilization.

Plaintiff did not knowingly and voluntarily consent to the medication sequence that followed. Plaintiff alleges that she was given four pills of various sizes and shapes within approximately 40 minutes under coercive circumstances. Later Jacobi records reflected prescriptions for amlodipine, metoprolol, losartan, and lorazepam, while listing only amlodipine and metoprolol as forcibly administered on the hard-copy AVS and in EMR production 03/31/26, but deleting both 212/111 blood pressure and Amlodipine in EMR production 04/29/26. Plaintiff alleges that, in reality, she was forced to take four pills of different sizes, even though she was not on such a regimen as an outpatient and had a history of adverse reactions, including anaphylaxis-related risk.

During the medication sequence, Plaintiff's systolic blood pressure rose to dangerous levels, including readings she recalls as approximately 197, 199, 220, and as high as 234. Plaintiff repeatedly protested, demanded a phone, demanded an attorney, and stated words to the effect that the staff were killing her. Plaintiff alleges that Defendant Ofoma refused or failed to truthfully document the most extreme blood-pressure event. Plaintiff

14

further alleges that all pills were administered personally by Ofoma, who demanded, "show your tongue so I see you swallowed pills," although the description of that event was altered across five EMR productions.

After Plaintiff demanded a phone and an attorney and stated that she would sue, Defendant Makina replied in Russian, in substance: "You already sued your landlord and now you will stay here."

Plaintiff alleges that Makina's statement directly tied her continued confinement to her protected petitioning activity, including her prior pro se HP harassment action in Housing Court against the landlord and her 07/03/25 report to the Bureau of Investigation, and supports the inference that the continued hold and medication were retaliatory, punitive, and pretextual rather than medically justified.

Plaintiff protested and, finally, at 23:35, was transferred to a general medical floor, begged to be allowed to go home, and was discharged late at night at approximately 00:05 a.m. on 08/05/25 while still physically distressed. At 00:07 a.m. on 08/05/25, a female security officer helped the still-barefoot Plaintiff call Prestige Car Service, and the car arrived at 00:13 a.m. on 08/05/25. Plaintiff's hard-copy AVS reflected a discharge blood pressure of 212/111, while later Jacobi EMR productions issued after 03/31/2026 altered or diluted that figure and other key details, and reflected a fourteen-day inpatient food-selection or diet order entered by Defendant Makina even though Plaintiff had already been cleared as not suicidal.

Plaintiff alleges that the food order appears in the 120 pages of EMR 3 from the 03/31/26 production, but not in the 90 pages of EMR 4 from 04/28/26, supporting Plaintiff's allegation that the EMR was being adjusted after the fact in response to this SDNY case.

Plaintiff further alleges that, while on the general medical floor at Jacobi, she was attended by Dr. Christine Cassidy, who recognized the severity of Plaintiff's ongoing blood-pressure crisis and physical distress, honored Plaintiff's request to be discharged late at night, and thereby ended a continued confinement that, in light of the dangerous blood-pressure events Plaintiff had already endured, placed Plaintiff at meaningful risk of stroke. Plaintiff names Dr. Cassidy here only to identify her protective conduct and to acknowledge that her timely discharge decision likely prevented a stroke. Plaintiff expressly does not name Dr. Cassidy as a wrongdoer or target in this action.

Plaintiff alleges that later Jacobi EMR productions issued after the commencement of this federal action materially altered the documented record of the general medical floor encounter, including by reframing or diluting the Cassidy encounter and by altering or removing the discharge blood-pressure entry of 212/111 reflected in Plaintiff's original

15

hard-copy AVS, in a manner consistent with post-event fabrication and retaliatory record-shaping after Plaintiff filed suit. Plaintiff further alleges that EMR production 4 of 04/29/26 appeared with a fabricated imitation of Plaintiff's signature, "00:12 a.m.," while at that time Plaintiff was near the gates awaiting the approaching 00:13 Prestige car with driver no. 20.

Plaintiff alleges that the later-expanded Jacobi NCBH EMR transformed her brief encounter into a false incapacity narrative, including references to PSYCKES-type material under a non-applicable name that did not apply to her, nonexistent neurocognitive disorders, nonexistent psychosis, paranoia- and delusion-style framing without supporting clinical content, and a fabricated assessment that Plaintiff alleges never truthfully occurred because she had refused to engage Ofoma in any meaningful narrative interview. Plaintiff further alleges that Ofoma's native Nigerian accent was not possible for her to understand without help.

