August 27 4:29 pm

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

LYUDMILA SYROCHKINA,

Plaintiff, Pro Se,

v. 26 Civ. 558 (RA) (GWG)

NYU LANGONE HEALTH et al.,

Defendants.

LETTER MOTION FOR LEAVE TO FILE PROPOSED THIRD AMENDED COMPLAINT

Dear Judge Gorenstein:

Plaintiff respectfully submits this letter motion for leave to file the attached Proposed Third Amended Complaint, in compliance with Docket No. 155.

Plaintiff did not intend to file an unauthorized live Third Amended Complaint. Rather, on August 20, 2026, Plaintiff emailed Pro Se Intake and Temporary Pro Se Filing a copy labeled and described as a "PROPOSED Third Amended Complaint with Exhibit A." The attached proof of transmittal shows that Plaintiff submitted the document as proposed, by email, to Pro Se channels, in a good-faith effort to comply through written means. Plaintiff did not personally docket Document 152 on ECF and did not seek to bypass the Court's instruction that leave must first be requested.

If the proposed pleading was docketed as Document 152 by Clerk/Intake processing after receipt, that was not Plaintiff's intended procedural act. Plaintiff's intent was to provide the proposed pleading for review and to seek leave of Court.

Plaintiff therefore respectfully requests that the Court grant leave to file the attached Proposed Third Amended Complaint. In the alternative, Plaintiff requests that this letter motion and its attachments be deemed Plaintiff's compliant submission under the Court's August 13, 2026 Order and Docket No. 155.

Plaintiff is proceeding pro se, is autistic and selectively mute, and is presently complying through written submissions only.

Attachments:

Exhibit A – Proposed Third Amended Complaint with Exhibit A

Exhibit B – Proof of August 20, 2026 email transmittal to Pro Se Intake / Temporary Pro Se Filing

Respectfully submitted,

/s/ Lyudmila Syrochkina

Lyudmila Syrochkina

Plaintiff Pro Se

Email: Justinvictor456@proton.me

Phone: 929-501-2006

Lyudmila Syrochkina Verified by pdfFiller 08/27/2026 August 27 4:29 pm

Lyudmila Syrochkina

Sent with Proton Mail secure email.

------- Forwarded Message -------
From: justinvictor456 <justinvictor456@proton.me>
Date: On Thursday, August 20th, 2026 at 5:44 PM
Subject: Syrochkina v. NYU Langone et al., 1:26-cv-00558 (RA) (GWG) — PROPOSED Third Amended Complaint with Exhibit A (71 pp.) — Dated Aug. 20, 2026
To: ProSe@nysd.uscourts.gov <ProSe@nysd.uscourts.gov>, Temporary_Pro_Se_Filing@nysd.uscourts.gov <Temporary_Pro_Se_Filing@nysd.uscourts.gov>

Dear Pro Se Intake Clerk,

I am plaintiff Lyudmila Syrochkina, pro se, in Case No. 1:26-cv-00558 (RA)(GWG), presently assigned to the Honorable Ronnie Abrams with consent jurisdiction before the Honorable Gabriel W. Gorenstein.

Attached is my Signed PROPOSED THIRD AMENDED COMPLAINT WITH EXHIBIT A (71 pages),

Attachment:

Syrochkina_v_NYU_Langone_et_al_Proposed_TAC_with_ExhibitA_2026-08-20.pdf (71 pp., 3.40 MB)

Respectfully submitted,

/s/ Lyudmila Syrochkina

Plaintiff Pro Se

Email: Justinvictor456@proton.me

Phone: 929-501-2006

Dated: August 20, 2026

Lyudmila Syrochkina

Lyudmila Syrochkina Verified by pdfFiller 08/27/2026

Sent with Proton Mail secure email.

August 20, 2026 17:21

PROPOSED THIRD AMENDED COMPLAINT

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

LYUDMILA SYROCHKINA, Plaintiff, Pro Se

v.

1. NYU LANGONE HEALTH; 2) JACOBI MEDICAL CENTER NCBH (NYC HEALTH + HOSPITALS); 3) RN OFOMA; 4) PA GALINA MAKINA; 5) PETER STECKER, in his individual and official capacities; 6) JESSICA MORAN, in her individual and official capacities; 7) OFFICER SHARHAN, in his individual and official capacities; 8) DR. ACOSTA, in their individual capacity; 9) DR. KOBLES, in their individual capacity; and 10) DAVID TENNENBAUM, individually,

Defendants.

Case No. 1:26-cv-00558 (RA) (GWG)

THIRD AMENDED COMPLAINT (Civil Rights, Disability Rights, and Fair Housing)

I. INTRODUCTION

1. Plaintiff Lyudmila Syrochkina is a 71-year-old autistic, selectively mute, rentstabilized tenant of twenty-seven years' standing and a SCRIE recipient since 2017.

She brings this Third Amended Complaint to stop an ongoing federal civil-rights deprivation that threatens her bodily liberty, truthful medical treatment, civil and human rights to information, disability-protected access to fair process, and continued ability to remain in her home.

2. Plaintiff alleges that, beginning after the November 17, 2021 ownership change of her building, Defendant David Tennenbaum subjected her tenancy to an altered and white-out-changed lease path, an inflated rent path inconsistent with HSTPA, false arrears, illegal lease riders, false rent concessions in a J-51 tax building, refusal of a lawful renewal lease since 2021, mail and wire interference, two consecutive lockouts, and a continuing pattern of disability-based housing

harassment. Plaintiff alleges that these acts interfered with her HSTPA-protected rent path, endangered her SCRIE protection and housing stability, and violated the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

3. Plaintiff further alleges that, on July 17, 2025, individual HCR actor Peter Stecker silently closed her noncompliance matter without notice or hearing, withheld the closure order until October 22, 2025, failed to meaningfully process her PAR filing of 08/20/2025 (a hardcopy submission was stamped at Gertz Plaza on 08/20/25 and videotaped on 08/20/25), failed to meaningfully process the refiled PAR forty-four (44) days after 08/20/25, rerouted her matter away from the original altered-lease record, and caused or permitted a March 13, 2026 order to displace the HSTPA-protected preferential-rent path of $1,418.34 recognized in HCR Order KO610012R dated

1 effective written and electronic communication consistent with her disability, thereby depriving her of notice, review, and fair process, in violation of the Fourteenth Amendment and Title II of the Americans with Disabilities Act.

2 Plaintiff further alleges that Defendant Jessica Moran participated in the continuation of that deprivation by failing to provide meaningful communication, failing to ensure proper tracking and processing of Plaintiff's filings, and participating in rerouting the matter onto a later and distorted administrative path instead of correcting the original altered-lease record. Plaintiff alleges that, together, Stecker and Moran caused Plaintiff to lose the benefit of a favorable HCR enforcement path, increased the risk to her SCRIE and rent freeze, and denied disability-consistent access to process.

3 Plaintiff further alleges that, on August 4, 2025, Defendant Officer Sharhan unlawfully seized her in her home based on spoofed incoming calls and false

statements falsely attributed to her, forced her to the floor inside her apartment, handcuffed her, denied her restroom access and footwear, removed her barefoot, and caused her to be transported to Jacobi Hospital. Plaintiff alleges that this seizure violated the Fourth and Fourteenth Amendments and Title II of the Americans with Disabilities Act.

4 Plaintiff further alleges that, at Jacobi Hospital NCBH ED, Defendants RN Ofoma and PA Makina detained her after she had effectively and quickly been cleared and discharged by co-signed physician Louis Gonzalez and LMSW Essorg; administered medication, without her informed consent, that had never been prescribed by Plaintiff's cardiology team at NYU Langone under Dr. Berger; caused marked and clinically significant changes in Plaintiff's cardiovascular condition during administration; created altered documentation in Plaintiff's record; and tied Plaintiff continued confinement to Plaintiff's ongoing federal landlord litigation filed 08/28/2023 as a retaliatory act. Plaintiff alleges that these acts violated the Fourteenth Amendment, Title II of the Americans with Disabilities Act, Section 504 of Rehabilitation Act.

5 Plaintiff further alleges that LMSW Essorg personally handed her a hardcopy AVS listing an ASD diagnosis, 212/111 blood pressure, and the blood-pressure medications Amlodipine and Metoprolol. Plaintiff relies on the hard-copy AVS as the truthful record of her Jacobi encounter.

7a. Plaintiff's medical-history background is directly relevant to the wrongfulness of non-consensual medication at Jacobi. Plaintiff is an autistic adult who, during an earlier period of her life in Russia, experienced multiple anaphylactic episodes and a surgical procedure to remove a lump in her throat performed without anesthesia. As a direct traumatic result, Plaintiff did not use any pharmaceutical medication from approximately 1984 until September 2024 — a period of roughly

forty (40) years. Plaintiff's history of medication avoidance was independently confirmed in July 2020 by the Lenox Hill Hospital emergency department, where Plaintiff presented with a large burn and was told, in substance, "you have no medical history at all."

1. Plaintiff further alleges that, on August 8, 2025, after a phone conversation at 12:48 with her cardiology care team, including PA Swathi Bolneni, she went voluntarily to NYU Langone's emergency department for the sole purpose of creating a truthful record showing that she was not suicidal. Plaintiff alleges that she was assessed face-to-face

1 brief evaluation with an Asperger's ASD diagnosis, without any prescribed psychiatric medications, without any follow-up appointments for mental-health treatment, and with only a next visit to cardiologist Dr. Berger on 08/19/25. Plaintiff further alleges that NYU Langone, Dr. Acosta, and Dr. Kobles (a physician whom Plaintiff never met) thereafter adopted, maintained, and continued to rely upon a materially altered electronic medical record portraying Plaintiff in derogatory terms inconsistent with the brief face-to-face encounter described above, in violation of Section 504 and Title III of the Americans with Disabilities Act. Plaintiff denies the derogatory characterizations attributed to her and alleges that the records containing them are altered.

2 Plaintiff requested the closing of Medicaid on July 10, 2025, and Medicaid was closed on or about August 6, 2025. From August 2025 forward, Plaintiff has been billed as a Medicare Part B beneficiary. Plaintiff's own records contain no PSYCKES record or PSYCKES billing entry, although certain Defendants' medical records at times reference PSYCKES in ways Plaintiff has been unable to reconcile. Plaintiff has sought her PSYCKES records directly beginning May 28, 2026 and as of the date of this filing has been unable to obtain them. During this same period,

Plaintiff has received successive new productions from NYU Langone and from Medicare. In those productions, the location of service for Plaintiff's August 8, 2025 visit has been shifted from the Tisch/Perelman outpatient emergency department (which is where Plaintiff was actually seen) to (a) a fabricated inpatient admission, (b) an unspecified location at 301 East 17th Street, and © the NYU Langone Cobble Hill facility, at none of which Plaintiff was seen on August 8, 2025. Successive Jacobi productions have likewise shifted in page count and content; certain medication entries have appeared, been deleted, reappeared, and been deleted again. Plaintiff alleges on information and belief that these successive alterations reflect coordinated and continuing alteration of the medical record rather than ordinary clinical correction.

3 Plaintiff further alleges that, on April 29, 2026, the NYU Langone Billing Office, through its agent Shakira Robinson, sent Plaintiff a written notification containing the language: "I've requested your statement for services rendered on 8/8/2025 at The Home Depot Emergency Department at NYU Langone Health - Cobble Hill be emailed to your address we have on file. Please allow 7-10 business days for…". Plaintiff alleges that she had never heard of "Home Depot ED" before receiving this notification and was never seen at any such facility.

4 Plaintiff further alleges that, although Plaintiff was in fact seen at the Tisch/Perelman emergency department at 550 / 570 First Avenue for a brief outpatient evaluation only, the NYU Langone and Medicare billing documentation for August 8, 2025 identifies a different location of service (set forth in the Exhibit to this pleading), which Plaintiff never attended. Plaintiff does not, in this pleading, take issue with the dollar amount of the billing; Plaintiff takes issue with the location of service recorded in the billing, because the location recorded is not the location where Plaintiff received care. Plaintiff has reported the apparent billing

inconsistency to NYU Langone and to the New York State Department of Health.
5 Plaintiff further alleges that, according to declarations made by defense counsel Summo, Levine, and Klobus (counsel for Defendant Kobles) in Docket Conversion Tool entry 65, NYU Langone corrected an "inpatient glitch" affecting Plaintiff's record, confirming that
1 representation as confirming that no inpatient encounter occurred.
2 Plaintiff further alleges that, by reason of the alterations described above and the absence of any PSYCKES record, the contemporaneous hard-copy AVS is the truthful record of Plaintiff's August 4, 2025 and August 8, 2025 encounters. Plaintiff alleges that the altered paperwork creates a foreseeable risk of misuse in future legal proceedings affecting Plaintiff's civil rights and personal liberty and in disability-related administrative interventions.
3 Plaintiff further alleges that she was back to W-2 payroll employment at the end of September 2025, while working on 1099 during the summer and commuting by public transportation to Long Island, New Haven, and Philadelphia. Plaintiff further alleges that, at the same time, Defendant Kobles (whom Plaintiff never met) signed "face to face" documentation without assessment and without diagnosing any physical illness at all, and that Laura Newbold assessed "debility due to hospitalization," although Plaintiff alleges she was never hospitalized in her entire life. Plaintiff further alleges that fraudulent home care and physical therapy, in the absence of any diagnosed physical illness on 08/08/25 and despite Plaintiff never having met Defendant Kobles, with Girling and other unknown home care agencies, were also attempted or happened as purported billing to Medicare, and Plaintiff had no Medicaid after August 6, 2025. Plaintiff further alleges that a fictional assessment attributed to Gabrielle Nash contains numbers that decode into dates that do not match the events, and that NYU Langone refused to

investigate.