As a direct and proximate result of the August 4, 2025 events, Plaintiff suffered terror, humiliation, physical pain, blood-pressure crisis, ongoing medical consequences, dignitary injury, and continuing fear of renewed false-pretext seizure, false detention, and forced medication based on a false incapacity record.

## VII. AUGUST 8, 2025 — VOLUNTARY NYU LANGONE VISIT, ONLY DR. O'HAGAN, AND FALSE PROVIDER ATTRIBUTIONS

On August 8, 2025, Plaintiff went voluntarily to NYU Langone's emergency department, after a phone consultation with PA Swathi Bolneni and consistent advice from friends, for the sole purpose of creating a truthful record showing that she was not suicidal following the false suicide narrative used to seize her on August 4, 2025.

Plaintiff did not go to NYU Langone because she was suicidal, did not seek psychiatric admission, and went there only to document, voluntarily and on the record, that she was not suicidal.

At the time of the visit, Plaintiff was still in a severe fight-or-flight state from the August 4, 2025 Jacobi seizure and forced medication, and did not yet know that the Jacobi event had involved metoprolol, losartan, and lorazepam in addition to amlodipine. Plaintiff alleges that lorazepam was particularly dangerous to her given her history of adverse reactions, including anaphylaxis-related risk.

Because Plaintiff has Selective Mutism, she could not adequately explain herself at the front desk on arrival and asked front-desk staff to call PA Bolneni to help explain the reason for her visit, as a disability-related communication measure rather than evidence of confusion, psychosis, or suicidality.

16

Plaintiff arrived at approximately 12:45 p.m. and was discharged at approximately 5:51 p.m. For essentially the entire visit, Plaintiff remained on bed 6, used her iPhone, and sent text messages from bed 6, with no continuous interruption other than her face-to-face 22-minute evaluation by Dr. O'Hagan.

Only one physician approached Plaintiff face-to-face during the entire visit: Dr. O'Hagan, who met Plaintiff at approximately 16:15, took Plaintiff to a small room in search of a confidential space, and evaluated Plaintiff from approximately 16:18 to 16:39.

During that 22-minute evaluation, Plaintiff was extremely anxious, labile, and processed information in a bottom-up, circumstantial manner consistent with autism. Plaintiff alleges that Dr. O'Hagan interrupted her, stating in substance, "stop your crazy detailing, we have no time," but by the end of the evaluation stated in substance, "yes, I believe you are not suicidal." Plaintiff further alleges that throughout her life she has often had rather rapid speech between episodes of selective mutism.

No other physician performed any face-to-face assessment of Plaintiff before or after Dr. O'Hagan. No other meaningful evaluation occurred, and Plaintiff received discharge clearance at approximately 5:51 p.m.

Plaintiff never changed out of her own red silk skirt and blouse and was never placed in a hospital gown, because she had volunteered for a wellness check only after the police assault on 08/04/25. Plaintiff therefore alleges that she was never undergoing the airway-related, sepsis-related, IV-related, SOFA-related, or other acute medical management later reflected in the expanded NYU Langone EMR.

Plaintiff first saw "Kimmel" in the EMR on 09/17/25 and had no idea it was a hospital. She also was billed as an outpatient. No monitoring on any devices was billed. The AVS was from ED Perelman. After-ED calls were from ED Perelman. The cardiology AVS of 08/19/25 also contained no trace of hospitalization, incapacity, or similar content.

Plaintiff alleges that the later NYU Langone EMR contains entries attributed to or associated with Dr. Kobles, Gabrielle Nash, and Laura Newbold, even though Plaintiff alleges that Kobles never approached her, Nash never personally assessed her for APS, and Newbold never assessed her in the manner reflected by the chart.

Plaintiff further alleges that there are several copied triage assessments containing a narrative about the DA office while Plaintiff was nearly mute. Plaintiff alleges that the detailed narrative was said only during the face-to-face encounter with O'Hagan and said nothing about the "DA Manhattan Office."