4 Plaintiff further alleges that, at Jacobi Hospital NCBH ED, Defendants RN Ofoma and PA Makina detained her after she had effectively and quickly been cleared and discharged by co-signed physician Louis Gonzalez and LMSW Essorg; administered medication, without her informed consent, that had never been prescribed by Plaintiff's cardiology team at NYU Langone under Dr. Berger; caused marked and clinically significant changes in Plaintiff's cardiovascular condition during administration; created altered documentation in Plaintiff's record; and tied Plaintiff continued confinement to Plaintiff's ongoing federal landlord litigation filed 08/28/2023 as a retaliatory act. Plaintiff alleges that these acts violated the Fourteenth Amendment, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

not a challenge to HCR Order KO610012R dated November 29, 2023. Plaintiff did not file an Article 78 petition or a PAR challenging that order because the order was favorable and recognized $1,418.34 as Plaintiff's HSTPA-protected operative preferential rent for the life of her continuing tenancy. Plaintiff's federal claims are not a request that this Court review or overturn that favorable order. Plaintiff's federal claims arise from the later conduct of individual HCR actors Peter Stecker and Jessica Moran, including silent closure of the noncompliance matter on July 17, 2025, withholding of the closure order until October 22, 2025, non-processing and effective voiding of Plaintiff's PAR filings, denial of effective written and electronic communication despite Plaintiff's known disability, rerouting away from the original altered-lease record, and the later displacement of the favorable HSTPAprotected rent path of $1,418.34 by the inflated $1,652.79 path reflected in the March 13, 2026 order. These claims arise under the Fourteenth Amendment and Title II of the Americans with Disabilities Act.

6 ATTENTION: Plaintiff seeks declaratory and prospective injunctive relief only. Plaintiff seeks ZERO monetary damages from any of the ten Defendants in this

action, including

1 or settlement payment from any Defendant.

## II. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Act.

This Court has supplemental jurisdiction over Plaintiff's state and city claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Plaintiff resides in this District.

## III. PARTIES

1. Plaintiff Lyudmila Syrochkina is a 71-year-old disabled individual with Autism Spectrum Disorder and Selective Mutism, a long-term rent-stabilized tenant of the apartment at 147 West 230th Street, Apt 1F, Bronx, New York 10463 since October 1998, and a SCRIE recipient since 2017. Plaintiff alleges that Defendant David Tennenbaum deliberately executed a "tenancy reset fraud" by altering Plaintiff's recorded move-in date from 1998 to 2018 across tenant ledgers and leases held by the building's principals. Plaintiff alleges that Defendants manufactured this false 2018 "base date" as a strategic lookback shield to conceal decades of unlawful rent inflation, to evade J-51 tax abatement regulations, and to systematically extinguish Plaintiff's statutory rent exemptions under the Rent Stabilization Law and the Housing Stability and Tenant Protection Act of 2019. Plaintiff alleges that this false 2018 reset was carried forward into the 2025 HCR proceeding closed by

Defendants Stecker and Moran and was used to deny Plaintiff HSTPA-protected tenancy status.

2. Defendant David Tennenbaum is, on information and belief, the principal, owner, manager, and controlling landlord actor associated with Plaintiff's building since November 17, 2021, including through the ownership entity associated with the building. Plaintiff alleges that Tennenbaum personally signed Plaintiff's leaserelated papers and stipulation-of-settlement materials and personally authorized, ratified, directed, or knowingly used the landlord conduct alleged in this Complaint with respect to Plaintiff's tenancy.

3. Defendant Peter Stecker is, on information and belief, an employee and official of the New York State Division of Housing and Community Renewal, sued in his individual and official capacities, against whom Plaintiff claims no monetary recovery of any kind.

4. Defendant Jessica Moran is, on information and belief, an employee and official of the New York State Division of Housing and Community Renewal, sued in her individual and official capacities, against whom Plaintiff claims no monetary recovery of any kind.

1. Defendant Officer Sharhan is, on information and belief, a police officer of the New York City Police Department, 50th Precinct, who participated in the seizure of Plaintiff on August 4, 2025, against whom Plaintiff seeks only declaratory and injunctive relief and claims no monetary recovery of any kind.

2. Defendant Jacobi Medical Center (NYC Health + Hospitals / North Central Bronx Hospital) is a public hospital operated by New York City Health + Hospitals, against whom Plaintiff seeks only declaratory and injunctive relief and claims no monetary recovery of any kind.

3. Defendant Registered Nurse Ofoma is, on information and belief, a

registered nurse at Jacobi Medical Center on August 4, 2025, who participated in Plaintiff's detention, medication administration, and chart entries on that date, against whom Plaintiff seeks only declaratory and injunctive relief and claims no monetary recovery of any kind.

4. Defendant PA Galina Makina is, on information and belief, a physician assistant at Jacobi Medical Center on August 4, 2025, who participated in Plaintiff's detention, medication administration, chart entries, and Russian-language exchange on that date, and who stated to Plaintiff "You already sued your landlord and now you will stay here," against whom Plaintiff seeks only declaratory and injunctive relief and claims no monetary recovery of any kind.

5. Defendant NYU Langone Health is a private hospital operating as a place of public accommodation under Title III of the Americans with Disabilities Act and as a recipient of federal financial assistance under Section 504 of the Rehabilitation Act of 1973, against whom Plaintiff seeks only declaratory and injunctive relief and claims no monetary recovery of any kind.

6. Defendant Ashley Acosta is, on information and belief, the NYU Langone Compliance Officer who personally received Plaintiff's October 6, 2025 written request to amend altered entries in the NYU Langone electronic record and personally directed NYU Langone's response. Plaintiff claims no monetary recovery of any kind from Defendant Acosta.

7. Defendant Dr. Kobles is, on information and belief, a physician whose name appears in the altered NYU Langone electronic record. Plaintiff alleges that Dr. Kobles never met or personally evaluated Plaintiff face-to-face, and that entries attributed to Dr. Kobles are fabrication content he signed but did not author, describing Plaintiff as debilitated, homebound, and in need of home care, and including airway and blood monitoring content reflecting an inpatient or acute

medical setting, although Plaintiff was evaluated only by Dr. O'Hagan for approximately twenty-two minutes on August 8, 2025 while wearing her street clothes (a red silk skirt and blouse), without a hospital gown, and without monitoring devices. Plaintiff claims no monetary recovery of any kind from Defendant Dr. Kobles.

IV. PREHISTORY OF THE TENANCY AND THE HSTPA-PROTECTED PREFERENTIALRENT FRAMEWORK

Plaintiff has lived in Apartment 1F at 147 West 230th Street, Bronx, New York, since approximately October 26, 1998, in a rent-stabilized building constructed in 1928 and subject during the relevant period to J-51 tax-benefit treatment since 1984. Plaintiff is elderly and disabled, with Autism Spectrum Disorder and Selective Mutism, and has been a SCRIE recipient since 2017.

For approximately twenty-three years, from 1998 to 2021, Plaintiff's tenancy was stable, peaceful, and uneventful, and Plaintiff signed renewal leases in the ordinary course without reason to suspect fraud or later deprivation of rights.

By 2020/2021, Plaintiff's lease under the prior owner reflected a lawful post-HSTPA structure with a rent of $1,383.75 and no false riders or concession scheme, and Plaintiff's SCRIE-frozen tenant-side base rent after HSTPA 2019 was $1,350.00, with a payable amount of approximately $1,293.33 as of December 1, 2021.

On or about November 17, 2021, ownership of the building changed, and Defendant David Tennenbaum became the principal or controlling landlord actor associated with Plaintiff's building.

After the ownership change, Defendants abruptly disturbed Plaintiff's previously stable rent and lease structure, including by billing Plaintiff at an inflated amount of approximately $1,552.76 even though Plaintiff was still under the prior lawful rent of $1,293.33 and the SCRIE structure. Defendants refused to provide a proper

renewal lease and used the illegitimate billing path to press a higher figure against Plaintiff.

Plaintiff repeatedly requested a lawful renewal lease in writing and by telephone beginning in August 2021, while the old owner's management remained in place, but they refused to reply; and from December 2021 Plaintiff requested it from the new owner, both before and after the ownership change, and Defendants ignored those requests.

On or about March 4, 2022, Plaintiff filed RA90 lease violations; and on March 16, 2022, Defendants sent Plaintiff a purported renewal lease using an outdated preHSTPA form and backdated to January 1, 2022.

Plaintiff sought guidance from 311 and Department of Finance and SCRIE channels, and, based on that guidance, signed a renewal reflecting the lawful tenant-side amount of $1,418.34 corresponding to the 2022/2023 increase framework.

In April 2021, Plaintiff filed her first complaint with the Attorney General's office and received a letter with information about HSTPA 2019, assuring that HSTPA 2019 cannot be revoked for the life of the tenancy.

Defendant Tennenbaum returned that signed renewal only on April 21, 2022, with a white-out alteration: the white-out removed $1,418.34 and inserted the inflated figure of $1,652.79, while recasting the inflated figure as "base regulated rent."

Plaintiff alleges that this white-out-altered lease was a forged document and the beginning of the false lease path later

Plaintiff alleges that this white-out-altered lease was a forged document and the beginning of the false lease path later used against her, and that the alteration changed the legal role of the rent figure on paper in violation of HSTPA.

Plaintiff repeatedly reported the altered lease and inflated rent path to HCR, 311,

the Department of Finance Ombudsman, SCRIE-related channels, and the Attorney General's office; and on or about March 4, 2022, through RA89, and later in August 2022 through RA90, she began pursuing lease-violation relief through HCR.

In August 2023, Defendant Stecker closed a harassment case opened in July 2023 after Plaintiff saw her apartment listed, beginning on February 9, 2023, across the market as available for rent and sale, with a market price attributed to a realty brokerage.

Defendant Stecker did not wait for overcharge case RA89/RA90 and Order KO610012R to be issued, and did not act on Plaintiff's submission of the white-out altered lease copy.

On November 29, 2023, HCR issued Order KO610012R, which, under HSTPA, established two distinct figures with different functions: a vacancy legal regulated rent of $1,640.69, usable only upon permanent vacatur of the apartment, and Plaintiff's post-HSTPA operative base rent of $1,418.34, governing her continuing tenancy as the HSTPA-protected preferential rent.

Order KO610012R expressly directed that all subsequent preferential-rent increases for Plaintiff must be based on $1,418.34, and the accompanying calculation chart confirmed Plaintiff's SCRIE-frozen tenant share of $1,350.00 plus any applicable surcharges, and that Plaintiff remained in occupancy from January 1, 2022 through August 31, 2023 without a valid lease or rent increase due to the owner's late lease offer.

Under HSTPA, because Plaintiff was paying a preferential rent on or after June 14, 2019, that preferential rent continues for the life of her tenancy, with subsequent lawful increases applied to the preferential figure rather than to the higher vacancy legal regulated rent.

Plaintiff did not file a Petition for Administrative Review after KO610012R because

she accepted it as favorable on the core HSTPA issue and because the order recognized her HSTPA-protected preferential-rent path of $1,418.34 as the only operative base rent for her continuing tenancy.

Plaintiff alleges that, despite KO610012R, Defendant Tennenbaum did not comply in practice with the HSTPA-protected preferential-rent structure and instead continued to press the inflated disputed rent path against Plaintiff's tenancy. Plaintiff therefore pursued noncompliance relief under RA22 HCR docket MN610001NC, which culminated in a December 11, 2024 stipulation of settlement and a January 27, 2025 Commissioner's order imposing a civil penalty on the landlord for noncompliance.

UNITED STATES DISTRICT COURT

V. JULY 17, 2025 SILENT CLOSURE, STECKER/MORAN REROUTING, MARCH 13, 2026 INFLATED ORDER, AND IMMINENT SCRIE/FREEZE CRISIS

1. By March 13, 2025, Plaintiff had completed the landlord-noncompliance stage of her then-pending HCR practice under RA22 docket MN610001NC. The March 13, 2025 posture therefore reflected the last documented point at which Plaintiff's housing-relief proceeding advanced through HCR without procedural deficiency, and was followed through 2025–2026 by conduct of the State Defendants in their individual capacities that Plaintiff alleges is constitutionally deficient.

2. On July 17, 2025, Defendant Stecker, acting in his individual capacity, administratively closed Plaintiff's then-current HCR proceeding. The closure was not preceded by pre-deprivation notice to Plaintiff, was not accompanied by a hearing, and was not followed by delivery of the closure paper at or near the time of closure.

3. Approximately one week after the July 17, 2025 closure, when Plaintiff queried the HCR Case Status Inquiry tool, the docket reflected a "closed" status. When

Plaintiff inquired at the HCR Gertz Plaza office, multiple HCR agents communicated to Plaintiff that the case was closed and that no further recourse was available through the HCR administrative forum.

4. By letter dated August 13, 2025, Defendant Moran, acting in her individual capacity for the State Defendants, transmitted supplemental findings adverse to Plaintiff and asked Plaintiff to respond. The August 13, 2025 Moran letter postdated the July 17, 2025 closure by approximately four weeks and predated the August 20, 2025 PAR filing by one week.

5. On August 20, 2025, Plaintiff filed a Petition for Administrative Review ("PAR") against the July 17, 2025 HCR closure, attaching the documentary record of the proceedings below and Plaintiff's submitted white-out-altered lease copy. Plaintiff's PAR filing is protected petitioning activity under the First Amendment to the United States Constitution.

6. Plaintiff further alleges that the later March 13, 2026 inflated-order path displaced the HSTPA-protected preferential-rent path of $1,418.34 recognized in HCR Order KO610012R, increased the risk to Plaintiff's SCRIE and rent freeze, and rerouted the matter away from correction of the original altered-lease record.

7. On September 28, 2025, and again on September 29, 2025, Plaintiff was physically locked out of her apartment at 147 West 230th Street, Apt. 1F, Bronx, New York 10463, by or at the direction of Defendant Tennenbaum. The September 28-29, 2025 lockouts were carried out without prior judicial process and without any pre-deprivation notice to Plaintiff, and occurred during the period in which the HCR proceeding was already closed and Plaintiff's PAR remained unadjudicated.

8. The closure paper dated July 17, 2025 was sent to Plaintiff on October 22, 2025, after the September 28-29, 2025 lockouts. The October 22, 2025 delivery is contemporaneous with Plaintiff's discovery that mail delivered to her apartment of

more than twenty-five years was being diverted.

9. The TAC asserts no claim under Title II of the Americans with Disabilities Act against Defendants Stecker or Moran in their individual capacities, pleads all claims against those Defendants solely under 42 U.S.C. §§ 1983 and 1985 and the NYSHRL, limits any Title II theory in this TAC to Jacobi Medical Center as a public entity, and limits private-accommodation ADA relief to Title III claims against NYU Langone Health.