Plaintiff alleges that the chief complaint for the entire wellness check was formulated by Plaintiff for Dr. O'Hagan and still remains present in the expanded EMR as "I am not suicidal!", but that the later EMR also contains an "updated chief complaint" with a fabricated narrative about the DA Manhattan Office.

Plaintiff alleges that the later NYU Langone EMR contains false APS-style assessment content, false debility findings, false homebound status, false home-care need, false Kimmel-related inpatient entries, and false inpatient-style content that never truthfully occurred during her brief voluntary visit and 22-minute assessment by Dr. O'Hagan. Plaintiff alleges that there was no medical physical assessment at all.

Plaintiff received successive NYU Langone EMR productions dated September 17, 2025, November 17, 2025, March 23, 2026, and March 30, 2026, all containing the same core disputed material with shifting formatting, pagination, and additional detail in the March 23, 2026 production, including impossible inpatient-related, Kimmel-related, monitoring-related, and incapacity-related content.

Plaintiff repeatedly notified NYU Langone and Defendant Acosta, the NYU Langone Compliance Officer, that the EMR contained obvious impossibilities, false provider attributions, and dangerous false incapacity content, and requested correction, amendment, deletion, or meaningful truth-finding regarding those entries.

Plaintiff alleges that Acosta amended some of the most egregious notes but refused to remove the broader false Kimmel inpatient incapacity narrative, did not perform a meaningful audit of authorship, access history, audit trail, metadata, or insertion history sufficient to determine how the disputed entries were created, expanded, inserted, adopted, or maintained, and, on or about November 5, 2025, sent a letter stating in substance that NYU Langone could not amend Dr. Wilson's forensic evaluation, even though Plaintiff had not asked for amendment of Dr. Wilson's forensic evaluation, but rather of the disputed August 8, 2025 NYU Langone record itself.

Plaintiff alleges that NYU Langone, Acosta, and Kobles thereafter continued to maintain the disputed false disability-related EMR content even after notice, leaving Plaintiff trapped against a dangerous false record portraying her—an autistic and selectively mute woman who had voluntarily come to prove she was not suicidal—as instead being psychotic, delusional, neurocognitively impaired, debilitated, homebound, exploitable, neglected, or APS-eligible.

Plaintiff alleges that this continued maintenance of the false disability-related EMR threatens her bodily liberty, future medical treatment, legal credibility, and continued housing stability, because such records are routinely consulted by future medical

providers, emergency responders, social-service investigators, APS personnel, courts, and housing-related decision-makers, who may treat the false content as if it were neutral and accurate.

Plaintiff further alleges that post-creation alteration and material inaccuracy in the 08/08/2025 encounter record appears in additional ways. The version of the record generated on April 27, 2026 lists Plaintiff's current Brooklyn address, 1675 E 18th St, Brooklyn, NY 11229-1262, and current email address—information Plaintiff updated in MyChart only approximately one week earlier. In contrast, the earlier version of the same record printed on November 17–18, 2025 shows the old Tisch Hospital address.

Plaintiff further alleges that the May 1, 2026 billing statement for the same August 8, 2025 visit charges $5,106.17 under CPT code 99283 for an Emergency Department Visit Level 3. Plaintiff further alleges that a customer-service response dated April 30, 2026 from Shakira Robinson at NYU Langone states that the services were rendered at "The Home Depot Emergency Department at NYU Langone Health – Cobble Hill." Plaintiff alleges that she was never treated at any Home Depot location or Cobble Hill facility. Plaintiff alleges that she was seen only at the Tisch / Perelman Emergency Department for approximately 22 minutes in a brief discussion with Dr. O'Hagan, without a hospital gown, without any monitoring, without any diagnosis of acute physical illness, and without the airway-related, sepsis-related, SOFA-related, heparin-related, or incapacity-related interventions later reflected in the expanded records.

Plaintiff alleges that these discrepancies—current address and email pulled into a historical encounter note, incorrect billing location identified as Home Depot / Cobble Hill, and a high-level ED charge for a short outpatient wellness check with no supporting acute physical findings—demonstrate that Defendants altered or reprocessed the 08/08/2025 record and billing after the visit and after the filing of this action, and that the records and billing contain material inaccuracies and fabrications.