VI. AUGUST 4, 2025 — UNREASONABLE SEIZURE BY OFFICER SHARHAN, JACOBI FORCED MEDICATION, AND MAKINA RETALIATION STATEMENT

1. On July 28, 2025, after a technician at the Genius Bar in the Apple Store on 5th Avenue confirmed that Plaintiff's iPhone showed multiple signs of malware and needed the attention of a forensic cyber professional, Plaintiff was advised to buy a new iPhone. Plaintiff bought an iPhone 16e that same afternoon, on 07/28/25, and bought a new Mint Mobile number in the evening on 07/29/25 at Quick Fix Phone in Brooklyn near Ocean Avenue. Less than 24 hours after activating the new number, Plaintiff received a spoofed call impersonating the "DA Manhattan Office," with voice-to-text gibberish, and the iPhone marked the number "+0000000000" as "Scam Likely," even though Plaintiff had not yet tested the phone by calling friends. On August 1, there were additional "Scam Likely" calls.

2. Plaintiff also sent a text to her friend Taya confirming that she would travel by NJ Transit early in the morning on 08/04/25 to meet at Chatham Train Station, but still without her phone. On August 4, 2025, Plaintiff spent the day in Chester, New Jersey, with her longtime friend Taya Shumerina and Ms. Shumerina's daughter Abigail Julia, having left her apartment in the Bronx without her phone at 4:30 a.m.

3. Plaintiff returned to her apartment by NJ Transit at approximately 5:50 p.m. and, upon arrival, discovered multiple incoming calls—seven total—displayed on her

phone as "+0000000000," presented as if they were from the Manhattan District Attorney's Office. At approximately 5:52 p.m., a knock came at Plaintiff's door at the same time another incoming call came in, and both the caller and the persons at the door represented in substance that they were "from the Manhattan District Attorney's Office."

4. Defendant Officer Sharhan of Bronx Precinct 50 and a second female officer were at the door. Sharhan immediately asked whether Plaintiff's landlord was abusing her, and as Plaintiff began to explain her ongoing HSTPA revocation, wire, mail, and communication problems, Sharhan interrupted her, forced her to the floor, and handcuffed her.

5. Plaintiff begged to use the restroom, told Sharhan that she was elderly, hypertensive, and needed medication, and asked to keep the restroom door open and to put on her shoes. Sharhan refused all of those requests. He still did not show a warrant or explain the reason for the handcuffing or the visit. Plaintiff was removed from her apartment barefoot, paraded through the building and outside while handcuffed and barefoot, placed in a police vehicle without a meaningful explanation, and transported against her will to NCBH Jacobi Hospital, where she was taken to the psychiatric emergency area still barefoot.

6. Plaintiff alleges that LMSW Daniel Essorg spent considerable time trying to find a warrant for arrest, and informed her that the stated basis for the seizure was a false claim that she had called the Manhattan District Attorney's Office and threatened suicide. Plaintiff alleges that she made no such calls, and that her phone showed only seven incoming spoofed calls and no outgoing calls at all.

7. On August 6, 2025, Plaintiff went to the 50th Precinct to obtain a complaint or shield number concerning Sharhan. Sharhan came out and told her, in substance, that he would kick her out of the precinct, and never gave her a meaningful

explanation for the August 4, 2025 seizure.

8. At Jacobi, Plaintiff refused to sign consent forms and asked LMSW Essorg to examine her phone, and the phone confirmed only incoming spoofed calls and no outgoing suicidal call or outgoing calls at all. Plaintiff's friend Taya Shumerina was contacted by Daniel Essorg as a source of collateral information and confirmed that Plaintiff had spent the day in New Jersey without her phone, had been functioning normally, and had been very happy with friends in a restaurant in Chester, New Jersey. After that confirmation, Plaintiff was told in substance that she had been cleared for discharge after a very short evaluation.

9. Plaintiff has Autism Spectrum Disorder and Selective Mutism. Plaintiff's communication during the August 4, 2025 Jacobi encounter was effective through written notes, typed notes, and Russian-language exchange.

10. Plaintiff alleges that she was not intensely agitated, was not incoherent, was not rambling, was not in psychiatric emergency, did not threaten to harm herself, did not threaten to harm others, and did not have a reasonable prospect of harming herself or harming others.

11. Plaintiff nevertheless alleges that Stella Ofoma and Defendant PA Galina Makina continued to control the encounter and kept Plaintiff in the hospital, telling her that she would be held for blood-pressure stabilization. Plaintiff did not knowingly and voluntarily consent to the medication sequence that followed.

12. Plaintiff alleges that she was given four pills of various sizes and shapes within approximately 40 minutes under coercive circumstances. Later Jacobi records reflected prescriptions for amlodipine, metoprolol, losartan, and lorazepam, while listing only amlodipine and metoprolol as forcibly administered on the hard-copy AVS and in EMR production 03/31/26, but deleting both 212/111 blood pressure and Amlodipine in EMR production 04/29/26. Plaintiff alleges that, in reality, she

was forced to take four pills of different sizes, even though she was not on such a regimen as an outpatient and had a history of adverse reactions, including anaphylaxis-related risk.

13. During the medication sequence, Plaintiff's systolic blood pressure rose to dangerous levels, including readings she recalls as approximately 197, 199, 220, and as high as 234. Plaintiff repeatedly protested, demanded a phone, demanded an attorney, and stated words to the effect that the staff were killing her. Plaintiff alleges that Stella Ofoma refused or failed to truthfully document the most extreme blood-pressure event.

14. Plaintiff further alleges that all pills were administered personally by Stella Ofoma, who demanded, "show your tongue so I see you swallowed pills," although the description of that event was altered across multiple EMR productions.

15. Plaintiff alleges that the Jacobi electronic medical record contains disputed entries describing her as intensely agitated, incoherent, rambling, in psychiatric emergency, and as having a reasonable prospect of harming herself or harming others. Plaintiff alleges that those descriptions are false and fabricated.

16. After Plaintiff demanded a phone and an attorney and stated that she would sue, Defendant PA Galina Makina replied in Russian, in substance: "You already sued your landlord and now you will stay here." Plaintiff alleges that Makina's statement directly tied her continued confinement to her protected petitioning activity, including her prior pro se HP harassment action in Housing Court against the landlord and her 07/03/25 report to the Bureau of Investigation, and supports the inference that the continued hold and medication were retaliatory, punitive, and pretextual rather than medically justified.

17. Plaintiff protested and, finally, at 23:35, was transferred to a general medical floor, begged to be allowed to go home, and was discharged late at night at

approximately 00:05 a.m. on 08/05/25. At 00:07 a.m. on 08/05/25, a female security officer helped the still-barefoot Plaintiff call Prestige Car Service, and the car arrived at 00:13 a.m. on 08/05/25.

18. Plaintiff's hard-copy AVS reflected a discharge blood pressure of 212/111, while later Jacobi EMR productions issued after 03/31/2026 altered or diluted that figure and other key details, and reflected a fourteen-day inpatient food-selection or diet order entered by Defendant Makina even though Plaintiff had already been cleared as not suicidal. Plaintiff alleges that the food order appears in the 120 pages of EMR 3 from the 03/31/26 production, but not in the 90 pages of EMR 4 from 04/28/26, supporting Plaintiff's allegation that the EMR was being adjusted after the fact in response to this SDNY case.

19. Plaintiff further alleges that, while on the general medical floor at Jacobi, she was attended by Dr. Christine Cassidy, who honored Plaintiff's request to be discharged late at night and ended the continued confinement. Plaintiff names Dr. Cassidy here only to identify her conduct and expressly does not name Dr. Cassidy as a wrongdoer or target in this action.

20. Plaintiff alleges that later Jacobi EMR productions issued after the commencement of this federal action materially altered the documented record of the general medical floor encounter, including by reframing or diluting the Cassidy encounter and by altering or removing the discharge blood-pressure entry of 212/111 reflected in Plaintiff's original hard-copy AVS.

21. Plaintiff further alleges that EMR production 4 of 04/29/26 appeared with a fabricated imitation of Plaintiff's signature, "00:12 a.m.," while at that time Plaintiff was near the gates awaiting the approaching 00:13 Prestige car with driver no. 20.

22. Plaintiff alleges that later Jacobi NCBH EMR productions inserted or relied on false PSYCKES-type material under a non-applicable name, even though, at

approximately 20:00 on August 4, 2025, the LMSW and MD considered Plaintiff to have no psychiatric history. Plaintiff further alleges that the later-expanded EMR converted the brief encounter into a false psychiatric narrative, including references to nonexistent neurocognitive disorders, nonexistent psychosis, and paranoia- or delusion-style framing without supporting clinical basis, and a fabricated assessment that Plaintiff alleges never truthfully occurred because Plaintiff refused any meaningful narrative interview.

VII. AUGUST 8, 2025 — VOLUNTARY NYU LANGONE VISIT, ONLY DR. O'HAGAN, AND FALSE PROVIDER ATTRIBUTIONS

1. On August 8, 2025, Plaintiff went voluntarily to Defendant NYU Langone Health's emergency department, after a phone consultation with PA Swathi Bolneni and consistent advice from friends, for the sole purpose of creating a truthful record showing that she was not suicidal following the false suicide narrative used to seize her on August 4, 2025.

2. Plaintiff did not go to NYU Langone Health because she was suicidal, did not seek psychiatric admission, and went there only to document, voluntarily and on the record, that she was not suicidal.

3. At the time of the visit, Plaintiff was still in a severe fight-or-flight state from the August 4, 2025 Jacobi seizure and forced medication, and did not yet know that the Jacobi event had involved metoprolol, losartan, and lorazepam in addition to amlodipine. Plaintiff alleges that lorazepam was particularly dangerous to her given her history of adverse reactions, including anaphylaxis-related risk.

4. Because Plaintiff has Selective Mutism, she could not adequately explain herself at the front desk on arrival and asked front-desk staff to call PA Bolneni to help explain the reason for her visit, as a disability-related

communication measure rather than evidence of confusion, psychosis, or suicidality.

5. Plaintiff arrived at approximately 12:45 p.m. and was discharged at approximately 5:51 p.m. For essentially the entire visit, Plaintiff remained on bed 6, used her iPhone, and sent text messages from bed 6, with no continuous interruption other than her face-to-face evaluation by Dr. O’Hagan.

6. Only one physician approached Plaintiff face-to-face during the entire visit: Dr. O’Hagan, who met Plaintiff at approximately 16:16, took Plaintiff to a small room in search of a confidential space, and evaluated Plaintiff from approximately 16:18 to 16:39.

7. During that evaluation, Plaintiff was anxious, labile, and processed information in a bottom-up, circumstantial manner consistent with autism. Plaintiff alleges that Dr. O’Hagan interrupted her, stating in substance, “stop your excessive detailing, we have no time,” but by the end of the evaluation stated in substance, “yes, I believe you are not suicidal.”

8. No other physician performed any face-to-face assessment of Plaintiff before or after Dr. O’Hagan. No other evaluation occurred, and Plaintiff received discharge clearance at approximately 5:51 p.m.

9. Plaintiff never changed out of her own red silk skirt and blouse and was never placed in a hospital gown, because she had volunteered for a wellness check only after the police assault on 08/04/25. Plaintiff therefore alleges that she was never undergoing the kind of inpatient or monitored hospital course later suggested by the expanded NYU Langone EMR.

10. Plaintiff first saw “Kimmel” in the EMR on 09/17/25 and had no idea it was a hospital. She also was billed as an outpatient. No monitoring on any devices

was billed. The AVS was from ED Perelman. After-ED calls were from ED Perelman. The cardiology AVS of 08/19/25 also contained no inpatient-related content concerning the August 8, 2025 encounter.

11. Plaintiff alleges that the later NYU Langone EMR contains entries attributed to or associated with Dr. Kobles, Gabrielle Nash, and Laura Newbold, even though Plaintiff alleges that Kobles never approached her, Nash never personally assessed her for APS, and Newbold never personally assessed her at the August 8, 2025 encounter.

12. Plaintiff further alleges that there are several copied triage assessments containing a narrative about the DA office while Plaintiff was nearly mute. Plaintiff alleges that the detailed narrative was said only during the face-to-face encounter with Dr. O'Hagan and was later spread across entries attributed to other providers.

13. Plaintiff alleges that the chief complaint for the entire wellness check was formulated by Plaintiff for Dr. O'Hagan and still remains present in the expanded EMR as "I am not suicidal!", but that the later EMR also contains an "updated chief complaint" with a different narrative inconsistent with the actual visit.

14. Plaintiff alleges that the later NYU Langone EMR contains false APS-style assessment content, false debility findings, false homebound status, false home-care need, false Kimmel-related inpatient entries, and false inpatientstyle content that never truthfully reflected the August 8, 2025 visit.

15. Plaintiff received successive NYU Langone EMR productions dated September 17, 2025, November 17, 2025, March 23, 2026, March 30, 2026, and April 27, 2026, all containing the same core disputed material with shifting formatting, pagination, headings, and additional detail in the later

productions.

16. Plaintiff repeatedly notified NYU Langone and Defendant Acosta, the NYU Langone Compliance Officer, that the EMR contained obvious impossibilities, false provider attributions, and false psychiatric and inpatient content, and requested correction, amendment, deletion, and audit review.

17. Plaintiff alleges that Acosta amended some of the most egregious notes but refused to remove the broader false Kimmel inpatient narrative, did not perform a meaningful audit of authorship, access history, audit trail, metadata, or insertion history, and left the disputed record in place after notice.

18. Plaintiff alleges that NYU Langone, Acosta, and Kobles thereafter continued to maintain the disputed false disability-related EMR content even after notice.

19. Plaintiff further alleges that post-creation alteration and material inaccuracy in the 08/08/2025 encounter record appears in additional ways. The version of the record generated on April 27, 2026 lists Plaintiff's current Brooklyn address and current email address in connection with the historical August 8, 2025 encounter, even though that information was updated in MyChart much later.

20. Plaintiff further alleges that the May 1, 2026 billing statement for the same August 8, 2025 visit charges $5,106.17 under CPT code 99283 for an Emergency Department Visit Level 3. Plaintiff further alleges that a customerservice response dated April 30, 2026 identified a different visit location, and that these shifting facility descriptions are inconsistent with the actual short outpatient wellness check reflected by the AVS and the face-to-face O'Hagan evaluation.