## VIII. CROSS-INSTITUTION COORDINATED FABRICATION PATTERN AND ARTICLE 81 RISK CONTEXT

Plaintiff alleges that the Jacobi and NYU Langone records, although generated at separate institutions on separate dates, show strikingly similar fabrication patterns rather than independent good-faith medical documentation, including parallel "in the making" AVS-style variants that did not match the original benign hard-copy AVS materials.

In both institutions, the original hard-copy AVS materials were short, simple, and consistent with Plaintiff's actual brief encounters, including a notation consistent with Asperger's and autism, no medication regimen of the type later attributed to her, quick

discharge, and no follow-up indicating ongoing incapacity, psychiatric instability, neurocognitive disorder, psychosis, debility, homebound status, or home-care need.

Plaintiff alleges that, despite the simplicity and benign character of the original hard-copy AVS records, the later electronic medical records at both Jacobi and NYU Langone transformed those simple AVS encounters into expanded narratives of incapacity, psychiatric instability, paranoia- and delusion-style framing without supporting clinical content, neurocognitive impairment, and inpatient-style management that the original hard-copy AVS did not support.

Plaintiff further alleges that, in both institutions, the later EMR productions display visible traits of fabrication in the making, including AVS-style variants that did not exist in the original hard copy, recurring blood-pressure entries unsupported by the hard-copy record, shifting provider attributions, page-count variations across successive productions, and incapacity-style content inserted into a record that originally reflected only a brief autism-coded encounter.

Plaintiff alleges that material alterations in both the Jacobi and NYU Langone EMR productions, including changes to the Jacobi general-medical-floor record and to the documented 212/111 discharge blood-pressure entry, occurred after the commencement of this federal action, supporting the inference that the EMR alterations were not neutral medical corrections but post-event fabrication and retaliatory record-shaping linked to Plaintiff's federal litigation.

Plaintiff further alleges that her supplemental filings already submitted in this action, including her letter to NYU Langone leadership and the four-page "EMR in the making" pages previously produced, materially contributed to the Court's decision to permit Plaintiff leave to file this Second Amended Complaint. Plaintiff intends to supplement the record with additional EMR productions, including the Jacobi EMR 4 production and the NYU Langone EMR 5 production limited to the August 8, 2025 visit, which Plaintiff alleges will further confirm the cross-institution coordinated fabrication pattern alleged herein.

Plaintiff alleges that the two systems used parallel false themes against her, including: at Jacobi, false SOFA-related severity-style content and false acute-care framing; at NYU Langone, false airway-related, sepsis-related, IV-related, and SOFA-style content, plus false APS-style assessment, false debility, false homebound status, and false home-care need; and at both Jacobi and NYU Langone, parallel false incapacity, psychiatric-instability, and inpatient-style framing converting Plaintiff's actual brief encounters into fabricated narratives of medical and cognitive incapacity.

Plaintiff further alleges that both records include nearly identical linguistic framing concerning a supposed call to the Manhattan District Attorney's Office, even though Plaintiff alleges that no such outgoing suicidal call was made, that her phone showed only incoming spoofed calls, and that the phone in question had been purchased only one day before the August 4, 2025 events.

Plaintiff alleges that the cross-institution similarity of these patterns is significant because Jacobi and NYU Langone are separate institutions handling separate encounters, and yet the later-expanded records moved in the same false direction at the same time, in a manner not consistent with neutral charting error, ordinary administrative correction, or independent professional judgment, but consistent with coordinated, pattern-based fabrication or expansion of a false incapacity narrative across two medical systems.

Plaintiff does not yet know which person or mechanism created every false entry in either system, but alleges that the documented similarities, including page-count variations across successive EMR productions, similarly fabricated AVS variants, similarly false provider attributions, similarly false inpatient and incapacity framing, and similarly worded "Manhattan DA call" framing, are among the strongest indicators that the EMR narratives were not truthful records of what actually happened to her.

Plaintiff alleges that the false themes that emerged in both expanded EMRs, including paranoia- and delusion-style framing without supporting clinical content, neurocognitive-style framing without supporting evaluation, debility, homebound status, and home-care need, are precisely the categories of content foreseeably usable in Article 81 guardianship-type or incapacity-type proceedings against an elderly disabled tenant.