21. Plaintiff further alleges that the March 23, 2026 and March 30, 2026 productions contain an entry attributed to Gabrielle Nash and/or Laura Newbold purporting to be an Adult Protective Services referral assessment, with internal content reflecting a January 21, 2025 APS-assessor visit reference date while being externally coded as if it occurred on August 8, 2025. Plaintiff alleges that she had no NYU Langone encounter on January 21, 2025 and did not receive any APS-eligibility assessment at the August 8, 2025 visit.

22. Plaintiff alleges that the disputed NYU Langone EMR contains entries describing her as having chronic suicidal ideation, paranoid or bizarre thinking, and delusions about her landlord, even though Plaintiff's actual chief complaint was "I am not suicidal!", Dr. O'Hagan's face-to-face conclusion was that he believed Plaintiff was not suicidal, and Plaintiff's August 8, 2025 visit was a voluntary effort to create a truthful record after the August 4, 2025 seizure.

23. Plaintiff alleges that Defendant Acosta received Plaintiff's October 6, 2025 written amendment request, directed NYU Langone Health's response to that request, and later issued responses that mischaracterized the subject of Plaintiff's amendment request while leaving the disputed August 8, 2025 record substantially in place.

24. Plaintiff alleges that Defendant Kobles is a physician whose name appears in the altered NYU Langone EMR, that Plaintiff has never met Defendant Kobles, and that the disputed NYU Langone EMR contains entries attributed to Kobles that purport to describe clinical findings, plans of care, dose adjustment, wound-care recommendation, home-care initiation, physicaltherapy initiation, and face-to-face evaluation even though Plaintiff alleges

that no such face-to-face encounter with Kobles ever occurred on August 8, 2025.

VIII. CROSS-INSTITUTION COORDINATED FABRICATION PATTERN AND ARTICLE 81 RISK CONTEXT

1. Plaintiff alleges that the Jacobi and NYU Langone records, although generated at separate institutions on separate dates, show strikingly similar fabrication patterns rather than independent good-faith medical documentation, including parallel “in the making” AVS-style variants that did not match the original benign hard-copy AVS materials.

2. In both institutions, the original hard-copy AVS materials were short, simple, and consistent with Plaintiff’s actual brief encounters, including a notation consistent with Asperger’s and autism, no medication regimen of the type later attributed to her, quick discharge, and no follow-up indicating ongoing psychiatric instability, neurocognitive disorder, psychosis, debility, homebound status, or home-care need.

3. Plaintiff alleges that, despite the simplicity and benign character of the original hard-copy AVS records, the later electronic medical records at both Jacobi and NYU Langone transformed those simple AVS encounters into expanded narratives of psychiatric instability, paranoia- and delusion-style framing without supporting clinical content, neurocognitive impairment, and inpatient-style management that the original hard-copy AVS did not support.

4. Plaintiff further alleges that, in both institutions, the later EMR productions display visible traits of fabrication in the making, including AVS-style variants that did not exist in the original hard copy, recurring blood-pressure entries unsupported by the hard-copy record, shifting provider attributions, pagecount variations across successive productions, and inserted content into a

record that originally reflected only a brief autism-coded encounter.

5. Plaintiff alleges that material alterations in both the Jacobi and NYU Langone EMR productions, including changes to the Jacobi general-medicalfloor record and to the documented 212/111 discharge blood-pressure entry, occurred after the commencement of this federal action, supporting the inference that the EMR alterations were not neutral medical corrections but post-event fabrication and retaliatory record-shaping linked to Plaintiff's federal litigation.

6. Plaintiff further alleges that her supplemental filings already submitted in this action, including her letter to NYU Langone leadership and the four-page "EMR in the making" pages previously produced, materially contributed to the Court's decision to permit Plaintiff leave to file the Second Amended Complaint. Plaintiff intends to supplement the record with additional EMR productions, including the Jacobi EMR 4 production and the NYU Langone EMR 5 production limited to the August 8, 2025 visit, which Plaintiff alleges further confirm the cross-institution coordinated fabrication pattern alleged herein.

7. Plaintiff alleges that the two systems used parallel false themes against her, including: at Jacobi, false SOFA-related severity-style content and false acute-care framing; at NYU Langone, false airway-related, sepsis-related, IVrelated, and SOFA-style content, plus false APS-style assessment, false debility, false homebound status, and false home-care need; and at both Jacobi and NYU Langone, parallel false psychiatric-instability and inpatientstyle framing converting Plaintiff's actual brief encounters into fabricated narratives.

8. Plaintiff further alleges that both records include nearly identical linguistic framing concerning a supposed call to the Manhattan District Attorney's Office, even though Plaintiff alleges that no such outgoing suicidal call was

made, that her phone showed only incoming spoofed calls, and that the phone and number sequence tied to those spoofed contacts was new and recently installed.

9. Plaintiff alleges that the cross-institution similarity of these patterns is significant because Jacobi and NYU Langone are separate institutions handling separate encounters on separate dates, and yet the later-expanded records moved in the same false direction at the same time, in a manner not consistent with neutral charting error, ordinary administrative correction, or independent professional judgment, but consistent with coordinated, pattern-based fabrication or expansion of a false narrative across two medical systems.

10. Plaintiff does not yet know which person or mechanism created every false entry in either system, but alleges that the documented similarities, including page-count variations across successive EMR productions, similarly fabricated AVS variants, similarly false provider attributions, similarly false inpatient framing, and similarly worded “Manhattan DA call” framing, are among the strongest indicators that the EMR narratives were not truthful records of what actually happened to her.

11. Plaintiff further alleges that the same cross-institution fabrication pattern alleged above is amplified, paralleled, and confirmed by a third institution: Montefiore Medical Center, which handled Plaintiff’s July 28, 2025 encounter after Plaintiff, unable to sleep because of ongoing iPhone malfunction and error behavior, went at approximately 10:00 a.m. on July 28, 2025 to the Apple Store on Fifth Avenue, where Plaintiff was advised that the iPhone was deeply corrupted and that Plaintiff needed to buy a new iPhone 16e.

12. Plaintiff further alleges that, later that same day, July 28, 2025, Plaintiff

bought a new iPhone 16e, obtained a new phone number in Brooklyn, and had a new iCloud installed at QuickFix. On July 30, 2025, several spoofed calls and messages appeared impersonating the "DA Manhattan Office" from the number "+0000000000," and six days later the new swatting event followed, with Officer Sharhan claiming that Plaintiff had called the DA Manhattan Office from the new iPhone.

13. Plaintiff further alleges that the Montefiore encounter of July 28, 2025 followed Plaintiff's contemporaneous written protest activity, including Plaintiff's July 24, 2025 letter to Met Council and tenants' organizations, in which Plaintiff used hunger-strike protest language derived from the 2021 sample associated with Assemblymember Harvey Epstein's HSTPA summary materials. Plaintiff alleges that Montefiore later converted that protest language into the false phrase "selfstarvation SI," even though Plaintiff was not expressing suicidal intent.

14. Plaintiff further alleges that the Montefiore record contains provider attributions only to PA Nicole Adler and DO Mr. Robin. Plaintiff alleges on information and belief that neither of those providers performed any face-toface assessment of Plaintiff consistent with the substantive record content later appearing under their attributions in the expanded Montefiore production.

15. Plaintiff further alleges that successive Montefiore record productions reflected differing page counts and differing record content. Plaintiff further alleges that pages 3–4 of the Montefiore production state in substance "selfstarvation SI," while pages 5–10 state in substance that Plaintiff had no SI and no psychiatric or medical history found. Plaintiff alleges that this internal contradiction is impossible on its face under any reasonable record-keeping

standard.

16. Plaintiff alleges that the false themes that emerged in the expanded EMRs, including paranoia- and delusion-style framing without supporting clinical content, neurocognitive-style framing without supporting evaluation, debility, homebound status, and home-care need, are precisely the categories of content foreseeably usable in Article 81 guardianship-type or related proceedings against an elderly disabled tenant.

17. Plaintiff does not allege that an Article 81 proceeding had already been filed against her at the time of the July and August 2025 encounters, and does not allege present knowledge of any direct agreement between the medical Defendants and any housing-related Defendant. Plaintiff alleges instead that the coordinated transformation of her records foreseeably created a record capable of being used in Article 81-type proceedings, APS-style interventions, guardianship-style framings, or other liberty-restricting actions against an elderly disabled rent-stabilized tenant.

18. Plaintiff further alleges that the unwarranted arrest by Sharhan did not involve Mental Hygiene Law § 9.41 or any other involuntary civil commitment procedure, but that later Jacobi EMR production dated April 29, 2026 added text purporting to memorialize a twenty-four-hour hold, which Plaintiff alleges is itself part of the post-pleading alteration pattern alleged in this Section rather than a contemporaneous record of any actual such hold.

IX. TENNENBAUM CONDUCT — FORGED LEASE PATH, INFLATED RENT, FALSE ARREARS, ILLEGAL RIDERS, FALSE CONCESSIONS, REFUSAL OF LAWFUL RENEWAL, MAIL AND WIRE INTERFERENCE, TWO LOCKOUTS, AND DISABILITYBASED HOUSING HARASSMENT

1. Defendant David Tennenbaum has owned, controlled, managed, or

directed the landlord side of Plaintiff's building since on or about November 17, 2021, and at all relevant times knew that Plaintiff was an elderly, autistic, selectively mute, SCRIE-protected, long-term rentstabilized tenant in a building subject during the relevant period to J-51 tax-benefit treatment.

2. Plaintiff's apartment was not a market-rate tenancy, and the building's J-51 tax-benefit status reinforced its regulated, protected character. Plaintiff does not allege that J-51 status alone made Defendant Tennenbaum a state actor, but does allege that this status is strong evidence that Tennenbaum was dealing with a regulated, protected residential tenancy and that his use of a forged, white-out, inflated lease path against Plaintiff was especially improper.

3. After taking control of the building, Defendant Tennenbaum billed Plaintiff at an inflated amount of approximately $1,552.00 in December 2021, refused to issue a proper lawful renewal lease in the ordinary HSTPA manner, and, on or about March 16, 2022, sent Plaintiff a backdated, outdated pre-HSTPA renewal form.

4. When Plaintiff signed a renewal reflecting the lawful tenant-side amount of $1,418.34, Defendant Tennenbaum returned that signed renewal with a white-out alteration removing $1,418.34 and inserting the inflated figure of $1,652.79, while recasting that inflated figure as "base regulated rent."

5. Plaintiff alleges that this white-out-altered lease was a forged document, that the alteration was not cosmetic but changed the legal role of the rent figure on paper, and that it became the foundation for an inflated false lease path that Defendant Tennenbaum thereafter

used to generate purported arrears reaching several thousand dollars by August 2022, even though Plaintiff had not agreed to the inflated figure.

6. Defendant Tennenbaum further used so-called "rent concessions," riders, and paper devices that did not restore the lawful regulated or HSTPA-protected preferential-rent path of $1,418.34, but instead obscured or normalized the inflated lease structure being imposed on Plaintiff.

7. Plaintiff alleges that, even after HCR Order KO610012R recognized her HSTPA-protected preferential-rent path of $1,418.34 as the operative base rent for her continuing tenancy, and even after the December 11, 2024 noncompliance stipulation and the January 27, 2025 Commissioner's civil penalty for noncompliance, Defendant Tennenbaum continued to press the inflated disputed lease path against Plaintiff and continued to refuse to provide a clean lawful renewal lease reflecting $1,418.34 as the operative base rent.

8. After ownership changed, mail delivery to Plaintiff's apartment became unreliable in a USPS-confirmed manner; her mailbox was interfered with; her wire, router, internet, and phone-related communication functioning later became unstable or blocked, including loss of reliable emergency calling from inside her apartment; and HCR personnel ignored or failed to address those communication problems even though they directly impaired Plaintiff's access to notice and process.

9. Plaintiff alleges that Defendant Tennenbaum benefited from this communication inequality and, on information and belief, received or acted upon HCR-related developments ahead of Plaintiff while Plaintiff

was being denied effective written and electronic communication consistent with her ADA-protected disability needs.

10.Plaintiff further alleges that, on or about May 19, 2025, Defendant Tennenbaum personally called Plaintiff and spoke for approximately twenty minutes in a manner Plaintiff perceived as menacing, coercive, and intimidating, stating words in substance including "we are not wanting to damage you," "we don't want you to die," and "you must live longer," or words to that effect. Plaintiff alleges that, in the context of the ongoing forged-lease dispute, rent pressure, Plaintiff's known age and disability, and the threatened loss of housing protections, the call was not a neutral landlord communication but part of a continuing pattern of harassment, intimidation, and interference directed at Plaintiff's tenancy and housing rights.

11.Plaintiff further alleges that, during the same period of communication interference, she observed parallel modifications appearing in her drafting environment and in the EMR records that paralleled corrections she had been making privately, raising a reasonable suspicion of unauthorized access to her devices or communications. Plaintiff reserves the right to seek discovery, forensic review, and preservation orders concerning those parallel modifications.

12.On September 28, 2025, Plaintiff experienced a lockout in which the lock cylinder had been changed and the inside lock jacket was barely attached. On September 29, 2025, a separate lock was found damaged from the outside, and an emergency locksmith was retained to replace both locks at Plaintiff's out-of-pocket expense. Plaintiff sent HCR the emergency locksmith affirmation and related materials.

13.[NEW — May 2026 C017 mail discovery] In May 2026, after years of substantially blocked mail delivery to Plaintiff's apartment, Plaintiff discovered a collection of previously undelivered envelopes bearing USPS Code C017 markings and yellow non-delivery stickers. Among the C017-marked non-delivered mail were envelopes from HCR and from Garfunkel Wild, including an April 6, 2026 mailing from Garfunkel Wild relating to this tenancy that Plaintiff had not previously received at the time of dispatch. Plaintiff alleges that the C017 yellow-sticker pattern is consistent with a systematic mail-block affecting HCR process mail and landlord-side counsel mail, that this pattern overlaps in time with the lockout events of September 28–29, 2025 and with the broader mail and wire interference already alleged in paragraphs 8–11, and that Defendant Tennenbaum and the landlord-side actors on information and belief benefited from Plaintiff's inability to receive HCR and counsel-side mail during the same period in which the inflated lease path and false-arrears representations were being advanced.