Plaintiff does not allege that an Article 81 proceeding had already been filed against her at the time of the August 2025 encounters, and does not allege present knowledge of any direct agreement between the medical Defendants and any housing-related Defendant. Plaintiff alleges instead that the coordinated transformation of her records foreseeably created a record capable of being used in Article 81-type proceedings, APS-style interventions, guardianship-style framings, or other liberty-restricting actions against an elderly disabled rent-stabilized tenant.

Plaintiff further alleges that the unwarranted arrest by Sharhan did not involve Mental Hygiene Law § 9.41, but that Makina later added, in EMR production 04/29/26, paragraph 9.40, a 24-hour hold,

## IX. TENNENBAUM CONDUCT — FORGED LEASE PATH, INFLATED RENT, FALSE ARREARS, ILLEGAL RIDERS, FALSE CONCESSIONS, REFUSAL OF LAWFUL RENEWAL,

**MAIL AND WIRE INTERFERENCE, TWO LOCKOUTS, AND DISABILITY-BASED HOUSING HARASSMENT**

Defendant David Tennenbaum has owned, controlled, managed, or directed the landlord side of Plaintiff's building since on or about November 17, 2021, and at all relevant times knew that Plaintiff was an elderly, autistic, selectively mute, SCRIE-protected, long-term rent-stabilized tenant in a building subject during the relevant period to J-51 tax-benefit treatment.

Plaintiff's apartment was not a market-rate tenancy, and the building's J-51 tax-benefit status reinforced its regulated, protected character. Plaintiff does not allege that J-51 status alone made Defendant Tennenbaum a state actor, but does allege that this status is strong evidence that Tennenbaum was dealing with a regulated, protected residential tenancy and that his use of a forged, white-out, inflated lease path against Plaintiff was especially improper.

After taking control of the building, Defendant Tennenbaum billed Plaintiff at an inflated amount of approximately $1,552.00 in December 2021, refused to issue a proper lawful renewal lease in the ordinary HSTPA manner, and, on or about March 16, 2022, sent Plaintiff a backdated, outdated pre-HSTPA renewal form.

When Plaintiff signed a renewal reflecting the lawful tenant-side amount of $1,418.34, Defendant Tennenbaum returned that signed renewal with a white-out alteration removing $1,418.34 and inserting the inflated figure of $1,652.79, while recasting that inflated figure as "base regulated rent."

Plaintiff alleges that this white-out-altered lease was a forged document, that the alteration was not cosmetic but changed the legal role of the rent figure on paper, and that it became the foundation for an inflated false lease path that Defendant Tennenbaum thereafter used to generate purported arrears reaching several thousand dollars by August 2022, even though Plaintiff had not agreed to the inflated figure.

Defendant Tennenbaum further used so-called "rent concessions," riders, and paper devices that did not restore the lawful regulated or HSTPA-protected preferential-rent path of $1,418.34, but instead obscured or normalized the inflated lease structure being imposed on Plaintiff.

Plaintiff alleges that, even after HCR Order KO610012R recognized her HSTPA-protected preferential-rent path of $1,418.34 as the operative base rent for her continuing tenancy, and even after the December 11, 2024 noncompliance stipulation and the January 27, 2025 Commissioner's civil penalty for noncompliance, Defendant Tennenbaum continued to

press the inflated disputed lease path against Plaintiff and continued to refuse to provide a clean lawful renewal lease reflecting $1,418.34 as the operative base rent.

After ownership changed, mail delivery to Plaintiff's apartment became unreliable in a USPS-confirmed manner; her mailbox was interfered with; her wire, router, internet, and phone-related communication functioning later became unstable or blocked, including loss of reliable emergency calling from inside her apartment; and HCR personnel ignored or failed to address those communication problems even though they directly impaired Plaintiff's access to notice and process.

Plaintiff alleges that Defendant Tennenbaum benefited from this communication inequality and, on information and belief, received or acted upon HCR-related developments ahead of Plaintiff while Plaintiff was being denied effective written and electronic communication consistent with her ADA-protected disability needs.

Plaintiff further alleges that, on or about May 19, 2025, Defendant Tennenbaum personally called Plaintiff and spoke for approximately twenty minutes in a manner Plaintiff perceived as menacing, coercive, and intimidating, stating words in substance including "we are not wanting to damage you," "we don't want you to die," and "you must live longer," or words to that effect. Plaintiff alleges that, in the context of the ongoing forged-lease dispute, rent pressure, Plaintiff's known age and disability, and the threatened loss of housing protections, the call was not a neutral landlord communication but part of a continuing pattern of harassment, intimidation, and interference directed at Plaintiff's tenancy and housing rights.