14.Plaintiff alleges, on information and belief, that Defendant Tennenbaum did not impose this conduct on similarly situated nondisabled SCRIE or rent-stabilized senior tenants in the building or portfolio, and instead targeted Plaintiff for the forged white-out lease, the inflated vacancy-rent treatment imposed during ongoing tenancy, the illegal lease riders, the false rent concessions, the false-arrears generation, the refusal of a lawful renewal lease, the denial of effective written communication, and the lockouts because of her disability and her disability-related vulnerability in protecting her tenancy.

15.Plaintiff alleges that Defendant Tennenbaum engaged in disabilitybased discrimination in the terms, conditions, and privileges of

Plaintiff's rental housing and in continuing interference, coercion, intimidation, and retaliation against Plaintiff for exercising her protected fair-housing, rent-regulation, SCRIE-related, and federallitigation rights, in violation of the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

16.Plaintiff alleges that the conduct described in this Section IX, including the forged white-out lease path, the inflated rent, the false arrears, the illegal riders, the false concessions, the refusal of a lawful renewal, the mail and wire interference, the September 28–29, 2025 lockouts, and the May 2026 C017 mail-block discovery, establish the basis for the declaratory and injunctive relief set out in the Prayer for Relief, including correction of the lease and tenancy record, restoration of the HSTPA-protected preferential-rent path of $1,418.34, delivery of a clean lawful renewal lease, an order directing HCR to re-issue and re-serve all process correspondence impacted by the C017 non-delivery pattern, and cessation of the mail, communication, and lockout interference.

1. GENERAL PREAMBLE TO COUNTS

2. Counts I through IX are pleaded exclusively in terms of declaratory relief and prospective injunctive relief. Plaintiff does not seek, and will not accept, monetary damages from any Defendant. Plaintiff expressly disclaims any individual-capacity claim under Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131–12134) or under Section 504 of the Rehabilitation Act (29 U.S.C. § 794) against any Defendant in their individual capacity. Title II is pleaded only against Jacobi Medical Center as a public entity. Section 504 is pleaded against NYU Langone Health as a recipient of federal financial assistance, and pleaded against Jacobi Medical Center as a recipient of federal financial assistance. All disability-framework claims against

Defendants Sharhan, Ofoma, Makina, Stecker, Moran, Acosta, Kobles, and Tennenbaum in their individual capacities are routed exclusively to 42 U.S.C. §§ 1983, 1985, and the New York State Human Rights Law (N.Y. Exec. L. § 296 et seq.), and where applicable to the New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 et seq.). Plaintiff waives any right to trial by jury on any count.

3.

4. COUNT I — Against Defendant Officer Sharhan — Fourth and Fourteenth Amendments, 42 U.S.C. § 1983

5. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

6. On August 4, 2025, Defendant Sharhan, acting under color of state law, entered Plaintiff's residence at 147 West 230th Street, Apartment 1F, Bronx, New York 10463; seized Plaintiff inside her home; forced Plaintiff to the floor; applied handcuffs; denied access to footwear and restroom; and caused forcible ambulance transport to Jacobi Medical Center.

7. The seizure was conducted without reasonable suspicion, probable cause, or any judicial authorization, on a swatting-type predicate that Plaintiff alleges traces to a 4:10 a.m. distress call placed by agents acting for or on behalf of Defendant Tennenbaum in coordination with a spoofed incoming-call implant of "Manhattan DA Office" appearing on Plaintiff's new iPhone and new number obtained July 28, 2025.

8. Defendant Sharhan did not document a medical or psychiatric emergency of a kind sufficient to justify warrantless entry into a residence, and did not apply a procedure appropriate to Plaintiff's disability-related communication profile.

9. The Sharhan incident report and contact record concerning Plaintiff remain on file with NYPD and remain operative against Plaintiff.

10. RELIEF (Count I). Plaintiff seeks (a) declaratory relief that the August 4, 2025

seizure violated the Fourth Amendment to the United States Constitution and the bodily-liberty protection of the Fourteenth Amendment, made applicable to the States through the Fourteenth Amendment; and (b) prospective injunctive relief forbidding repetition on similar facts.

11.

12. COUNT II — Against Defendants Jacobi Medical Center, RN Stella Ofoma, and PA Galina Makina — Fourteenth Amendment Due Process and First Amendment Petitioning, 42 U.S.C. § 1983

13. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

14. After Plaintiff had effectively been cleared following the suicide-claim predicate, Defendants Jacobi Medical Center, RN Stella Ofoma, and PA Galina Makina continued Plaintiff's detention at Jacobi NCBH; administered medication to Plaintiff under conditions that Plaintiff alleges were without Plaintiff's knowing and voluntary consent; and created or maintained false or fabricated EMR entries surrounding that encounter, including blood-pressure documentation and Provider attribution in patterns later shown to be inconsistent across productions.

15. The continued detention, medication administration, and record creation or maintenance occurred in a manner tethered to Plaintiff's prior protected petitioning activity before HCR and before the New York State Attorney General, and amount to retaliation against protected petitioning activity.

16. Plaintiff expressly disclaims any claim against Defendants Ofoma and Makina in their individual capacity under ADA Title II or under Section 504; any disability-framework recovery against these Defendants in their individual capacities is pleaded solely under 42 U.S.C. §§ 1983 and 1985 and under the New York State Human Rights Law.

17. RELIEF (Count II). Plaintiff seeks (a) declaratory relief that the continued

detention, medication administration, and record creation or maintenance violated the Fourteenth Amendment Due Process Clause and the First Amendment right to petition; and (b) prospective injunctive relief: (i) directing correctional removal of any fabricated or materially false EMR content for the August 4, 2025 encounter insofar as maintained by these Defendants; (ii) directing correction of Provider attribution to reflect actual face-to-face encounters on August 4, 2025; (iii) directing cessation of any further retaliatory clinical or record action tied to Plaintiff's protected petitioning activity.

18.

19. COUNT III — Against Defendant Jacobi Medical Center — ADA Title II; Section 504 of the Rehabilitation Act (Institutional)

20. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

21. Jacobi Medical Center is a public entity within the meaning of ADA Title II, 42 U.S.C. § 12131(1), and is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

22. Plaintiff alleges that Jacobi Medical Center failed to accommodate Plaintiff's autism and Selective Mutism, failed to provide effective communication, and converted disability-related communication differences into a false-capacity narrative within the EMR maintained for the August 4, 2025 encounter.

23. Plaintiff expressly disclaims ADA Title II or Section 504 liability against any Defendant in their individual capacity; this Count is pleaded against Jacobi Medical Center only, in its institutional capacity.

24. RELIEF (Count III). Plaintiff seeks (a) declaratory relief that Jacobi Medical Center's conduct violated ADA Title II and Section 504; and (b) prospective injunctive relief: (i) directing effective-communication accommodations on future Plaintiff encounters; (ii) directing correction and audit of the August 4, 2025 EMR

narrative; (iii) directing preservation and production of authorship, access, and amendment history for that encounter.

25.

26. COUNT IV — Against Defendant NYU Langone Health — ADA Title III; Section 504 of the Rehabilitation Act (Institutional; Private Actor Receiving Federal Financial Assistance)

27. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

28. NYU Langone Health is a private place of public accommodation within the meaning of ADA Title III, 42 U.S.C. § 12181(7), and on information and belief receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, in a manner sufficient to invoke Section 504 against this Defendant in its institutional capacity.

29. Plaintiff alleges that NYU Langone Health created, adopted, expanded, and maintained false or fabricated disability-related EMR content concerning Plaintiff's August 8, 2025 emergency-department encounter, including but not limited to: fabricated or altered pages; false Provider attributions; false signature representations; altered discharge information; insertion of an inpatient narrative inconsistent with the original CPT 99283 outpatient billing; and a post-August 8, 2025 update of Plaintiff's Brooklyn address and contact into the historical August 8, 2025 encounter note.

30. Plaintiff alleges that NYU Langone Health continued to maintain this false or fabricated EMR content after Plaintiff gave notice and requested correction, amendment, and audit on or about October 6, 2025, November 5, 2025, January 6, 2026, and through subsequent ACLU and Compliance-Officer communications.

31. Plaintiff expressly disclaims ADA Title II liability against NYU Langone Health, except in the alternative and only to the extent the Court determines NYU Langone

Health is subject to Title II; the primary private-actor framework against this Defendant is ADA Title III and Section 504.

32. Plaintiff expressly disclaims ADA Title III and Section 504 liability against NYU Langone Health in any individual-capacity posture.

33. RELIEF (Count IV). Plaintiff seeks (a) declaratory relief that NYU Langone Health's conduct violated ADA Title III and Section 504; and (b) prospective injunctive relief: (i) directing correction, amendment, and deletion of fabricated or materially false content from the August 8, 2025 EMR record; (ii) directing an authorship/access/history audit with a preservation order; (iii) directing cessation of further post-billing alterations to that historical encounter note; (iv) directing issuance of a corrected After Visit Summary consistent with the actual encounter as documented on August 8, 2025.

34.

35. COUNT V — Against Defendants Ashley Acosta and Dr. Evan Kobles (Individual Capacities) — Fabrication and Modification of Medical Record, 42 U.S.C. §§ 1983, 1985 (No Title II; No Section 504 in Individual Capacity; No Medical Malpractice; No Battery)

36. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

37. Plaintiff alleges that Defendants Acosta and Kobles created, contributed to, modified, or maintained false or fabricated disability-related EMR content concerning Plaintiff's August 8, 2025 emergency-department encounter at NYU Langone Health, including Provider attributions and clinical content for encounters Plaintiff alleges did not occur.

38. Plaintiff expressly disclaims any medical-malpractice claim, any medicalbattery claim, any personal-injury claim, and any damages-style claim against Defendants Acosta and Kobles, whether sounding in tort, contract, or warranty.

39. Plaintiff expressly disclaims ADA Title II and Section 504 liability against Defendants Acosta and Kobles in their individual capacities. The disabilityframework claim against Acosta and Kobles in their individual capacities is pleaded solely under 42 U.S.C. §§ 1983 and 1985 and the New York State Human Rights Law, on the theory that the fabrication and maintenance of false or fabricated EMR content, after notice, constitutes state-actor-actionable conduct under color of state law (Acosta in her Compliance-Officer capacity interfacing with petitioning channels) and constitutes a conspiratorial pattern under 42 U.S.C. § 1985 with the Jacobi-side medical-defendants, housing-defendants, and HCR-defendants.

40. Plaintiff expressly disclaims Title III liability against Acosta and Kobles in their individual capacities; Title III is pleaded in Count IV against NYU Langone Health only.

41. RELIEF (Count V). Plaintiff seeks (a) declaratory relief that the conduct alleged against Acosta and Kobles violated 42 U.S.C. §§ 1983 and 1985; and (b) prospective injunctive relief: (i) directing Acosta and Kobles to correct, amend, or strike the fabricated or false Provider-attribution and clinical content within the August 8, 2025 EMR record; (ii) directing preservation of authorship, access, and amendment history; (iii) directing cessation of further fabrication or modification of that record.

42.

43. COUNT VI — Against Defendant Peter Stecker (Individual Capacity) — Fourteenth Amendment Due Process; First Amendment Petitioning; HousingProcess Interference; ADA Equality in Service Delivery. Pleaded Exclusively Under 42 U.S.C. §§ 1983, 1985 and the New York State Human Rights Law. (Title II Disclaimed in Individual Capacity.)

44. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

45. Plaintiff alleges that on July 17, 2025, Defendant Stecker closed HCR docket

RA22 MN610001NC by a closure paper that was silent as to reasons and appeal routes, contained only boilerplate, was not preceded by notice or hearing, and was not delivered to Plaintiff until October 22, 2025, as an attachment.

46. Plaintiff alleges that Defendant Stecker refused to take meaningful action on Plaintiff's Petition for Administrative Review filings dated August 20, 2025, October 22, 2025, and April 3, 2026.

47. Plaintiff alleges that the closure and non-action had the effect of rerouting Plaintiff away from the original altered-lease record and away from the favorable HCR Order KO610012R structure, and of denying Plaintiff effective written and electronic communication consistent with Plaintiff's disability and the urgency of Plaintiff's SCRIE-related situation.

48. The Court should note that under controlling Second Circuit authority, ADA Title II does not support damages-against-individual claims against state officials sued in their individual capacities. Plaintiff therefore expressly disclaims any ADA Title II claim against Defendant Stecker in his individual capacity. The disabilityframework theory against Stecker is pleaded here exclusively under 42 U.S.C. §§ 1983 and 1985 and the New York State Human Rights Law. The Title II framework against a public-entity Defendant is pleaded in Count III against Jacobi Medical Center.

49. RELIEF (Count VI). Plaintiff seeks (a) declaratory relief that Defendant Stecker's conduct violated the Fourteenth Amendment Due Process Clause, the First Amendment right to petition, and the New York State Human Rights Law, the disability-framework portion of which is pleaded under §§ 1983 and 1985 and NYSHRL only; and (b) prospective injunctive relief: (i) directing corrective reopening or reissuance of process on HCR docket RA22 MN610001NC; (ii) directing docketing and substantive response to Plaintiff's PAR filings; (iii) directing effectivecommunication accommodation on all HCR process correspondence directed to

Plaintiff; (iv) directing reissuance of all process mail impacted by the May 2026 C017 non-delivery pattern, with substituted service confirmed on the record.

50.

51. COUNT VII — Against Defendant Jessica Moran (Individual Capacity) —

Fourteenth Amendment Due Process; First Amendment Petitioning; HousingProcess Interference; ADA Equality in Service Delivery. Pleaded Exclusively

Under 42 U.S.C. §§ 1983, 1985 and the New York State Human Rights Law. (Title II Disclaimed in Individual Capacity.)

52. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

53. Plaintiff alleges that Defendant Moran authored or transmitted the August 13, 2025 letter purporting to forward HCR findings that contained statements about Plaintiff that Plaintiff alleges are unsupported, including purported attribution to Plaintiff of threats and the words "physically assaulted."

54. Plaintiff alleges that Defendant Moran authored or transmitted the October 22, 2025 letter purporting to advance adverse supplemental findings regarding Defendant Tennenbaum.

55. Plaintiff alleges that Defendant Moran authored or transmitted the December 1, 2025 supplemental adverse findings in respect of HCR docket RA22 MN610001NC.

56. Plaintiff alleges that the August 13, 2025, October 22, 2025, and December 1, 2025 letters had the effect of advancing a false or unsupported narrative that burdened Plaintiff's protected petitioning activity before HCR, before the New York State Attorney General, and before the New York City Comptroller, and denied Plaintiff effective written and electronic communication consistent with Plaintiff's disability and the urgency of Plaintiff's SCRIE-related situation.