Plaintiff further alleges that, during the same period of communication interference, she observed parallel modifications appearing in her drafting environment and in the EMR records that paralleled corrections she had been making privately, raising a reasonable suspicion of unauthorized access to her devices or communications. Plaintiff reserves the right to seek discovery, forensic review, and preservation orders concerning those parallel modifications.

On September 28, 2025, Plaintiff experienced a lockout in which the lock cylinder had been changed and the inside lock jacket was barely attached. On September 29, 2025, a separate lock was found damaged from the outside, and an emergency locksmith was retained to replace both locks at Plaintiff's out-of-pocket expense. Plaintiff sent HCR the emergency locksmith affirmation and related materials.

Plaintiff alleges, on information and belief, that Defendant Tennenbaum did not impose this conduct on similarly situated non-disabled SCRIE or rent-stabilized senior tenants in the building or portfolio, and instead targeted Plaintiff for the forged white-out lease, the

inflated vacancy-rent treatment imposed during ongoing tenancy, the illegal lease riders, the false rent concessions, the false-arrears generation, the refusal of a lawful renewal lease, the denial of effective written communication, and the lockouts because of her disability and her disability-related vulnerability in protecting her tenancy.

Plaintiff alleges that Defendant Tennenbaum engaged in disability-based discrimination in the terms, conditions, and privileges of Plaintiff's rental housing and in continuing interference, coercion, intimidation, and retaliation against Plaintiff for exercising her protected fair-housing, rent-regulation, SCRIE-related, and federal-litigation rights, in violation of the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

As a direct result, Plaintiff suffered approximately five years of continuous housing harassment, financial injury including out-of-pocket emergency locksmith costs, false-arrears exposure, distortion of her tenancy record, jeopardy to her HSTPA preferential-rent and SCRIE protections, severe emotional and dignitary injury, and the imminent risk of loss of SCRIE, loss of rent freeze, loss of HSTPA-protected preferential rent, and homelessness after twenty-seven years of stable rent-stabilized tenancy.

**COUNT 1**

**Fourth and Fourteenth Amendments; ADA Title II**

**Against Defendant Officer Sharhan**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

On August 4, 2025, Defendant Officer Sharhan seized Plaintiff in her home, forced her to the floor, handcuffed her, denied her access to a restroom and footwear, and caused her forcible transport to Jacobi Hospital, despite the absence of any truthful basis for the claimed suicide narrative and despite Plaintiff's disability-related communication needs.

Plaintiff alleges that this conduct violated her rights under the Fourth and Fourteenth Amendments and denied her reasonable accommodation and equal access under ADA Title II.

**COUNT 2**

**Fourteenth Amendment Bodily Liberty; Forced Medication; False Records; First Amendment Retaliation**

**Against Jacobi Medical Center, RN Ofoma, and PA Galina Makina**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

24

After Plaintiff had effectively been cleared following the false suicide claim, Jacobi Medical Center, RN Ofoma, and PA Galina Makina continued Plaintiff's detention, administered medication without Plaintiff's knowing and voluntary consent, caused systolic blood-pressure spikes up to approximately 234, created or maintained false EMR entries, and continued the confinement in a retaliatory and pretextual manner tied to Plaintiff's prior protected petitioning activity.

Plaintiff alleges that this conduct violated her bodily-liberty rights under the Fourteenth Amendment and her rights under the First Amendment.

**COUNT 3**

**ADA Title II and Section 504**

**Against Jacobi Medical Center**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

Plaintiff alleges that Jacobi Medical Center failed to accommodate her autism and Selective Mutism, failed to provide effective communication, and instead converted her disability-related communication difficulties into a false incapacity narrative, thereby denying her equal access to services and protections.

Plaintiff alleges that this conduct violated ADA Title II and Section 504 of the Rehabilitation Act.

**COUNT 4**

**Battery**

**Against RN Ofoma and PA Galina Makina**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

Plaintiff alleges that RN Ofoma and PA Galina Makina administered non-consensual medication to her under coercive circumstances, fabricated or maintained false assessments surrounding that medication sequence, and caused harmful physical effects, including blood-pressure spikes of approximately 197, 199, 220, and 234.