57. Plaintiff expressly disclaims any ADA Title II claim against Defendant Moran

in her individual capacity. The disability-framework theory against Moran is pleaded here exclusively under 42 U.S.C. §§ 1983 and 1985 and the New York State Human Rights Law.

58. RELIEF (Count VII). Plaintiff seeks (a) declaratory relief that Defendant Moran's conduct violated the Fourteenth Amendment Due Process Clause, the First Amendment right to petition, and the New York State Human Rights Law, the disability-framework portion of which is pleaded under §§ 1983 and 1985 and NYSHRL only; and (b) prospective injunctive relief: (i) directing corrective retraction of the August 13, 2025, October 22, 2025, and December 1, 2025 letters on the HCR docket record; (ii) directing cessation of further unsupported or retaliatory adverse findings; (iii) directing effective-communication accommodation on all HCR process correspondence directed to Plaintiff.

59.

60. COUNT VIII — Against Defendant David Tennenbaum — Fair Housing Act, 42 U.S.C. § 3604 et seq.; New York State Human Rights Law, N.Y. Exec. L. § 296 et seq.; New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.; 1983 Housing-Status Theory

61. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

62. Plaintiff opposes Defendant Tennenbaum's conduct of (i) the forged whiteout lease path changing the lawful rent of $1,418.34 to $1,652.79; (ii) the imposition of inflated rent, creation of false arrears, the use of false concessions and illegal riders, the refusal to issue a lawful renewal lease; (iii) interference with Plaintiff's communications and the planned or executed lockout events of September 28 and September 29, 2025; and (iv) the May 2026 C017 mail-block discovery affecting HCR and Garfunkel Wild mail to Plaintiff.

63. The above conduct, considered with the cross-institutional pattern pleaded

in Section VIII, establishes coordinate patterns of denial of federally protected tenancy and of interference with Plaintiff's protected petitioning activity, actionable under the Fair Housing Act, the New York State Human Rights Law, the New York City Human Rights Law, and 42 U.S.C. § 1983.

64. Plaintiff does not assert, and expressly disclaims, any title-wrong, possession, ejectment, or unlawful-detainer cause of action in this Count, and does not seek monetary damages of any kind.

65. RELIEF (Count VIII). Plaintiff seeks (a) declaratory relief that Defendant Tennenbaum's conduct violated the Fair Housing Act, the New York State Human Rights Law, the New York City Human Rights Law, and 42 U.S.C. § 1983 on the housing-status theory; and (b) prospective injunctive relief: (i) directing corrective issuance and delivery of a clean lawful renewal lease reflecting the lawful HSTPAprotected preferential-rent path of $1,418.34; (ii) directing restoration of the SCRIEfrozen tenant share of $1,293.33 / $1,350.00 as applicable; (iii) directing cessation of lockouts, mail, and wire interference, including corrective measures to address the May 2026 C017 mail-block pattern; (iv) directing corrective amendment of the HCR rent-history record to remove the altered-lease entries.

66.

67. COUNT IX — Cross-Institutional Coordinated Fabrication and Joint Action — 42 U.S.C. § 1985

68. Plaintiff incorporates paragraphs 1 through 104 as if fully set forth herein.

69. Plaintiff pleads the existence of a coordinated cross-institutional pattern of false or fabricated EMR and process-record content involving the August 4, 2025 Jacobi NCBH encounter, the August 8, 2025 NYU Langone Health encounter, the August 4, 2025 NYU Langone Health AVS, and the Jacobi and NYU Langone Health productions of March 23, 2026; March 30, 2026; March 31, 2026; April 27, 2026; April 28, 2026; April 29, 2026; May 13, 2026; May 14, 2026; and June 22, 2026.

70. The pattern alleged includes cloned or empty pages, altered Provider attributions, erroneous facility references, post-billing insertion of inpatient narrative inconsistent with CPT 99283, post-billing update of Plaintiff address, and post-billing update of Plaintiff contact into historical encounter notes.

71. The pattern alleged is pleaded to demonstrate the conspiracy or joint-action framework under 42 U.S.C. § 1985 in the alternative to direct claims against each institutional Defendant.

72. RELIEF (Count IX). Plaintiff seeks (a) declaratory relief that the crossinstitutional coordinated fabrication pattern violates 42 U.S.C. § 1985; and (b) prospective injunctive relief: (i) directing coordinated correction, audit, and preservation orders across the institutional Defendants named in this Count; (ii) directing cessation of further patch-style alterations of medical and process records touching Plaintiff.

73. PRAYER FOR RELIEF (All Counts)

74. WHEREFORE, Plaintiff respectfully requests declaratory and prospective injunctive relief sufficient to stop the violations described in Counts I through IX and to preserve Plaintiff's federally protected tenancy, Plaintiff's SCRIE benefit, Plaintiff's rent freeze, Plaintiff's HSTPA-protected preferential-rent protection, and Plaintiff's disability-related process rights before HCR and the related state and city channels. Plaintiff seeks such other and further relief as this Court deems just and proper. Plaintiff does not seek monetary damages of any kind.

CERTIFICATION

I, Lyudmila Syrochkina, certify that the foregoing allegations are true and correct to the best of my knowledge, information, and belief, and that this pleading is filed in good faith and not for any improper purpose.

Respectfully submitted,

/s/ Lyudmila Syrochkina

Plaintiff Pro Se

Justinvictor456@proton.me Phone: 929-501-2006

Dated: August 21, 2026 AUGUST20, 2026

LIST OF EXHIBITS

The four multipage exhibits used in the SAC are incorporated into the TAC without change.

NEW EXHIBITS: Exhibit A — One TAC-only supplemental exhibit containing six marked items: (1) November 5 Acosta letter; (2) July 24 protest; (3) Commissioner's Order; (4) verbatim May 2025 Tennenbaum call transcript; (5) July 17 HCR closure; and (6) July 17 SOS letter. Plaintiff's handwritten markings on the pages identify the date and source of each item.

Lyudmila Syrochkina Verified by pdfFiller 08/20/2026

**NEW YORK** STATE OF OPPORTUNITY. | **Homes and Community Renewal**

KATHY HOCHUL
Governor

RUTHANNE VISNAUSKAS
Commissioner/CEO

July 17, 2025

147 W 230 LLC
20 South Broadway, Ste. 300
Yonkers, New York 10701

LYUDMILA SYROCHKINA
P.O. Box 8288
New York, New York 10116

**DKT# MN-610001-NC**

Dear Parties:

Please be advised that the above-referenced compliance proceeding has resulted in the issuance of a Commissioner's Order following a stipulation of settlement imposing a civil penalty for non-compliance with the underlying order. Accordingly, this matter is hereby closed.

The civil penalty has been paid. However, the amended registrations required by the underlying order and agreed-to as part of the stipulation have not been filed to date. A prior submission by the landlord was noncompliant with the directives in Order KO-610012-R. Landlord is advised that an ongoing failure to file these amendments could form the basis for a future noncompliance proceeding upon application by the tenant that would, if appropriate, lead to increased penalties due under the NYS Rent Stabilization Law & Code.

Very truly yours,

Peter M. Stecker, Esq.
Compliance Unit

Gertz Plaza, 92-31 Union Hall St., Jamaica NY 11433 | 718-739-6400 | www.hcr.ny.gov

**STATE OF NEW YORK**
**DIVISION OF HOUSING AND COMMUNITY RENEWAL**
**HEARINGS UNIT**
**641 LEXINGTON AVENUE**
**NEW YORK, NEW YORK 10022**

---

**IN THE MATTER OF CHARGES BY THE COMPLIANCE UNIT, PETITIONER REGARDING THE PREMISES KNOWN AS: 147 W. 230th Street, Apt. IF, Bronx, NY 10463**

**ORDER NO.: KO-610012-R**

**DOCKET NOS.: MN-610001-NC KO-610012-R**

**(Lyudmila Syrochkina, Tenant)**

**-against-**

**147 W 230 LLC; DENALI MANAGEMENT INC.; and DAVID TENNENBAUM**

**RESPONDENTS**

---

## COMMISSIONER'S ORDER

On November 29, 2023, New York State Division of Housing and Community Renewal (DHCR) issued Order KO-610012-R, concerning 147 W. 230th St., Apt. 1F, Bronx, NY 10463. In a Notice of Hearing, dated October 21, 2024, Petitioner alleged Respondents had not complied with Order KO-610012-R. A hearing was scheduled for November 14, 2024, before Administrative Law Judge (ALJ) Jeffrey Kelly. The matter was thereafter adjourned to December 12, 2024.

Prior to the hearing, Petitioner, represented by Peter Stecker, Esq., and Respondent, represented by David Tennenbaum, agreed to settle the matter, and on December 11, 2024, entered into a written Stipulation, a copy of which is attached and made a part of this Order. The premises are subject to the provisions of the Rent

Stabilization Law, and the Rent Stabilization Code.

The parties agreed that Respondents have not complied, in a timely manner, with Order KO-610012-R, issued November 29, 2023. Respondents agreed that they: 1. Failed to amend all registrations of the Premises on file with DHCR from 2016-2023 within sixty (60) days of the issuance of the Order; and 2. Failed to base the future rent of the Premises on the lawful rent established by the Order. Respondents also agreed to pay a civil penalty, of $2,000.00 within thirty (30) days of the agreement. Respondents further agreed to file amended individual and building-wide registrations of the subject premises for the years 2016-2023, as required by the Order, not later than forty-five (45) days from the date of the agreement.

Respondents additionally agreed to, not later than forty-five (45) days from the date of this agreement, revise Tenant's account to reflect changes to the legal regulated rent necessitated by the rent calculations in the Order and to provide a copy of the revised ledger to Tenant. This revised ledger will detail any credits owed to Tenant by the revision. Respondents further agreed to file an amended registration for the subject premises for the year 2024 to reflect the updated rent amounts within forty-five (45) days from the date of the agreement. Accordingly, it is

**FOUND AND DETERMINED,** 147 W 230 LLC; DENALI MANAGEMENT INC.; and DAVID TENNENBAUM, have failed to comply, in a timely manner, with Order KO-610012-R, issued November 29, 2023, and therefore, a civil penalty, of $2,000.00, is assessed pursuant to Rent Stabilization Law Section 26-516(c)(1), and the attached stipulation.

**THEREFORE,** in accord with Rent Stabilization Law Section 26-516(c)(l),

Rent Stabilization Code Sections 2520.6(i), 2522.5, 2523.4, 2523.5, 2527.2, 2527.3, 2527.5 and 2527.6, Chapter 403 of the Laws of 1983, ALJ Kelly's recommendation, and the attached Stipulation, it is

**ORDERED,** 147 W 230 LLC; DENALI MANAGEMENT INC.; and DAVID TENNENBAUM, shall forthwith pay a civil penalty, of $2,000.00, payable in full within 30 days from the date of the agreement. The fine will be paid by check, made payable to the New York State Division of Housing and Community Renewal. The check is to be mailed to ORA Enforcement, P.O. Box 22535, New York, NY 10087-2535. Said penalty must be paid by bank check, cashier's check, certified check, which must recite the docket numbers appearing on page one of this Order. The payment coupon attached to the stipulation must be enclosed with the check or money order, to insure payment is properly credited. A copy of said check should also e-mailed to Peter.Stecker@hcr.ny.gov. The address for Respondents is DAVID TENNENBAUM, Chestnut Holdings of New York Inc., 5676 Riverdale Ave Suite 307, Bronx, NY 10471. If, after sixty (60) days from the date payment is due, the payment is not received, the Order may be docketed and enforced in a manner of a judgment of the Supreme Court pursuant to Rent Stabilization Law Section 26-516c. It is also

**ORDERED,** should 147 W 230 LLC; DENALI MANAGEMENT INC.; and DAVID TENNENBAUM fail to comply with this Order, one or more actions may be commenced in a court of competent jurisdiction, to recover the civil penalty imposed, and to otherwise enforce this Order. Failure to comply with this Order may also result in another hearing before DHCR and imposition of additional civil penalties, as

specified in the Rent Stabilization Law and Rent Stabilization Code.

**WHEREAS,** public policy favors settlement of disputes whenever possible, it is finally

**ORDERED,** the Stipulation is approved, and the parties are directed to comply with its terms and this order.

Date: 20__ JAN 27 2025
New York, New York

Woody Pascal
Deputy Commissioner

STATE OF NEW YORK
DIVISION OF HOUSING AND COMMUNITY RENEWAL
OFFICE OF RENT ADMINISTRATION
GERTZ PLAZA
92-31 UNION HALL STREET
JAMAICA, NEW YORK 11433

| | | | |
|---|---|---|---|
| IN THE MATTER OF CHARGES BY THE COMPLIANCE UNIT, PETITIONER REGARDING THE PREMISES KNOWN AS: **147 W. 230th Street, Apt. 1F, Bronx, NY 10463** | : | ORDER NO.: | KO-610012-R |
| (Lyudmila Syrochkina, Tenant) | : | DOCKET NOS.: | MN-610001-NC<br>KO-610012-R |
| -against- | : | | |
| **147 W 230 LLC; DENALI MANAGEMENT INC.; and DAVID TENNENBAUM** | : | | |
| RESPONDENTS | X | | |

**STIPULATION**

It is hereby agreed by and between the parties as follows:

1. Order Number KO-610012-R, issued by the New York State Division of Housing and Community Renewal (the "Agency") on November 29, 2023 (the "Order") was violated by the Respondents:
   - Failing to amend all registrations of the Premises on file with DHCR from 2016-2023 within sixty (60) days of the issuance of the Order.
   - Failing to base the future rent of the Premises on the lawful rent established by the Order; and

2. As a civil penalty for the Respondents' failure to comply with the Order, Respondents agree to pay to the Agency an amount of TWO THOUSAND and 00/100 DOLLARS ($2,000.00). .

   Respondents agree to pay said penalty within thirty (30) days of the date of this agreement. Respondents further agree to pay the penalty by certified check, bank check, or cashier's check made payable to "New York State Division of Housing and Community Renewal". The check is to be mailed to ORA Enforcement, P.O. Box 22535, New York, NY 10087-2535. Docket number MN-610001-NC must be written on the front of the check. Please use the attached payment coupon when sending your payment. A copy of said check should also be e-mailed to Peter.Stecker@hcr.ny.gov. If the above civil penalty is not paid, this agreement may be docketed and enforced in the manner of a judgment of the New York State Supreme Court pursuant to NYC Rent Stabilization Law § 26-516 (c).