Plaintiff alleges that this conduct constituted offensive and harmful physical contact and therefore battery.

**COUNT 5**

**ADA Title III and Section 504**

**Against NYU Langone Health, Acosta, and Dr. Kobles**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

Plaintiff alleges that NYU Langone Health created, adopted, expanded, and maintained false disability-related EMR content concerning her August 8, 2025 visit, including fabricated or altered pages, false provider attributions, false signatures, altered discharge information, and false billing for that emergency-department encounter, even after Plaintiff gave notice and requested correction.

Plaintiff alleges that these acts violated ADA Title III and Section 504.

**COUNT 6**

**Fourteenth Amendment Due Process; First Amendment Retaliation; ADA Title II**

**Against Peter Stecker and Jessica Moran**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

Plaintiff alleges that Defendants Stecker and Moran closed the HCR enforcement path on July 17, 2025 without notice, failed to meaningfully process or track Plaintiff's PAR filings dated August 20, 2025, October 22, 2025, and April 3, 2026, rerouted Plaintiff away from the original altered-lease record and favorable HSTPA structure, and denied Plaintiff effective written and electronic communication despite her disability and the urgency of her SCRIE-related situation.

Plaintiff alleges that this conduct deprived her of due process, burdened her protected petitioning activity, and denied her equal access to process, in violation of the Fourteenth Amendment, the First Amendment, and ADA Title II.

**COUNT 7**

**Fair Housing Act; New York State Human Rights Law; New York City Human Rights Law; Forged Lease and False Arrears**

**Against David Tennenbaum**

Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

Plaintiff alleges that Defendant David Tennenbaum altered Plaintiff's lease by changing the original lawful rent of $1,418.34 to $1,652.79, imposed inflated rent, created false arrears, used false concessions and illegal riders, refused to provide a lawful renewal lease, interfered with communications, and carried out or caused lockouts, including the May 19,

2025 threatening phone call and the September 28–29, 2025 lockout and locksmith incident.

Plaintiff alleges that this conduct interfered with her SCRIE rights, rent-freeze protection, and HSTPA-protected preferential-rent path, and constituted disability-based discrimination, interference, coercion, intimidation, and retaliation in violation of the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests declaratory and injunctive relief sufficient to stop the violations described above and to preserve Plaintiff's SCRIE benefit, rent freeze, and preferential-rent protection.

Plaintiff seeks monetary damages only against Defendant David Tennenbaum, including compensatory and deterrent damages.

Plaintiff does not seek monetary damages against NYU Langone Health, Acosta, Dr. Kobles, Officer Sharhan, Jacobi Medical Center, RN Ofoma, PA Galina Makina, Peter Stecker, or Jessica Moran.

Plaintiff further requests such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**LIST OF EXHIBITS**

**Exhibit 1:** Multippage scan of August 4, 2025 Jacobi records, Officer Sharhan involvement, Taya Shumerina witness statement, NJ Transit receipt, and phone records showing spoofed incoming calls impersonating Manhattan DA office shortly after Plaintiff obtained a new iPhone and new number.

**Exhibit 2:** Multippage scan of rent history, lease renewal forms, SCRIE documents, and DHCR orders showing alleged revocation of HSTPA-protected preferential rent and threats to SCRIE benefits after 27 years of rent stabilization and 9 years of SCRIE.

**Exhibit 3:** Multippage scan of NYU Langone August 8, 2025 EMR productions, billing statements, and After-Visit Summary showing fabricated content, altered provider attributions, incorrect locations (including "Home Depot ED"), and discrepancies with the original hard-copy AVS.

**Exhibit 4:** Multippage scan of Jacobi August 4, 2025 records demonstrating cross-institutional similarities in EMR patterns with NYU Langone (cloned/empty pages, altered content, expanded incapacity narratives) that Plaintiff alleges are usable in Article 81-type proceedings.

Respectfully submitted,

**Lyudmila Syrochkina**
Plaintiff Pro Se
147 West 230th Street, Apt. 1F
Bronx, NY 10463
Email: Justinvictor456@proton.me
Phone: 929-501-2006

Dated: May 10, 2026



Verified by pdfFiller
05/10/2026