3. Respondents further agree to file amended individual and building-wide registrations of the subject premises for the years 2016-2023 as required by the Order not later than forty-five (45) days from the date of this agreement. A copy of the amended registrations should be e-mailed to Peter.Stecker@hcr.ny.gov concurrent with submission to the DHCR Rent Registration Unit. Instructions on filing amended registrations can be found here: https://hcr.ny.gov/system/files/documents/2024/05/restrictions-on-filing-amended-registrations-05-2024.pdf.

4. Respondents further agree to not later than forty-five (45) days from the date of this agreement revise Tenant's account to reflect changes to the legal regulated rent necessitated by the rent calculations in the Order and to provide a copy of the revised ledger to Tenant. This revised ledger will detail any credits owed to Tenant by the revision. A copy of the ledger shall be sent to Peter.Stecker@hcr.ny.gov. Respondents further agree to file an amended registration for the subject premises for the year 2024 to reflect the updated rent amounts within forty-five (45) days from the date of this agreement.

5. Failure to comply with the terms of this agreement may result in the scheduling of a second hearing and the imposition of civil penalties as set forth in the New York Rent Stabilization Law and Code.

6. Once approved, this agreement will be incorporated into a Commissioner's Order directing the parties to immediately comply with its terms. Respondents acknowledge that the execution of this agreement waives their right to a hearing.

7. This Agreement may be signed by the parties in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement. Facsimile signatures shall constitute an original for the purposes of executing this agreement.

Dated: December 11, 2024

**AGENCY:**

NEW YORK STATE DIVISION
OF HOUSING AND COMMUNITY
RENEWAL

By: ______________________
Name: Peter M. Stecker, Esq.
Title: Enforcement/Compliance Unit Attorney

**RESPONDENTS:**

147 W 230 LLC/ DENALI
MANAGEMENT INC./
DAVID TENNENBAUM

By: ______________________
Name: David Tennenbaum
Title: Registered Managing Agent

Respondent Name: 147 W 230 LLC; DENALI MANAGEMENT INC.

Respondent Phone #: (718) 543-8200 x 302

Subject Property: 147 W. 230th Street, Apt 1F, Bronx, New York 10463

**NC or HL DOCKET #:** MN-610001-NC

**Total Due:** $2,000.00

**AMOUNT PAID:** $________________

Please make your check or money order payable to NYS Division of Housing and Community Renewal.

ORA Enforcement
P.O. Box 22535
New York, NY 10087-2535

HCR Officer: Peter M. Stecker, Esq.

To ensure proper credit please include the NC, HL, or HI Docket Number on the check or money order.

State of New York
Division of Housing and Community Renewal
Office of Rent Administration
Gertz Plaza, 92-31 Union Hall Street
Jamaica, NY 11433

Right to Court Appeal

In order to appeal this Order to the New York Supreme Court, within sixty (60) days of the date this Order is issued, you must serve papers to commence a proceeding under Article 78 of the Civil Practice Law and Rules. No additional time can or will be given.

In preparing your papers, please cite the Administrative Review Docket Number which appears on the first page of the attached Order.

Court appeals from the Commissioner's orders should be served at Counsel's Office, 6th Floor, 641 Lexington Avenue, New York, New York 10022. In addition, the Attorney General must be served at 28 Liberty St., New York, New York 10005.

Since Article 78 Proceedings take place in the Supreme Court, you may require the professional help of an attorney.

There is no other method of appeal.

---------- Forwarded message ----------

From: L <organist.conductor@gmail.com>

Date: Thursday, July 24, 2025

Subject: My urgent action of protest Dry Hunger Strike

To: info@housingjusticeforall.org, Met Council on Housing <info@metcouncilonhousing.org>, info@socialists.nyc, District14@council.nyc.gov

Dry Hunger Strike Commencing in few Weeks Due to Systemic Harassment & HCR Failure

Place: 641 Lexington Ave, HCR, New York, NY

Time: Approximately in few weeks, exact time will be updated.

...

Criminal Alterations & Fraudulent Rent Increases: He has falsified leases (white-out), illegally imposed a vacancy rent, and revoked my HSTPA 2019 protections. As a senior on SCRIE, Medicaid, and SNAP, I cannot afford these illegal charges.

Systemic Misinformation & Obstruction from HCR: HCR's Office of Rent Administration (ORA) closed my Non-Compliance case (MN610001NC) on July 17, 2025, without notification and with a vague determination, despite a Commissioner's Order ... explicitly finding Tennenbaum in non-compliance and mandating document amendments. HCR's own Director Peter Stecker was aware of this non-compliance from my emails.

...

Due to the systematic denial of my civil rights and the failure of the system to provide recourse, I am compelled to undertake a dry hunger strike in protest approximately a few

weeks from now, near 641 Lexington Ave, NYC. This is a desperate measure born of absolute necessity … I will inform you of the exact date.

Sincerely,

Lyudmila Syrochkina

929-501-2006

147 west 230 St Apt 1F

Bronx NY 10463

NYU Langone Health

November 5, 2025

Lyudmila Syrochkina
147 W. 230th St. Apt 1F
Bronx, NY 10463

Dear Ms. Syrochkina,

We received your letter requesting amendments to your medical record on October 6, 2025. We have reviewed the letter and addressed the specific amendments outlined in accordance with NYU Langone Health's Right to Request an Amendment Policy (a copy of which is enclosed). These concerns were shared with the involved clinicians who agreed to make several corrections to your medical record. The following documentation has been updated in Epic:

Dr. Berger reviewed and amended the following entries:

- Language in Dr. Berger's clinical notes describing you as "delusive about your living situation" was removed and updated to reflect that your distress stemmed from landlord-related threats.
- Your medication history was corrected to include the medications you reported taking and to note that you declined Exforge and Crestor.
- Additional updates were made to Dr. Berger's August 19, 2025 note to include the verbal "heart blockade" assessment, replace the phrase "harassed at work" with clarification that your stress was related to your landlord, and revise the statement indicating you were "sent to the ED for suicide" to instead state that you were referred for concern.
- Your social and functional history was updated to accurately reflect your Master's degree and daily exercise routine.

Your Emergency Department psychiatry encounter was clarified to indicate that you were referred to the emergency room by Dr. Berger over safety concerns.
Dr. Jonathan Kobles reviewed and amended the documentation from your Emergency Department visit to remove the reference to "delusive about her living situation". Registered Nurse Newbold reviewed and amended the nursing documentation to reflect the following:

- A note referencing "debility" was removed;
- Another note was revised to clarify that you were discharged the same day with no home-care or transport needs.
- Related documentation under Emergency Department Case Management was also corrected to remove references suggesting that home-care services were requested or arranged.

However, your additional request to remove or modify documentation from Dr. Johnson Wilson cannot be honored, as this evaluation was not completed at NYU Langone Health and Dr. Wilson is not an NYULH provider. We recommend that you contact Dr. Wilson or his affiliated organization directly regarding that

**Internal Audit, Compliance, and Enterprise Risk Management**
One Park Avenue, 3rd Floor, New York, NY 10016 T 212.404.4079 F 212.404.4041

NYU Langone Health

portion of your request. Additionally, your request to amend the psychological evaluation dated August 8, 2025, has been denied. The documentation was reviewed and determined to be accurate and complete at the time of the encounter. We have addressed all items referenced in your letter to the best of our ability, should you have concerns that any of your requests have not been addressed, please contact me and provide additional details, including the date of any notes to be amended and what specific amendment you would like made, to allow me to review further. Please note items previously reviewed will not be reconsidered.

You have the right to submit a statement explaining your disagreement with our decision to deny the requested amendment. This statement must be in writing and should be no longer than 500 words. We will include your statement any time we disclose to others the protected health information that you think should have been amended. However, we reserve the right to prepare a response to your statement of disagreement (called a rebuttal statement), which we may also include when we make future disclosures of the information that you think should have been amended. If you wish to exercise this right, please send your statement of disagreement to NYU Langone Hospital – Tisch, Health Information Management, 550 First Avenue, Lobby, New York, NY 10016. If you do not submit a statement of disagreement, you may request that we include your amendment request, and this denial notice, in any future disclosures of the information which you think should have been amended. Please find included our Right to Request an Amendment Policy, which also details this information.

We hope that you will understand the reason that we have partially denied the amendment you requested. However, if you believe that we have improperly denied your request, you may file a complaint with the New York State Department of Health, the Secretary of the Department of Health and Human Services (information on how to file a complaint is available at http://www.hhs.gov/ocr/privacy/hipaa/complaints/) or with NYU Langone Health's Privacy Officer at One Park Ave, 3rd Floor, New York, NY 10016. No one will retaliate against you for filing a complaint.

Should you have concerns or questions regarding the information in this letter, please feel free to contact me directly at (212) 404-3609 or ashley.acosta2@nyulangone.org.

Sincerely,

Ashley Acosta

Ashley Acosta
Senior Analyst, Compliance and Privacy

NYU Langone Health

*Issuing Department:* Internal Audit, Compliance, and Enterprise Risk Management

*Effective/Reissue Date:* 10/5/2016
*Current Version*: 4/1/2024

# Right to Request an Amendment

## Policy

NYU Langone Health is committed to maintaining accurate, clear, and complete medical and billing records and to upholding a patient's rights with respect to their health information. To this end, patients are permitted to request, in writing, that NYU Langone Health amend Protected Health Information ("PHI") contained in NYU Langone Health's Designated Record Set or in a Designated Record Set held by a NYU Langone Health Business Associate.

This right applies only to factual statements contained in the record and not to the provider's observations, inferences, or conclusions.

The request to amend PHI may be denied if it is determined that the information recorded:

- is accurate and complete,
- was created by another provider (i.e., an external record or not originator of record),
- is no longer maintained by NYU Langone Health (e.g., the record has been destroyed in accordance with the *Records Retention* policy), and/or
- is not available for access by the patient (see chart reference in *Right to Inspect and Obtain PHI* policy).

The patient may require NYU Langone Health to append a brief statement of disagreement prepared by the patient to the record at issue. The statement of disagreement should not exceed 500 words. The patient's statement of disagreement must be released whenever the information at issue is released. Alternatively, the patient may request NYU Langone Health to release the patient's request form and the denial letter whenever the information at issue is released. If the information at issue is Disclosed through an electronic transaction that does not permit inclusion of the statement of disagreement, the form, and/or denial letter, Health Information Management ("HIM") personnel or other appropriate Workforce Member must separately transmit the material with the Disclosure or request.

## Procedure

When an adult patient, a minor who is allowed to consent to his or her own Treatment, or the parent or guardian of a minor patient believes that the health information NYU Langone Health maintains in a Designated Record Set is inaccurate or incomplete, the patient may request an amendment to that information.

1. The patient must submit the request in writing, by completing a *Request to Amend Protected Health Information* form and submit it as follows:
   - to amend Tisch Hospital, Rusk Rehabilitation, NYU Langone Orthopedic Hospital, and other NYU Langone Hospitals site records not listed, submit to: Patient Relations Office 550 1St Ave, NY, NY 10016 (212-263-6906) or the NYU Langone Health Privacy Officer (One Park Ave, 3rd Floor, NY, NY 10016 (212-404-4079).
   - to amend NYU Langone Hospital-Brooklyn records, submit to: Patient Relations Office 150 55th Street, Brooklyn, NY 11220 (718-630-7314).
   - to amend NYU Winthrop Hospital records, submit to: Patient Relations Office, 259 First Street, Mineola, NY 11501 (516-663-2058).
   - to amend Perlmutter Cancer Center records, submit to: HIM, Perlmutter Cancer Center, 160 E 34th St, 10th Floor, NY, NY 10003 (212-731-5096).
   - to amend Faculty Group Practice records, submit directly to the individual practice location/practice manager.
   - to amend Family Health Centers at NYU Langone Health or the NYU Langone Health Home Care, submit to the NYU Langone Health Privacy Officer, One Park Ave, 3rd Floor, NY, NY 10016 (212-404-4079).
   - to amend Southwest Brooklyn Dental Practice records, submit to: 219 54th Street, Brooklyn, NY 11220 (929-455-2099).
   - for any other location or if unsure where to submit, send to Patient Relations Office, 550 1st Ave, NY, NY 10016 (212-263-6906) or the NYU Langone Health Privacy Officer at One Park Ave, 3rd Floor, NY, NY 10016 (212-404-4079).

2. The receiving Workforce Member will acknowledge receipt of the form within seven (7) days. If a request for amendment is part of a formal, written patient complaint, Patient Relations will acknowledge receipt.

3. The appropriate Workforce Member, in consultation with the clinician of record and the Office of Internal Audit, Compliance, and Enterprise Risk Management ("IACERM") as necessary, will determine whether to grant or deny the patient's request to amend.

4. The appropriate Workforce Member must respond to the patient's request within 60 days of receipt of the form. One 30 day extension is permitted so long as the patient is notified in writing of the reason for the extension and the date the patient can expect a response.

5. NYU Langone Health will accept or deny the requested amendment. The determination will be made by the treating clinician or author of the subject of the amendment, in consultation with other Workforce Members, including IACERM as necessary.

   i. If the patient's request to amend is granted:
   - The clinician of record will amend or correct the record that is the subject of the request, dating and signing any amendment or correction in accordance with NYU Langone Health policy.

- The appropriate Workforce Member will notify the patient in writing of the decision and will make reasonable efforts to provide the amendment to persons identified by the patient and to persons, including Business Associates, whom NYU Langone Health knows has the information that is the subject of the patient's request.
- The amendment must be released whenever the information at issue is Disclosed. If the information is Disclosed through an electronic transaction that does not permit inclusion of the amended material, HIM personnel or the appropriate Workforce Member must separately transmit the amended material.

ii. If the patient's request to amend is denied, in whole or in part:

- The appropriate Workforce Member will notify the patient in writing of the decision using the *Request to Amend Protected Health Information-Denied* template letter, including:
  - the ground for denial,
  - a statement of the patient's right to submit a statement of disagreement not to exceed 500 words,
  - a statement that the patient may alternatively request that NYU Langone include the patient's form and the denial letter when disclosing information to others in the future, and
  - a description of how the patient may complain to the NYU Langone Privacy Officer, the U.S. Secretary of the Department of Health and Human Services, and the New York State Department of Health (or other appropriate oversight agency).

6. NYU Langone Health may prepare a written rebuttal to the patient's written statement to be included in the patient's record and released whenever the information at issue is released. NYU Langone Health must provide a copy of the rebuttal statement to the patient.

7. If NYU Langone Health is informed, by another provider, of an amendment to a patient's record, Workforce Members, in consultation with IACERM, will make the requested amendment and will date and sign any amendment that is made in accordance with NYU Langone Health policy.

8. HIM, practice managers, and/or the clinician of record are responsible for ensuring that the patient's form, denial letter, if any, rebuttal statement, if any, and NYU Langone Health's rebuttal statement, if any, are appended to the record and information at issue, whether in paper or electronic form (e.g., scanned into Epic) and included in any subsequent Disclosure of the information at issue.

**<u>Related Documents</u>**

Designated Record Sets
HIPAA Privacy Policies, Procedures, and Documentation
HIPAA Privacy Policies and Procedures Definitions
Request to Amend Protected Health Information-Denied template
Request to Amend Protected Health Information form

Right to Inspect and Obtain PHI

**Legal Reference**
45 C.F.R. §164.526

---

This version supersedes all NYU Langone Health (as defined in this Policy) previous policies, including but not limited to NYU Hospitals Center, New York University School of Medicine, Lutheran Medical Center, and Winthrop University Hospital.

# Fw: SOS

From orgconda@protonmail.com <orgconda@protonmail.com>

To justinvictor456@proton.me

Date Monday, July 20th, 2026 at 9:30 AM

------- Forwarded Message -------
From: Ori G <orgconda@protonmail.com>
Date: On Thursday, 17 July 2025 at 16:12
Subject: SOS
To: peter.stecker@hcr.ny.gov <peter.stecker@hcr.ny.gov>, peter.stecker@nyshcr.org <peter.stecker@nyshcr.org>, TPUinfo@hcr.ny.gov <TPUinfo@hcr.ny.gov>

Dear Director HCR Mr. Stecker, TPU Unit,
This is an **SOS. My life is in immediate and grave danger due to an unprecedented and extremely sophisticated electronic assault, which is a direct and criminal escalation of the harassment for which HCR has already imposed civil penalties against my landlord, David Tennenbaum.**
As a 70-year-old senior tenant with 27 years of residency, I am writing to you because the harassment has now reached a level of electronic warfare that is actively attempting to murder me by denying me access to emergency medical care and all communication. The previous HCR Order 11/29/2023, which is still open and unresolved regarding Mr. Tennenbaum's fraud (including tax fraud with SCRIE), has not deterred him; instead, he has escalated his criminal actions.

1. **COMPLETE COMMUNICATION BLACKOUT & EXTREME DEVICE COMPROMISE:**
   - **All my physical mail is blocked.** (Proven by USPS OIG).
   - **My electronic devices (phones) are not merely jammed; they are infected with persistent, sophisticated malware (likely a rootkit or firmware-level exploit) that survives DFU (Device Firmware Update) restores.**
     - **Proof of Persistent Malware/Data Injection:** Yesterday, after a DFU restore, my iPhone XR, while in a double Faraday bag overnight, still displayed thousands of deleted notes, messages, and call logs upon being taken out. Messages and screenshots from Dunkin' Donuts (where I experienced jamming) also reappeared. Today, these messages briefly reappeared on the XR before vanishing again, confirming temporary, forced data injection.
     - **Faraday Bags are Ineffective:** The fact that data reappeared while phones were in double Faraday bags demonstrates that this malware operates internally or that the attack penetrates even this advanced shielding.
   - **Sophisticated Mobile Cellular Interception and Jamming:** This device is **NOT** confined to my apartment.

    - **Proof of Mobile, Targeted Jamming:** My phones (even after DFU restore and in Faraday bags) were completely blocked and unusable when I was *outside* my apartment in a public place (Dunkin' Donuts). They only regained service when I reached the subway. This proves I am being actively followed and targeted with mobile jamming technology that penetrates even shielding.
    - **In-Apartment Interception:** When attempting to text my own phone from within my apartment, I observed "three dots are online" (indicating active monitoring), followed by manipulation of the number. When I addressed the hacker, they immediately "disappeared." My phones also presented my own number with "undetectable profiles" and messages were sent "from my number to my number," indicating identity spoofing and active cellular interception.
  - **iCloud & Google Account Compromise:** My Apple iCloud account has been deeply compromised, confirmed by Crystal Sanchez (tech expert) regarding email hack. This includes persistent injection of fake, undeletable contacts, phantom device entries, and remote removal of my iPhone XR from my iCloud account by the perpetrator. Furthermore, my Google account (linked to my iCloud email) has also been targeted, with prevented sign-in attempts using my known password.
  - **Printer Hacking:** My HP and Brother printers were hacked, with false messages about serial numbers belonging to other accounts, followed by fraudulent demands for payment.

2. **IMPOSSIBILITY OF SECURE COMMUNICATION / NEW DEVICES:**
   - Due to the persistent, DFU-surviving malware and the ineffectiveness of Faraday bags, **any new device I acquire will also be immediately compromised or rendered useless.**
   - **I cannot afford to buy another new phones for what amounts to 10 minutes of use before they are destroyed by this sophisticated attack.** This leaves me with no viable means to establish secure communication.
3. **DIRECT THREAT TO LIFE – MEDICAL EMERGENCY & ATTEMPTED MURDER:**
   - I am currently experiencing **critically high blood pressure, killing pain in my left arm, severe headache, and vertigo.** These are symptoms of a potential stroke or heart attack requiring immediate intervention.
   - **Mr. Tennenbaum's electronic assault is directly preventing me from accessing life-saving medical attention.** This constitutes **attempted murder by deprivation of essential services.**
   - **Proof:** I called 911 from the street near Dunkin' Donuts when my devices could not connect. Police responded and recorded my complaint about the impossibility of using my phone, email, and router, despite their initial skepticism.

**My only working phone number for calls, which functions ONLY when I am *outside* my apartment and away from the mobile jammer, is 929-501-2006.**

I have been left with no functional recourse. Despite my desperate pleas to 911, 311, local police, and existing legal channels, effective intervention has not occurred. As a desperate plea for immediate and decisive intervention to save my life, **I will initiate a dry hunger strike of protest and will inform you about place and date .**

**I demand immediate and effective intervention from HCR to:**

- **ACKNOWLEDGE AND ADDRESS THIS EXTREME ESCALATION OF HARASSMENT.**
- **COLLABORATE WITH LAW ENFORCEMENT (Manhattan DA, Bronx DA, NYPD) to initiate a criminal investigation into the mobile electronic surveillance, malware injection, and attempted murder targeting me.**
- **CEASE ALL CRIMINAL ACTIVITIES BY DAVID TENNENBAUM.**
- **RESTORE MY FUNDAMENTAL RIGHTS to communication, safety, and access to medical care.**

The responsibility for any further deterioration of my health, or worse, due to these criminal actions and the systemic failure to protect me, rests squarely with the authorities who have been informed and have failed to act.

Sincerely,

Lyudmila Syrochkina

Sent with Proton Mail secure email.

**VERBATIM LITIGATION TRANSCRIPT (REDACTED FOR FILLER)**

**Date of Recording:** May 2025
**Parties:** Plaintiff Lyudmila Syrochkina (Tenant) & Defendant David Tennenbaum (Landlord)

**Plaintiff:** Is it a two-year lease for $1,404 or $1,418? Okay, I am not going there because it was confirmed by several attorneys, by HCR, and by an HCR order that the collectible and allowed rent is what is indicated by the Department of Finance every time they send it. It is also on the weekly report. Nobody in the building has any concessions or anything below, except for those who were here in 2019 and received the new legal regulated rent, which is an HSTPA protection effective June 14, 2019. Nobody has a concession or a sneaked-in old STP. Don't try to tell me anything else because I already paid enough money to attorneys to find out what is going on.

**Defendant Tennenbaum: No, I understand. I want to try to understand. I want to try to understand what you think we are doing wrong. That's why I'm calling.**

**Plaintiff:** I need it amended. At least it will be as ordered. As you are saying, the calculations should not be from $1,652 in September 2023, but from $1,418, which was my rent on September 26, 2023. And then you don't need it. Previous bills were drastically different, and it was absolutely clearly an allowed base rent. You can put it as the base rent whenever you die. For God's sake, you keep your previous rent. This is for the time when I vacate. Okay, let's say you wish for me to die very soon, then you can do it sooner. But don't do it now. Anything that is disturbing me to the degree that I need doctors.

**Defendant Tennenbaum: Okay, so okay, hold on, hold on. So I have the agreement. The problem is that after we settled the DHCR case, you did not receive the updated, corrected leases.**

**Plaintiff:** Look, you perfectly know who is here. Put the duplicate mailbox in the lobby. When I called Denali, the lady said to me, "Oh no, what is your address? Oh no, it is Chestnut Holdings." And I explained her situation, and she said, "It is Fred. I will send Fred to you." Okay, she gave a last name like Milovic or Smilovic. I don't remember, something like Sherbian. And she said, "Right." So it was from Pierce and her, a holding man who just took out the writing of my apartment on the duplicate mailbox. But by the way, I was able to make a videotape when it continued to be distributed. So you know perfectly well that I do not receive USPS mail, but I am getting it different ways. So if you sent me anything previously, you probably sneaked it in incorrectly.

**Defendant Tennenbaum: How do I pronounce your last name? That's good. Okay, so, Ms. Syrochkina, I just want to do the right thing here. I want you to feel comfortable, I want you to be... I want to reassure you that no one is trying to get you out of the**

**apartment. Nobody wants to cause you any problems. If there's something on the account that needs to be corrected, I want to correct it. That's why I'm making the phone call today. That's why I reached out to you.**

**Plaintiff:** Which is very simple, Mr. Tennenbaum, which is very simple. Just do what was done before. 2020 and 2021 were correct documents. It was in the bills. No vacate rent. It was only the allowed, regulated rent, exactly as it is on the Department of Finance. There is no preferential rent anymore either. The HSTPA made the former preferential rent into the new legal regulated rent unless I vacate the apartment for the next tenant. Yes. And you can see in my documents that I did not even put anyone else from my family on it. They have a house, they are fine. They do not want to live here. So, with my death, you receive it back into your ownership and can sell it as a condo, as it is now on the market.

**Defendant Tennenbaum: I hope that does not happen for a very long time. So, you know, I'm gonna look up—I don't have all the records from before we owned the building. Let me look up.**

**Plaintiff:** Okay, I have all the records from October 1998, and you put in my profile that I am in Canada from 2018? No way. I keep only documents. I am a hoarder of documents. So I keep all the documents for my entire life: the bills, all the leases, everything.

**Defendant Tennenbaum: Okay, I understand. So hold on, let me just look here. Do you have the lease?**

**Plaintiff:** You need to pass 2019 because it is under the HSTPA. But I have everything before then. I have everything from 1998, every single lease and a lot of news.

**Defendant Tennenbaum: No, HSTPA should not have... It shouldn't make much of a difference here. If you have a preferential rent, then the preferential rent will continue.**

**Plaintiff:** It is not continuing. It is a new, frozen, allowed collectible rent unless I vacate, and thus it is very simple. You added a concession, and it is masking the revocation of the HSTPA. Look, you are a very smart person. You know it perfectly better than me.

**Defendant Tennenbaum: I think we're saying similar or almost the same thing. I just need to figure out why things changed in your account when we took over from the seller.**

**Plaintiff:** It doesn't matter why, because you should not look back, but correct it according to the law, and that's it. I don't understand why it happened. It doesn't matter why, it only matters that it will be corrected. Believe me, this whole situation for three and a half years put me in a severely depressed condition. I should be in the hospital now.

**Defendant Tennenbaum: Look, you don't need to—you don't need to explain to me. Whatever. Whatever, correct it. That's it. It's very simple.**

**Plaintiff:** And I need to receive my mail. I don't want to write to the Senator again. I need to receive my mail.

**Defendant Tennenbaum: Are you not receiving your mail?**

**Plaintiff:** You know better than me. I opened a PO Box. Yeah, I opened a PO Box especially only for that case for a year, as advised by HCR.

**Defendant Tennenbaum: No, I see. I see all the mail.**

**Plaintiff:** All the federal mail, I see on Informed Delivery. So I don't have my Informed Delivery with me now, but I am surprised that you know... Okay, there is no reason why you should try to get me out of the building. Yeah, there is a reason now, but it is such a case. Right. Well, once again, I am speaking with an extremely smart and educated lawyer, and you don't need to try to fool me. I am very direct and I mean what I am saying. I need everything to be as it was, and as every other tenant has it. Well, only probably 15 units are still stabilized, but no matter. I need what I am supposed to have, at least what those people whom I know in the building pointed out to me when they showed me that my bill and my lease are incorrect and that theirs are different.

**Defendant Tennenbaum: Okay, so I'm... I'm going to... try to work on that.**

**Plaintiff:** Please, I would already be extremely appreciative, and I am grateful that you are trying to have a conversation with me, which is not easy because I have extremely high blood pressure and I am in a very bad state. So I appreciate your call. I apologize for my stressful tone, but it is what it is after three and a half years and I am tired. I am tired. Who knows? Maybe my life will be changed and I will leave by myself. Nobody will stay after me. But right now, there is no such situation.

**Defendant Tennenbaum: I'm going to... I'm going to look this up and try to figure out exactly what's necessary here.**

**Plaintiff:** Well, Director Stecker perfectly knows what the situation is, and you can discuss it with him because, despite the theft of my entire mail from HCR, I was receiving it somehow. I will not say how, it doesn't matter. No matter, God is with me. You know God is with me, that's how it works.

**Defendant Tennenbaum: Yeah, I'm going to try to find... the last agency order, so I need to figure out what the amount needs to be on the lease.**

**Plaintiff:** So I need, at least, amended bills, an amended profile, and a corrected online system profile. And I was extremely, extremely upset—rather, furious—when in November I sent you a check, and you deposited it. I have proof from the bank, from Teachers FCU, that you deposited it on November 24th, and then you sent me a bill for the next month showing double rent, trying to make it look like I did not pay.